Frederick A. Batson, OSB 821887
batson@gleaveslaw.com
GLEAVES SWEARINGEN LLP
P. O. Box 1147
Eugene, OR  97440
Phone:  (541) 686-8833
Fax:  (541) 345-2034

Lead Counsel for Plaintiff Dynamic Measurement Group, Inc.

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## EUGENE DIVISION

| | |
|---|---|
| **DYNAMIC MEASUREMENT GROUP, INC.,** an Oregon corporation,<br><br>**PLAINTIFF**,<br><br>v.<br><br>**UNIVERSITY OF OREGON,** a special governmental body as defined by ORS 174.117(1)(i); **MIA TUAN,** individually and in her official capacity; **EDWARD J. KAME'ENUI,** individually and in his official capacity; **FRANCIS J. FIEN IV,** a/k/a Hank Fein, individually and in his official capacity; **BRAD SHELTON,** individually and in his official capacity; and **HOP SKIP TECHNOLOGIES INC.,** an Oregon corporation,<br><br>**DEFENDANTS**. | Case No.  6:_____<br><br><br>**COMPLAINT FOR TRADEMARK AND COPYRIGHT INFRINGEMENT** |

Plaintiff Dynamic Measurement Group, Inc. by this action seeks injunctive relief to prevent continuing trademark infringement and unfair competition by the University of Oregon, and by a private corporation acting in concert with the University of Oregon, in connection with DMG's registered marks DIBELS, DIBELS Next, and IDEL. It also seeks injunctive relief and statutory damages with respect to copyright infringement and misuse of copyright management information by those same parties in connection with an "app" containing the DIBELS Oral Reading Fluency assessment measures.

## PARTIES

1. Plaintiff Dynamic Measurement Group, Inc. ("DMG") is an Oregon corporation having its principal place of business at 859 Willamette Street, Suite 320, Eugene, OR 97401.

2. Defendant University of Oregon (hereinafter referred to as "the University" or "UO") is a special government body organized and existing under Chapter 768, Oregon Laws 2013. It has a principal place of business at 1585 E. 13th Avenue, Eugene, OR 97403. Although the University may at one time have been a state agency, by enactment of Chapter 768, Oregon Laws 2013, which took effect on July 1, 2014, and by virtue of the provisions of ORS 352.033 and 174.112(1)(c), the Oregon legislature deliberately recast the University as a public body that that would no longer be considered an arm of the State of Oregon and thus may be the object of actions such as the instant case.

3. Defendant Mia Tuan ("Dr. Tuan") is, according to plaintiff's information and belief, a citizen or resident of the State of Oregon. She is the Interim Dean of the University's College of Education.

4.      Defendant Edward J. Kame'enui ("Dr. Kame'enui") is, according to plaintiff's information and belief, a citizen or resident of the State of Oregon. He is Co-Director, with defendant Hank Fien, of the University's Center on Teaching and Learning.

5.      Defendant Francis J. Fien IV, also known as Hank Fein ("Dr. Fien"), is, according to plaintiff's information and belief, a citizen or resident of the State of Oregon. He is Co-Director, with Dr. Kame'enui, of the University's Center on Teaching and Learning.

6.      Defendant Brad Shelton is, according to plaintiff's information and belief, a citizen or resident of the State of Oregon. He is Interim Vice President for Research and Innovation at the University of Oregon.

7.      Defendant Hop Skip Technologies Inc. ("Hop Skip Technologies") is an Oregon corporation with its principal place of business at 2324 Olive Street, Eugene, OR 97405.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction over the Lanham Act claims in this action under 28 U.S.C. §1331, over the copyright and copyright management information claims in this action under 28 U.S.C. § 1338, and over the state law claims in this action under general principles of ancillary jurisdiction.

9.      Venue is proper in this Court as all parties are resident in the State of Oregon and the events giving rise to plaintiff's claims occurred in this District.

## FACTS COMMON TO ALL CLAIMS

### The Origins and Evolution of DIBELS®

10.      Since the early 1990s, the founders of plaintiff DMG, Dr. Ruth Kaminski and Dr. Roland Good, have been engaged in the business of researching, developing, administering, distributing and publishing materials known as Dynamic Indicators of Basic Early Literacy Skills

("DIBELS"), and in training teachers in the use of these materials. DIBELS is designed to enable teachers in grades K-6 to assess the literacy skills of their students, and thus to focus remedial help where it is needed.

11.　　In February of 2002, Drs. Good and Kaminski established DMG as a for-profit company to carry on the work of developing, publishing, and administering DIBELS and training teachers in the use of DIBELS. They assigned to DMG all their rights in those materials including the DIBELS mark.

12.　　DMG's DIBELS products have been used throughout the United States for many millions of students. They are perhaps the most widely used and best known literacy assessments in the United States for grades K-6. Roughly 25% of all students in the United States are assessed using DIBELS.

13.　　Dr. Kaminski first conceived of and developed the early versions of the DIBELS assessment measures as a graduate student in or about 1988-1992 in connection with her doctoral dissertation at the University of Oregon. Prior to defending her dissertation in 1992, Dr. Kaminski also came up with the name "Dynamic Indicators of Basic Early Literacy Skills" and its acronym DIBELS – although she did not use them in her dissertation.

14.　　Dr. Kaminski obtained her Ph.D. from the University in 1992, and thereafter until August of 2003 was employed by the University, as a part-time Research Associate from 1992-1993 and thereafter until mid-2003 as a Research Associate with the title of Assistant Professor in the College of Education.

15.　　Dr. Kaminski's doctoral advisor was Dr. Good, at that time an assistant professor at the University, and he supervised her research in the field of early childhood literacy assessment. As their confidence in the efficacy of Dr. Kaminski's early DIBELS literary

assessment measures and its various iterations grew, they moved beyond academic research and together began to make DIBELS materials available to elementary schools around the country, and to offer DIBELS training to schools for a fee on their own time. Their commercial use of the DIBELS mark in connection with these activities began at least as early as 1994, when they were paid by the Shasta County, California Board of Education located in Redding, California to conduct on-site training in the use of DIBELS. (See Exhibit A.) They were hired by Shasta County in their individual capacities, and they paid the expenses associated with that training out of their own pockets. Over the years since then, Drs. Good and Kaminski have personally conducted hundreds of paid DIBELS trainings.

16.     As DIBELS gained in stature and popularity, it became the focus of extensive academic research, both at UO and at several other universities, and the subject of numerous academic studies and papers. During the years 1996-2001, UO faculty and staff conducted considerable academic research on the effectiveness of the DIBELS measures.

17.     At the same time and throughout the 1990's, Drs. Good and Kaminski devoted considerable efforts to building widespread acceptance and use of DIBELS assessments, and by 2000, hundreds of schools had to one degree or another adopted the DIBELS measures as an integral part of their early childhood literacy programs.

18.     In addition to the DIBELS assessment measures, in the late 1990s Dr. Good began offering schools the support service of analyzing and reporting their DIBELS assessment results. He provided a data template to schools, which they could populate with their data and return to him for analysis. He would then use a detailed program he had developed to analyze the data and create a report that the schools could use to keep track of their students' individual and collective progress.

19.     However, as DIBELS grew in popularity, it became clear that there was both a need and opportunity for a more robust service that would allow schools to enter their own data online and generate automated reports and analysis, and the University took on that role. Beginning in April or May of the 2000 academic year, Dr. Good in collaboration with certain staff members of the University's Center on Teaching and Learning developed an online system for that purpose, housed on the University's servers. This system was, with Dr. Good's encouragement and consent, named the DIBELS Data System, with the understanding that its purpose was solely to provide a service to schools using the DIBELS product. The DIBELS Data System was at all times conceived and understood as an ancillary service to users of the Good and Kaminski DIBELS literacy assessment materials. At first, there was generally no charge to schools for using the system, although the University later instituted a charge of $1 per year per student.

20.     The year 2001 was a pivotal one in the evolution of DIBELS. In that year Drs. Good and Kaminski released a new version of DIBELS that they identified, somewhat arbitrarily, as the "5th edition." (Previous iterations of DIBELS had not been numbered.) They made it available to schools upon request, or as part of a package price that included their teacher training services. Also, Dr. Good provided the University's Center on Teaching and Learning with a copy of DIBELS 5th for posting on a UO website so that schools could download it without charge. In both contexts, the DIBELS 5th materials bore copyright notice in the form "© 2001 Good and Kaminski" and used the symbol "TM" next to the DIBELS mark to signify Drs. Good and Kaminski's ownership of the trademark, as shown on Exhibit B.

21.     DIBELS 5th was also the first iteration of DIBELS to contain commercially created content. Prior to its release, Drs. Good and Kaminski had been using texts created by an

unaffiliated nonprofit organization to test children's oral reading fluency. For DIBELS 5th edition, Drs. Good and Kaminski decided to create new oral reading texts of their own. They hired and supervised independent contractors to write 24 new texts, which they called the DIBELS Oral Reading Fluency or "DORF" passages, and paid these contractors from their personal funds pursuant to written agreements that vested copyright in Drs. Good and Kaminski.

22.     Also in 2001, Drs. Good and Kaminski came to the realization that without substantially more oral reading fluency measures, and without a commercial publisher to disseminate the product, DIBELS was not going to achieve its full potential as an accurate assessment of childhood literacy. They also decided to expand the coverage of DIBELS from grades K-3, which it had been until that time, to include grades 4-6.

23.     Given the significant expense they had incurred to create the first 24 DORF passages, the significant additional funding needed to create DORF passages for grades 4-6, and the fact that they had no experience with commercial publishers, Drs. Good and Kaminski originally approached the University for help. They hoped that some arrangement could be made whereby they would cede to UO their rights to DIBELS, UO would reimburse them for the DORF passages, UO would make a deal with a publisher for funding and distribution of an expanded DIBELS product, royalties would be reinvested in further DIBELS development, and Drs. Good and Kaminski would retain control over that development.

24.     The University, however, was unwilling or unable to enter into such an arrangement. Instead, the University itself suggested that Drs. Good and Kaminski should create a private "start-up" – i.e., a for-profit corporation – to fund further development of the DIBELS assessment materials privately and to pursue the wide distribution of DIBELS through commercial publishers.

25.     Discussions of these and other possible arrangements occurred sporadically over a two-month period in May and June of 2001, mostly between Drs. Good and Kaminski on one hand and UO's Office of Technology Transfer (OTT) on the other.  At no time did OTT or anyone else speaking for UO so much as suggest that UO had any claim to the DIBELS mark, or to the DORF passages that Drs. Good and Kaminski had paid for.  OTT did assert that it should own copyright in some non-DORF DIBELS content, on the grounds that development had been funded by a grant administered by the University.  However, it did not make this claim by way of stopping Drs. Good and Kaminski from commercializing DIBELS; on the contrary, its proposal was that it would assign its alleged copyrights to the start-up, presumably in exchange for some share of any revenue that might be generated, although what that revenue share might be was never made clear.  OTT said it would generate documentation to put its proposed plan into effect.

26.     Without necessarily agreeing with the University's proposal and the premises underlying it, Drs. Good and Kaminski decided to wait and see what sort of legal document UO might present.  But the University did not follow through with any draft paperwork, and by the start of the 2001-2002 academic year it was clear to Drs. Good and Kaminski that the discussions with UO were at a dead end.

27.     Drs. Good and Kaminski were concerned that without further development of DORF passages for grades 4-6, which the UO clearly did not wish to fund, DIBELS would die. Accordingly, Drs. Good and Kaminski decided to develop and commercialize DIBELS independently and with their own personal resources.  They decided to take the University's suggestion that they create a private start-up company, and to develop completely new and additional DIBELS assessment materials so as to avoid any future dispute with the University regarding the copyright to the non-DORF portions of the DIBELS content.

28.     In late 2001 Drs. Good and Kaminski began negotiations with a commercial educational publisher, Sopris West Educational Services, Inc. ("Sopris"), for publication of DIBELS.

29.     In January, 2002, Drs. Good and Kaminski incorporated their start-up, plaintiff DMG.  From that point forward, DMG was the exclusive vehicle for the development and commercialization of DIBELS products.

30.     On February 6, 2002, shortly after its incorporation, DMG entered into a publishing agreement with Sopris to publish DIBELS.  In that agreement DMG granted Sopris exclusive publication rights in DIBELS and also gave Sopris the right to use the DIBELS mark in connection with its sale of those materials.  Originally, the contract was for DIBELS 5th.  However, in the end the parties decided not to publish DIBELS 5th but instead to launch the new DIBELS product that DMG was working on.

31.     On February 13, 2002, a few days after signing the Sopris contract, DMG applied to the United States Patent and Trademark Office to register the DIBELS mark.  Registration of that mark issued in 2003.  UO did not file any objection to DMG's application to register the DIBELS mark, and DMG informed the UO when it received the registration.  From that point forward, DMG displayed the DIBELS mark on its products with the registration symbol attached, thus: DIBELS[®].

32.     Development of the new DIBELS product, funded entirely by DMG using personal funds invested by Drs. Good and Kaminski, began in 2001 and continued through 2002 into early 2003.  This new product was first advertised by Sopris in its Fall/Winter 2002 catalogue – see Exhibit C hereto – and the first sales occurred in early 2003.  Market response

was significant: in the first eight months of 2003 sales exceeded $1,100,000, an explosion of interest due in large part to Sopris's sales and marketing efforts.

33. DMG and Sopris styled this new product "DIBELS 6th edition" or "DIBELS 6th," but despite what that name might appear to imply, this DIBELS product was in fact almost entirely new. The only materials carried over from DIBELS 5th were 20 of the 24 DORF passages that Drs. Kaminski and Good and DMG had personally commissioned and paid for earlier. An additional 151 new DORF passages were added, commissioned from outside contractors, and the rest of the DIBELS measures were written from the ground up, by Drs. Good and Kaminski on their own time as employees of DMG and by an independent contractor hired and paid by DMG.

34. Far from objecting to these commercial activities of Drs. Good and Kaminski, UO sought to take advantage of them. At least as early as June 2003, UO provided on the UO Website a link to Sopris's website to enable teachers to purchase printed copies of the DIBELS materials. See Exhibit D. Immediately below this link, UO advertised the DIBELS Data System service, which for $1 per student would analyze schools' DIBELS test scores. Clearly, and with good reason, UO expected traffic to the DIBELS Data System to increase as commercial sales of DIBELS increased.

35. And far from asserting any claim to the DIBELS mark or DIBELS 6th content, UO acknowledged DMG's ownership of this intellectual property on the UO Website, most explicitly by means of a user agreement (the "Educational Use Agreement"). (The foregoing Exhibit D contains a reference, in the "Download for Free" box, to the Educational Use Agreement.)

36.     The Educational Use Agreement that UO posted for DIBELS 6th had its origins in a new set of commercial negotiations that DMG commenced in the spring of 2003.  These negotiations were aimed at a three-way publishing agreement for DIBELS 6th that would include not only Sopris but also a new party, Wireless Generation, Inc. ("Wireless Generation"), a commercial digital educational publisher.  Under the agreement that arose from these negotiations, Wireless Generation published DIBELS 6th edition on portable electronic devices that permitted teachers to administer and score the assessment, and Sopris undertook all other publication of DIBELS 6th, including in book form.

37.     In its negotiations with Sopris and Wireless Generation, DMG insisted, and Sopris and Wireless Generation agreed, that UO should continue to be allowed to distribute copies of the DIBELS 6th edition for free on the http://dibels.uoregon.edu website (the "UO Website") for the benefit of school districts that could not afford the commercial versions sold by Sopris or Wireless Generation or otherwise did not wish to purchase them.  However, it was important to DMG and its publishing partners that (i) free access not lead to unauthorized downstream uses; (ii) DMG maintain quality control over the DIBELS product to ensure the integrity of the DIBELS mark; and (iii) the public be on notice that the DIBELS mark and DIBELS materials were proprietary to Drs. Good and Kaminski and DMG.

38.     Accordingly, DMG undertook to secure the UO's cooperation on an Educational Use Agreement and to ensure that any teacher who downloaded a free copy of DIBELS 6th from the UO Website would have to accept the Educational Use Agreement.

39.     On May 23, 2003, Dr. Good sent a draft Educational Use Agreement to, among others, defendant Dr. Edward J. Kame'enui, who at that time was Director of UO's Institute for the Development of Educational Achievement (IDEA), later renamed the Center on Teaching

and Learning, and Dr. Deborah C. Simmons, at that time the Associate Director of IDEA. This draft Educational Use Agreement began with the critical sentence, "DIBELS™ is a proprietary name referring to the work of Roland Good, Ruth Kaminski, and select colleagues (Dynamic Measurement Group, Inc., DMG)." Dr. Good's email continued:

> I believe this Educational Use Agreement is consistent with all current understandings and agreements that we have made. Please let me know if you see any concerns, issues, or potential misunderstandings. The intent of the agreement is to include it in the Administration and Scoring Guide on page 5, and to make it a screen on the download section that all users encounter as they access the materials.

The University representatives expressed no objection.

40. A final version of this Educational Use Agreement, incorporating some edits proposed by Sopris and Wireless Generation, was attached to the DIBELS Administration and Scoring Guide, which was downloadable from the UO Website, at least as early as July 2, 2003. See Exhibit E.

41. The University accepted this final version of the Educational Use Agreement and posted it on the UO Website on the download page for DIBELS 6th edition at least as early as March 2, 2004. As agreed with DMG, the University constructed the download page – where teachers could download the proprietary DIBELS 6th materials for free – in such a way that any user would have to accept the Educational Use Agreement as a condition of the download.

42. The text of the Education Use Agreement as accepted and posted by the University on the UO Website in early 2004 was as follows:

**Educational Use Agreement**

DIBELS™ is a proprietary name referring to the work of Roland Good, Ruth Kaminski, and select colleagues (Dynamic Measurement Group, Inc., DMG). The intent of DMG is to make the DIBELS assessment tools available to the educational entities listed below. Such use, however, is not intended to and does not place the materials in the public domain. Photocopy masters of the materials are available at (dibels.uoregon.edu). Schools, school districts and multi-district agencies may make

unlimited photocopies of these materials for internal educational use. In addition, Sopris West publishes a print version of the measures (www.sopriswest.com), and Wireless Generation provides a Palm application (www.wgen.net). These materials may not be resold on a for-profit basis without the express written consent of DMG and Sopris West. As a part of our program to provide the free photocopy masters and permission to photocopy described above, we do require all users to register on the website so that we may document usage as we pursue additional research and development funding, and so that we may notify users when new and improved materials are available. We also require that users copy the DIBELS materials without modification except as agreed to in advance and in writing by DMG. Modifications that would be agreed to include changing color or font of materials. Modifications that would not be permitted include removing logos or acknowledgements for contributions to the DIBELS materials. Any uses of our DIBELS materials that are inconsistent with the provisions of this Educational Use Agreement are strictly prohibited.

43.     Thus, as early as March, 2004, the University publicly acknowledged and publicly promulgated the fact that the DIBELS mark belonged to DMG and that the DIBELS materials were proprietary to DMG. The Educational Use Agreement also makes clear that the University was fully aware of, and had no objection to, the commercial publication of DIBELS 6th edition by DMG's licensees, Sopris and Wireless Generation.

44.     When DMG obtained its federal registration of the DIBELS mark, the University at DMG's request duly amended the Educational Use Agreement to replace "DIBELS™" with "DIBELS®." When technology changed, the reference to "Palm" was replaced with "handheld computer software and related products." With those exceptions, the Educational Use Agreement for DIBELS remained in place and essentially unaltered for almost ten years on the UO Website.

45.     After the Educational Use Agreement was agreed to by the University, Dr. Kaminski began devoting herself full time to DMG, although she maintained a courtesy appointment as Assistant Professor in the College of Education.

46.     In early 2004, senior UO officials undertook an internal investigation of DMG's use, ownership and registration of the DIBELS copyrights and trademark. The reason for this investigation was, apparently, that the public announcement of DMG's contract with commercial

publishers Sopris and Wireless Generation had caused one or more UO staff to question whether

UO policy was being complied with. (As noted earlier, DMG's negotiations with these

publishers had been well known to several key University officials.)

47.     According to DMG's information and belief, a summary of this investigation was

provided to the Vice President, Research & Graduate Studies, and in February 2005 a meeting

regarding the investigation took place between the University General Counsel's Office and

several senior administrative officials of the University, including but not limited to:

- the Vice President, Research & Graduate Studies,
- the Associate Vice Provost,
- the Director, Office for Responsible Conduct of Research, and
- a representative of the Office of Professional Research and Development.

In short, the question of who owned the DIBELS intellectual property received the full attention

of the University at a very high level, making the results as described below all the more

significant and the conduct that has given rise to this Complaint all the more incomprehensible.

48.     In 2005, evidently as a result of the aforesaid investigation, the University decided

(and DMG readily agreed) that it would be prudent to set down in writing their understanding as

to the ownership of, and usage rights in, DIBELS intellectual property.  The Office of

Technology Transfer (OTT) was tasked with drafting this agreement, and in October 2005

forwarded to DMG's counsel a first draft of what it called an Intellectual Property Agreement.

49.     This draft, prepared by the staff of the University most knowledgeable concerning

intellectual property, stated among other things that:

- DMG owned the DIBELS mark;

- DMG owned the copyright to the DIBELS 6th edition; and

- DMG would continue to make DIBELS 6th edition available for free via the UO Website to users accepting the Educational Use Agreement described above.

50. This Intellectual Property Agreement went through several subsequent drafts, but the basic terms just described were at all times agreed in principle, and by the end of 2005 both DMG and the OTT believed they had a contract ready to be signed. DMG is informed and believes that the agreed-upon final draft Intellectual Property Agreement was vetted by the University General Counsel's office and the Oregon Department of Justice. Randolph Geller, then an attorney in the General Counsel's Office and later UO General Counsel, confirmed to DMG's representatives that the content of the agreed-upon final draft Intellectual Property Agreement was acceptable but advised DMG that certain standard disclosures from Dr. Good (regarding work outside the University) would need to be submitted in order for UO to be able to sign the agreement. Dr. Good accordingly submitted the standard written disclosures to the University. After some discussion regarding the scope of additional financial information required, Dr. Good provided such financial information to Lynette Shenkel at the UO Office for Responsible Conduct of Research as requested. The University indicated no dissatisfaction with the information provided.

51. A copy of the final draft of that contract, showing in "redlined" form a final round of changes that the University itself had requested, and that DMG had agreed to include, is attached hereto as Exhibit F. It was this redlined draft, or a clean version of it, that was circulated among University officials and to the Oregon Department of Justice for approval.

52.     The terms of the contract included the following:

- The parties agreed that DMG was the exclusive owner of the DIBELS trademark, the DIBELS 6th measures, and the DORF passages (§3.2).

- DMG granted to the University and to all users generally a non-exclusive license to use the DIBELS 6th measures and the DORF passages "pursuant to the terms and conditions of the Educational Use Agreement" -- namely, the Educational Use Agreement described above, which was attached as an exhibit to the contract. (§4.1)

- DMG granted to the University a non-exclusive license to "use the DIBELS Trademark in connection with the operation, maintenance, and promotion of the UO DIBELS Data System." (§4.3)

- The University and DMG each agreed not to take any action detrimental to the goodwill associated with the DIBELS Trademark. (§4.3)

53.     In addition, the contract provided that within three months following execution the parties would "jointly write a statement describing the origins of the DIBELS assessment measures, and stating that DIBELS® is a registered trademark of DMG." This joint statement was to appear on the opening page or other appropriate page of the DMG website and the UO Website. (§3.4.b)

54.     After the Intellectual Property Agreement had been worked out with University officials, Dr. Good reduced his time commitment to the University and began working part time at DMG, with the full knowledge and consent of the University.

55.     For reasons that have never been fully explained to DMG, and despite numerous inquiries by DMG, the University never physically signed the 2005 agreement that it had largely

drafted, extensively negotiated, and had assured DMG was completely acceptable. However, notwithstanding its failure to sign the agreement, the University continued for the next seven years to act in accordance with the basic terms and tenets of the agreement, as did DMG. Most critically, the University continued to post the Educational Use Agreement, acknowledging DMG's ownership of DIBELS, and to condition downloads of DIBELS assessment materials from its website on user acceptance of the Educational Use Agreement. (See Exhibit G.) Other conduct by the University that was consistent *only* with its acceptance of the terms of the unsigned agreement include, without limitation, the following:

- The DIBELS materials it disseminated via the UO Website bore the ® symbol next to the DIBELS mark, acknowledging DMG's registration. (See Exhibits H and I.)

- The UO Website in multiple instances used the ® symbol next to the DIBELS mark in public-facing text prepared by UO's own staff. Examples include (i) a statement on UO's home page that "DIBELS® 6th edition" materials were available for download; (ii) announcements on the UO Website that, "A new edition of DIBELS®, DIBELS Next, became available for users this fall (2010-2011 school year)"; and (iii) UO's FAQ webpage. (See Exhibits I, J, and K.)

- UO provided links from its website not only to DMG's website – see Exhibit L hereto – but also to the websites of Sopris and Wireless Generation for those school districts wishing to purchase print or wireless-enabled copies of DIBELS. See, e.g., Exhibit M.

In effect, a license with respect to the DIBELS mark and DIBELS 6th materials was granted by DMG and accepted by the University, and honored in practice by the parties.

56.    As the links just described make clear, the University was well aware from the start of the investment being made in DIBELS by third parties under license from DMG. In fact,

DMG and its publishing licensees made enormous investments of time and capital in developing, producing, marketing, and distributing the DIBELS materials, including Wireless Generation's development and refinement of software to score DIBELS assessments on a handheld device.

57.     Since 2003, DMG's publishers have distributed DIBELS throughout the United States to thousands of schools and school systems, serving many millions of children. Sample of early DIBELS materials from Sopris and Wireless Generation are attached hereto as Exhibits N and O, and these publishers' most recent DIBELS offerings may be seen at http://www.iamvoyager.com/assessment/dibels-next and http://www.amplify.com/assessment/mclass-dibels-next, respectively. A significant share of DMG's royalties from its publishers has been plowed back into development of new and additional DIBELS assessment tools.

58.     These links from the UO Website to the websites of Sopris and Wireless Generation were not selfless acts on the University's part. UO itself benefitted substantially from sales by DMG's commercial licensees because school district purchasers frequently used the DIBELS Data System to display and analyze their students' test scores, thus providing both income and research data to the University. According to DMG's information and belief, since the Intellectual Property Agreement was negotiated and mysteriously put aside in 2005, UO has made tens of millions of dollars from schools using the Data System service to enter their students' DIBELS scores and generate automated online reports and analysis. And until the unlawful acts of the University that gave rise to this Complaint, as described below, all those schools came into the DIBELS ecosystem either by accepting the terms of the Educational Use Agreement on the UO Website and downloading the DIBELS materials, or by purchasing DIBELS materials from Sopris or Wireless Generation.

59.     As a result of all the conduct just described, for a decade it was clear beyond doubt to any member of the public who came in contact with DIBELS products that these products and the trademarks attached to them came from a single source, namely DMG. Substantial goodwill accrued to DMG as a result.

60.     During that time DMG obtained federal registrations for numerous trademarks in the United States Patent and Trademark Office, without any interference or complaint from the University.

61.     DMG owns registrations for the following marks for use in connection with the following goods and services:

| Mark | Reg. No. | Date of Reg. | Goods/Services |
|------|----------|--------------|----------------|
| DIBELS | 2,729,165 | 6/24/03 | Printed instructional, educational and teaching materials in the areas of literacy and early literacy assessment and skills; educational books, periodical reports and printed teaching materials in the areas of literacy skills and early literacy skills, monitoring and assessing student outcomes, skill and progress. |
| DIBELS | 2,750,275 | 8/12/03 | Providing on-line instructional, educational, testing and teaching materials and distributing course materials in connection therewith in the field of literacy and early literacy skills, monitoring and assessment via a global computer network. |
| DIBELS | 2,771,559 | 10/07/03 | Educational research; educational testing; instruction in the field of literacy and early literacy skills, monitoring and assessment of student progress and outcomes; education and educational services in the nature of workshops, classroom instruction, seminars, professional development, and in-service and pre-service training in the field of literacy and early literacy skills, monitoring and assessment of student progress and outcomes; standardized testing; preparing, administering and scoring standardized tests; measurement evaluations in the areas of literacy, early literacy skills for |

| Mark | Reg. No. | Date of Reg. | Goods/Services |
|---|---|---|---|
| | | | educational purposes; providing seminars, training and educational conferences, all of the foregoing in the areas of literacy and early literacy skills, monitoring and assessment of student progress and outcomes; publication of educational books, periodical reports, and teaching materials in the areas of literacy and early literacy skills, monitoring and assessment of student progress and outcomes. |
| DIBELS NEXT | 3,970,666 | 05/31/11 | Printed instructional, educational and teaching materials in the areas of literacy and early literacy assessment and skills; educational books, periodical reports and printed teaching materials in the areas of literacy skills and early literacy skills, monitoring and assessing student outcomes, skill and progress<br><br>Educational research; educational testing; instruction in the field of literacy and early literacy skills, monitoring and assessment of student progress and outcomes; education and educational services in the nature of workshops, classroom instruction, seminars, professional development, and in-service and pre-service training in the field of literacy and early literacy skills, monitoring and assessment of student progress and outcomes; standardized testing; preparing, administering and scoring standardized tests; measurement evaluations in the areas of literacy, early literacy skills for educational purposes; providing seminars, training and educational conferences, all of the foregoing in the areas of literacy and early literacy skills, monitoring and assessment of student progress and outcomes; publication of educational books, periodical reports, and teaching materials in the areas of literacy and early literacy skills, monitoring and assessment of student progress and outcomes; providing on-line instructional, educational, testing and teaching materials and distributing course materials in connection therewith in the field of literacy and early literacy skills, monitoring and assessment via a global computer network. |
| DIBELS NEXT | 4,084,850 | 1/10/12 | Computer software for instructional and educational testing. |

| Mark | Reg. No. | Date of Reg. | Goods/Services |
|---|---|---|---|
| DIBELSNET | 4,164,609 | 6/26/12 | Providing online non-downloadable software for monitoring and assessment data reporting services in the area of literacy and early literacy skills. |
| IDEL | 3,446,832 | 6/10/08 | Printed instructional, educational and teaching materials in the areas of literacy and early literacy assessment and skills in Spanish; educational books, periodical reports and printed teaching materials in the areas of literacy skills and early literacy skills, monitoring and assessing student outcomes, skill and progress.<br><br>Educational research; educational testing in Spanish; instruction in the field of literacy and early literacy skills, monitoring and assessment of student progress and outcomes; education and educational services in the nature of workshops, classroom instruction, seminars, professional development, and in-service and pre-service training in the field of literacy and early literacy skills, monitoring and assessment of student progress and outcomes; standardized testing in Spanish; preparing, administering and scoring standardized tests; measurement evaluations in the areas of literacy, early literacy skills for educational purposes; providing seminars, training and educational conferences, all of the foregoing in the areas of literacy and early literacy skills, monitoring and assessment of student progress and outcomes; publication of educational books, periodical reports, and teaching materials in the areas of literacy and early literacy skills, monitoring and assessment of student progress and outcomes; Providing on-line instructional, educational, testing and teaching materials in Spanish and distributing course materials in connection therewith in the field of literacy and early literacy skills, monitoring and assessment via the Internet. |

62.    DMG's registration of the basic DIBELS mark, Reg. No. 2,729,165, is now

incontestable under 15 U.S.C. §1065.  On June 25, 2008, DMG filed the necessary declarations

under Sections 8 and 15, and on July 25, 2008, the trademark office recognized DIBELS as an incontestable mark.

63. DMG renewed its registration in the DIBELS mark as of July 26, 2012.

**The IDEL® Mark**

64. The only mark listed above that does not include "DIBELS" is the mark IDEL. This mark is an acronym for Indicadores Dinámicos del Éxito en la Lectura, and applies to a product designed to provide young Spanish language readers the same sort of assistance that DIBELS provides to English language readers. IDEL is not a mere translation of DIBELS, but rather a new product based on similar underlying principles. Drs. Good and Kaminski, and later DMG, created IDEL in the period 2001-2003 by hiring independent contractors who were literacy scholars fluent in Spanish. These independent contractors were paid by Drs. Good and Kaminski, and later DMG, out of personal funds invested by Drs. Good and Kaminski, and worked solely under their direction pursuant to written agreements that vested copyright in DMG. IDEL was first made available for sale to the public by DMG's licensee Wireless Generation in or around 2004, and in print by DMG's licensee Sopris in 2005.

65. As with DIBELS, DMG made the IDEL assessment measures available to the University for free download to school districts on the UO Website, beginning in 2003. At first the product was known by a slightly different acronym, "BIDEL" – see Exhibit P – which mark was changed to IDEL when DMG discovered that BIDEL had negative connotations in some Spanish-speaking countries.

66. IDEL was available for free download at the UO Website in the same manner as DIBELS 6th edition. The IDEL materials bore a trademark registration notice (®) to protect DMG's ownership of the mark, and were accessible only upon acceptance of a version of the

Educational Use Agreement identical to that used for DIBELS, except that references to "DIBELS" were replaced with references to "IDEL".

67. The University also posted the IDEL Administration and Scoring Guide, with the Educational Use Agreement attached and with the ® symbol next to the IDEL mark, on the UO Website without alteration or complaint, thus acknowledging DMG's trademark rights in IDEL. See Exhibit Q.

68. The DIBELS Data System did not at first offer a paid service for reports on IDEL results. Such a service was provided beginning in 2007, with DMG's consent and for the sole purpose of providing an ancillary service that supported DMG's IDEL product.

**The DIBELS NEXT® Mark and DIBELSNet® Service**

69. In 2011, DMG launched its latest literacy assessment product, DIBELS Next. ("DIBELS Next" is yet another mark shown on the chart above.) DIBELS Next is a complete and total rewrite from the ground up of the DIBELS 6th Edition , and, as with DIBELS 6th, its development and creation were funded entirely by DMG. At present DIBELS Next is available only from DMG and its licensees Sopris (since renamed Voyager Sopris Learning) and Wireless Generation (since renamed Amplify).

70. Until recently, the University publicly acknowledged that DIBELS Next was a registered trademark on its FAQ web page. See Exhibit K.

71. After DMG released DIBELS Next, DMG and its licensees' school district customers encountered a series of difficulties with the University's DIBELS Data System. Despite extensive support and information provided by DMG, and despite assurances from University staff that the DIBELS Data System would support DIBELS Next for the 2010-2011 academic year, the Data System provided almost no reporting capabilities for DIBELS Next

throughout the 2010-2011 school year, resulting in multiple complaints to DMG from school districts.  Frustrated that the Data System was harming its brand, DMG decided to start its own parallel data service to run automated reports and analyze results for school districts.  In the first half of 2011, DMG offered free DIBELS Next reporting to districts that complained about the University's Data System. For the 2011-2012 school year, DMG rebranded its data system "DIBELSNet" and launched it as a commercial service, advertising it as a "new data reporting service from the authors of DIBELS." Among other products, DIBELSNet supports the DIBELS NEXT, DIBELS 6th Edition, and IDEL products.  DMG has obtained a federal registration for the DIBELSNet mark, as shown in the above chart.

**UO's Sudden Change of Tune: Harassment and Infringement**

72.     On April 4, 2012, without warning and without any attempt at prior consultation, outside counsel to the University sent DMG a demand letter, a copy of which is attached as Exhibit R.  This letter, contrary to all prior dealings between the parties, bizarrely asserted that UO had been using the DIBELS mark in commerce since 1980 (which was at least eight years before Dr. Kaminski even began writing the DIBELS measures), and that UO owned all DIBELS intellectual property.  Counsel claimed that DMG's use of that intellectual property had "recently come to our attention" – which may technically have been true as to the writer, but was utterly false as to the University.  The letter demanded that DMG assign all DIBELS intellectual property to the University.

73.     The same outside counsel wrote similar demand letters to Sopris and Wireless Generation.

74.     After DMG rejected this demand, the University filed an application with the U. S. Patent and Trademark Office on July 20, 2012, seeking itself to register the DIBELS mark

for the very goods and services covered by DMG's existing registrations. See Exhibit S. Apart from the obvious groundlessness of this application, two things about it are worth noting. First, the application was signed by Randolph Geller, the very same University counsel who had been involved in negotiating the unsigned 2005 agreement described above and who had assured DMG that its terms were acceptable. Second, the application was filed on a "Section 1(b)" basis (*see* 15 U.S.C. §1051(b)), meaning that it was based on an "Intent to Use" the mark rather than on actual use – contrary to the allegations of prior use made in the April 2012 letter.

75.     The Patent and Trademark Office rejected UO's application for the DIBELS mark on November 15, 2012, citing DMG's existing registrations.

76.     On June 3, 2013, the University filed two applications to register the IDEL mark, one alleging actual use and the other intent to use, for various goods and services essentially identical to DMG's.

77.     Four days later the University filed a petition to cancel DMG's IDEL registration, alleging that DMG's use of the IDEL mark was likely to cause confusion with UO's alleged IDEL mark, and that DMG had obtained its registrations by fraud.

78.     The University's applications to register IDEL were rejected by the Patent and Trademark Office on September 23, 2013. Its cancellation proceedings are pending but are expected to be stayed once the Patent and Trademark Office is advised of the filing of this Complaint.

79.     On November 19, 2013, the University filed cancellation proceedings with respect to DMG's DIBELS, DIBELS Next, and DIBELSNet registrations, alleging that DMG's use of those marks is likely to cause confusion with the University's alleged DIBELS mark, and that DMG had obtained its registrations by fraud. Those cancellation proceedings are pending but

are expected to be stayed once the Patent and Trademark Office is advised of the filing of this Complaint.

80.     Moreover, while the University has not succeeded to date in getting any relief from the Patent and Trademark Office and the trademarks remain the DMG's name, the University has been engaged in a steady, creeping campaign to infringe DMG's rights and inflict actual damage on DMG, as more fully described in Counts I through IX below.  After sitting back and watching Drs. Good and Kaminski and DMG develop DIBELS and IDEL for many, many years, and after more than a decade of consistently recognizing DMG's ownership of the DIBELS and IDEL trademarks, the University is seeking to appropriate their value for itself.

WITH REFERENCE TO THE FOREGOING, DMG asserts the following claims against defendants:

## COUNT I

### INFRINGEMENT OF THE DIBELS
### TRADEMARK IN VIOLATION OF THE LANHAM ACT

81.     DMG incorporates herein by reference the allegations contained in paragraphs 1 - 80 above.

82.     The University has begun using the DIBELS mark in a manner likely to cause confusion or mistake on the part of customers, and to deceive customers as to the origin, sponsorship, and authenticity of DIBELS materials.  Without limitation, the University has engaged in the following conduct:

83.     In violation of the license described above and of its entire course of dealing with DMG, and despite the fact that DIBELS is an incontestable registered mark, the University has – without warning to DMG – taken numerous steps to eradicate all acknowledgement of DMG's trademark rights from its website and to create the impression that it is the owner of the mark.

First, it has unilaterally replaced the Educational Use Agreement posted on its website in connection with downloads of DIBELS 6th edition with a new, short agreement that makes absolutely no reference to DMG, DMG's proprietary rights in DIBELS, or DMG's registered trademark in DIBELS. See Exhibit T hereto. Despite repeated protests by DMG, the University has continued to provide free distribution of DMG's product, DIBELS 6th edition, while refusing to restore the correct Educational Use Agreement to its website that identifies the product as DMG's.

84.     Second, the University has removed the ® symbol from the DIBELS and DIBELS Next marks used on its website. It has done so although DIBELS is an incontestable mark, and although the University's recent efforts to register that mark have been rejected by the U.S. Patent and Trademark Office.

85.     Third, despite the above, the University has whited out the ® symbol from the actual DIBELS materials that it makes available to schools for free download, and removed all references to DMG from those materials. For an example, compare Exhibit U with Exhibit J. In other words, it has taken the DIBELS 6th edition provided to it by DMG, and literally covered up the trademark symbols of the registered trademark owner, and anything that would tie the materials to registered owner.

86.     By removing from its website these acknowledgments of DMG's ownership of the DIBELS mark, the University is attempting to mislead the public into believing that it, not DMG, is the owner of the mark and the ultimate source of DIBELS products.

87.     By so misleading the public, UO is apparently also trying to undermine DMG's competitive DIBELSNet service by casting doubt on DMG's legitimacy as the ultimate source of DIBELS products.

88.     Furthermore, the University has been making deliberately misleading statements attempting to divert to itself the goodwill accruing to the DIBELS mark.  For example, it has taken to publicly referring to the product as "University of Oregon DIBELS 6th Edition."  The opening page of the University's DIBELS Data System website currently proclaims under "News and Announcements":  "University of Oregon DIBELS 6th Edition Better Than Ever!" – and other promotional materials use this same moniker.  See, e.g., Exhibit V attached hereto. There is only one DIBELS 6th edition, and that belongs to DMG, not the University.  At no time did DMG authorize the University to use the name of the University as a composite mark with DMG's registered DIBELS mark.

89.     This public confusion is exacerbated by the fact that the metadata on the University's DIBELS Data System website (i) causes a Google search for "DIBELS" to identify UO as its first hit, and (ii) identifies the University's website as the "**Official** DIBELS Home Page" (emphasis added).  See Exhibit W.  The only legitimate "official" DIBELS home page is DMG's own home page, www.dibels.org.

90.     Most recently, the University in collaboration with defendant Hop Skip Technologies released an "app," available on iTunes, which is advertised as supporting the administration of "the University of Oregon's DIBELS 6th edition Oral Reading Fluency assessments."  See the web page located at

https://itunes.apple.com/WebObjects/MZStore.woa/wa/viewSoftware?id=868388314&mt=8, a printout of which is attached as Exhibit X.  Not only is there no such thing as "the University of Oregon's DIBELS 6th edition," but DMG has never authorized the University to use the DIBELS mark on anything other than an unaltered download of the DIBELS 5th or 6th edition from the UO Website.  This use of the DIBELS mark on an app for a tablet designed to score the DORF

passages is far beyond the scope of the license granted by DMG to the University.  Indeed, this app – advertised as being "all about mobile technology in the classroom" and as "leverag[ing] the convenience of a tablet to make administering of DIBELS assessment easier than ever" (see Exhibit Y) – competes in a misleading fashion with DMG's authorized licensee, Wireless Generation (since renamed Amplify), which likewise provides schools with the software to administer the DIBELS assessment on tablets and other mobile devices.

91.     The University is actively engaged in marketing this HiFi app, as may be seen in Exhibit Z, a printout from its website at  https://dibels.uoregon.edu/market/HiFi.

92.     The University's conduct as described above has caused widespread confusion among DIBELS customers and has had a negative impact on the image of DIBELS in the marketplace, causing serious damage to DMG.

93.     The University's conduct as described above constitutes an infringement of DMG's exclusive rights to the DIBELS trademark, in violation of the Lanham Act, 15 U.S.C. § 1114(1)(a).

94.     The infringement described herein will cause irreparable injury to DMG not fully compensable in monetary damages unless promptly enjoined.  In the absence of injunctive relief, DMG will have no adequate remedy at law.  A remedy in equity is warranted considering the balance of hardships, and the public interest in avoiding consumer confusion will be served by an injunction.

## COUNT II

## INFRINGEMENT OF THE IDEL TRADEMARK
## IN VIOLATION OF THE LANHAM ACT

95.     DMG incorporates herein by reference the allegations contained in paragraphs 1 - 80 above.

96.     UO has begun using the IDEL mark in a manner likely to cause confusion or mistake on the part of customers, and to deceive customers as to the origin, sponsorship, and authenticity of IDEL materials.  Without limitation, UO has engaged in the following conduct:

97.     In violation of the license described above and of its entire course of dealing with DMG and DMG's trademark registration for IDEL, UO has without warning to DMG taken several steps to eradicate all acknowledgment of DMG's trademark rights from its website and to create the impression that it is the owner of the mark.  First, it has unilaterally replaced the Educational Use Agreement posted on its website that had been distributed with the IDEL materials with a new, short agreement that makes no reference to DMG, DMG's proprietary rights in IDEL or DMG's registered trademark in IDEL.  See Exhibit T.  Despite repeated protests by DMG, UO has continued to provide free distribution of DMG's product IDEL, while refusing to restore the correct Educational Use Agreement to its website that identifies the product as DMG's.

98.     Second, UO has whited out the ® symbol from the actual IDEL materials it makes available to schools for public download, as well as the copyright notice that appeared in DMG's name: compare Exhibit AA with Exhibit BB.  In other words, it has taken the IDEL product provided to it by DMG and literally covered up the trademark and copyright symbols of the trademark owner.

99. By removing from its website these acknowledgments of DMG's ownership, UO is attempting to mislead the public into believing that it, not DMG, is the owner of the IDEL mark and the ultimate source of IDEL products.

100. By so misleading the public, UO is also apparently trying to undermine DMG's competitive DIBELSNet service by casting doubt on DMG's legitimacy as the ultimate source of IDEL products.

101. UO's conduct as described above has caused widespread confusion among IDEL customers and had a negative impact on the image of IDEL in the marketplace, causing serious damage to DMG.

102. UO's conduct as described above constitutes an infringement of DMG's exclusive rights to the IDEL trademark, in violation of the Lanham Act, 15 U.S.C. § 1114(1)(a).

103. The infringement described herein will cause irreparable injury to DMG not fully compensable in monetary damages unless promptly enjoined. In the absence of injunctive relief, DMG will have no adequate remedy at law. A remedy in equity is warranted considering the balance of hardships, and the public interest in avoiding consumer confusion will be served by an injunction.

## COUNT III

### INFRINGEMENT OF THE DIBELS NEXT TRADEMARK IN VIOLATION OF THE LANHAM ACT

104. DMG incorporates herein by reference the allegations contained in paragraphs 1 - 103 above.

105. In addition to sowing confusion as to the DMG products that it *is* authorized to distribute, UO has also been spreading confusion regarding DMG's latest product, DIBELS Next, which it is *not* authorized to distribute. As noted above, DIBELS Next was launched in

2010 and is an entirely new product, not made available through UO. The UO DIBELS Data System offers to provide schools with scoring of DIBELS Next assessment results, which any third party can do provided it does not confuse customers as to the ownership of the DIBELS Next mark and the sponsorship of the services concerned. But the UO Website has gone so far as to identify the benchmark goals that DMG has set – for DMG's own product – as the "DIBELS Next *Former* Goals" and to identify UO's unauthorized set of benchmark goals as the "DIBELS Next *Recommended* Goals" (emphasis added) – including under a headline proclaiming that DIBELS Data System offers "More Options, More Accurate Results." See, e.g., the web page located at https://dibels.uoregon.edu/market/assessment/recommendedgoals/, a printout of which is attached as Exhibit CC.

106. A consumer seeing the term "Recommended" will naturally assume that these goals are recommended by the company that is the source of both DIBELS Next and the "former" goals – which of course is not true. This is an improper and infringing use of the DIBELS Next mark, and is calculated to confuse and deceive consumers as to the origin, sponsorship, and authenticity of DIBELS Next materials. It is also calculated to mislead school districts into using the University's DIBELS Data System service instead of DMG's DIBELSNet service to process assessment results.

107. UO's conduct has in fact caused widespread confusion among DIBELS Next customers and had a negative impact on the image of DIBELS Next in the marketplace, causing serious damage to DMG.

108. Furthermore, UO has been misusing the DIBELS Next mark in connection with teacher training. DMG has the exclusive nationwide right to conduct teacher training under the DIBELS Next mark, as shown in the trademark chart in Par. 61 above. While UO has the same

right as anyone else to train teachers in the use of DIBELS Next materials, it cannot lawfully do so in a manner calculated to lead teachers to believe that its training is authorized or official DIBELS Next training. Yet that is precisely what UO is doing, as exemplified by the pages of its training materials shown in Exhibit DD.

109. To make matters yet worse, in its training materials UO presents as coming from DIBELS Next, numerous passages that are in fact from DIBELS 6th, thus misrepresenting and mislabeling the product in which it purports to offer training, and undermining the quality of the DIBELS Next product.

110. UO's conduct constitutes an infringement of DMG's exclusive rights to the DIBELS Next trademark, in violation of the Lanham Act, 15 U.S.C. § 1114(1)(a).

111. The infringement described herein will cause irreparable injury to DMG not fully compensable in monetary damages unless promptly enjoined. In the absence of injunctive relief, DMG will have no adequate remedy at law. A remedy in equity is warranted considering the balance of hardships, and the public interest in avoiding consumer confusion will be served by an injunction.

## COUNT IV

### INFRINGEMENT OF THE DIBELS TRADEMARK IN VIOLATION OF O.R.S. 646.608

112. DMG incorporates herein by reference the allegations contained in paragraphs 1 - 111 above.

113. UO's conduct as described above has created, and if not stopped will continue to create, a likelihood of confusion or misunderstanding as to the source, sponsorship, and approval of the DIBELS product, as well as likelihood of confusion or misunderstanding as to affiliation, connection, or association between UO and the DIBELS mark or certification by DMG. Further,

UO has represented that its good or services have sponsorship, approval, characteristics, and qualities that they do not have. Finally, UO has disparaged the goods and services of DMG by false and misleading representations of fact. As such UO's conduct constitutes an infringement of DMG's exclusive rights to the DIBELS trademark and/or an unlawful practice in violation of state law, including without limitation Oregon Rev. Statutes 646.608(1)(b), 646.608(1)(c), 646.608(1)(e) and 646.608(1)(h).

114.    The infringement described herein will cause irreparable injury to DMG unless promptly enjoined. In the absence of injunctive relief, DMG will have no adequate remedy at law. A remedy in equity is warranted considering the balance of hardships, and the public interest in avoiding consumer confusion will be served by an injunction.

## COUNT V

## INFRINGEMENT OF THE IDEL TRADEMARK
## IN VIOLATION OF O.R.S. 646.608

115.    DMG incorporates herein by reference the allegations contained in paragraphs 1 - 114 above.

116.    UO's conduct as described above has created, and if not stopped will continue to create, confusion or misunderstanding as to the source, sponsorship, and approval of the IDEL product, as well as likelihood of confusion or misunderstanding as to affiliation, connection, or association between the UO and the IDEL mark or certification by DMG. As such it constitutes an infringement of DMG's exclusive rights to the IDEL trademark and/or an unlawful practice in violation of state law, including without limitation Oregon Rev. Statutes 646.608(1)(b) and 646.608(1)(c).

117.    The infringement described herein will cause irreparable injury to DMG unless promptly enjoined. In the absence of injunctive relief, DMG will have no adequate remedy at

law. A remedy in equity is warranted considering the balance of hardships, and the public interest in avoiding consumer confusion will be served by an injunction.

## COUNT VI

### INFRINGEMENT OF THE DIBELS NEXT TRADEMARK
### IN VIOLATION OF O.R.S. 646.608

118.    DMG incorporates herein by reference the allegations contained in paragraphs 1 - 117 above.

119.    UO's conduct as described above has created, and if not stopped will continue to create, confusion or misunderstanding as to the source, sponsorship, and approval of the DIBELS Next product and DIBELS Next training, as well as likelihood of confusion or misunderstanding as to affiliation, connection, or association between the UO and the DIBELS Next mark or certification by DMG. As such it constitutes an infringement of DMG's exclusive rights to the DIBELS Next trademark and/or an unlawful practice in violation of state law, including without limitation Oregon Rev. Statutes 646.608(1)(b) and 646.608(1)(c).

120.    The infringement described herein will cause irreparable injury to DMG unless promptly enjoined. In the absence of injunctive relief, DMG will have no adequate remedy at law. A remedy in equity is warranted considering the balance of hardships, and the public interest in avoiding consumer confusion will be served by an injunction.

## COUNT VII

### UNFAIR COMPETITION

121.    DMG incorporates herein by reference the allegations contained in paragraphs 1 - 120 above.

122.    UO's conduct as described constitutes unfair competition as a matter of common law.

123.    This unfair competition will cause irreparable injury to DMG unless promptly enjoined.  In the absence of injunctive relief, DMG will have no adequate remedy at law.  A remedy in equity is warranted considering the balance of hardships, and the public interest in avoiding consumer confusion will be served by an injunction.

## COUNT VIII

## COPYRIGHT INFRINGEMENT

124.    DMG incorporates herein by reference the allegations contained in paragraphs 1 - 123 above.

125.    The license granted by DMG to UO for reproduction and distribution of the DIBELS materials permits the distribution of such materials only on the UO Website and pursuant to the Educational Use Agreement.  (Indeed, the Educational Use Agreement that UO itself distributed for years specifically acknowledged that for-profit exploitation of DIBELS would require DMG"s consent.) The materials covered by that license include the DORF passages described above.

126.    The DORF passages were created by DMG in collaboration with commissioned third parties pursuant to written agreements vesting the copyright in DMG.  DMG has registered its copyright in the DORF passages.

127.    The United States Copyright Office has issued the following registrations which encompass such material:

**Dibels 5th Edition**

| Copyright Number | Title |
|---|---|
| TXu001619550 | Dynamic Indicators of Basic Early Literacy Skills 5th Edition. |

**Dibels 6th Edition**

| Copyright Number | Title |
|---|---|
| TX0006989892 | Dynamic Indicators of Basic Early Literacy Skills 6th Edition First Grade Scoring Booklet Progress Monitoring Oral Reading Fluency. |
| TX0006989918 | Dynamic Indicators of Basic Early Literacy Skills 6th Edition First Grade Student Materials Benchmark Assessment. |
| TX0006989907 | Dynamic Indicators of Basic Early Literacy Skills 6th Edition First Grade Student Materials Progress Monitoring Oral Reading Fluency. |
| TX0006993551 | Dynamic Indicators of Basic Early Literacy Skills 6th Edition Second Grade Scoring Booklet Benchmark Assessment. |
| TX0006993557 | Dynamic Indicators of Basic Early Literacy Skills 6th Edition Second Grade Scoring Booklet Progress Monitoring Oral Reading Fluency. |
| TX0006993539 | Dynamic Indicators of Basic Early Literacy Skills 6th Edition Second Grade Student Materials Benchmark Assessment. |
| TX0006993530 | Dynamic Indicators of Basic Early Literacy Skills 6th Edition Second Grade Student Materials Progress Monitoring Oral Reading Fluency. |
| TX0006993564 | Dynamic Indicators of Basic Early Literacy Skills 6th Edition Third Grade Scoring Booklet Benchmark Assessment. |
| TX0006993548 | Dynamic Indicators of Basic Early Literacy Skills 6th Edition Third Grade Scoring Booklet Progress Monitoring Oral Reading Fluency. |
| TX0006993542 | Dynamic Indicators of Basic Early Literacy Skills 6th Edition Third Grade Student Materials Benchmark Assessment. |
| TX0006993535 | Dynamic Indicators of Basic Early Literacy Skills 6th Edition Third Grade Student Materials Progress Monitoring Oral Reading Fluency. |
| TX0006993554 | Dynamic Indicators of Basic Early Literacy Skills 6th Edition Fourth Grade Scoring Booklet Benchmark Assessment. |
| TX0006993593 | Dynamic Indicators of Basic Early Literacy Skills 6th Edition Fourth Grade Scoring Booklet Progress Monitoring Oral Reading Fluency. |
| TX0006993377 | Dynamic Indicators of Basic Early Literacy Skills 6th Edition Fourth Grade Student Materials Benchmark Assessment. |
| TX0006993376 | Dynamic Indicators of Basic Early Literacy Skills 6th Edition Fourth Grade Student Materials Progress Monitoring Oral Reading Fluency. |
| TX0006993575 | Dynamic Indicators of Basic Early Literacy Skills 6th Edition Fifth Grade Scoring Booklet Benchmark Assessment. |
| TX0006993559 | Dynamic Indicators of Basic Early Literacy Skills 6th Edition Fifth Grade Scoring Booklet Progress Monitoring Oral Reading Fluency. |

| | |
|---|---|
| TX0006993536 | Dynamic Indicators of Basic Early Literacy Skills 6th Edition Fifth Grade Student Materials Benchmark Assessment. |
| TX0006993541 | Dynamic Indicators of Basic Early Literacy Skills 6th Edition Fifth Grade Student Materials Progress Monitoring Oral Reading Fluency. |
| TX0006993576 | Dynamic Indicators of Basic Early Literacy Skills 6th Edition Sixth Grade Scoring Booklet Benchmark Assessment. |
| TX0006993583 | Dynamic Indicators of Basic Early Literacy Skills 6th Edition Sixth Grade Scoring Booklet Progress Monitoring Oral Reading Fluency. |
| TX0006993550 | Dynamic Indicators of Basic Early Literacy Skills 6th Edition Sixth Grade Student Materials Benchmark Assessment. |
| TX0006993547 | Dynamic Indicators of Basic Early Literacy Skills 6th Edition Sixth Grade Student Materials Progress Monitoring Oral Reading Fluency. |

See Exhibit EE hereto.

128.    Notwithstanding DMG's copyright ownership of the DORF passages, UO and defendant Hop Skip Technologies have jointly developed, and begun to market and sell, an app called "HiFi Reading" that is designed to "facilitate[] the administration, scoring, and management of DIBELS 6th Edition assessments."  See Exhibit Y.  As of the date of filing of this Complaint, the app only includes the DORF passages, and not the other measures contained in DIBELS 6th edition.  The app contains verbatim copies of all 171 DIBELS Oral Reading Fluency (DORF) 6th edition passages, without any authorization from DMG.

129.    Publication of this "HiFi Reading" app with the DORF passages constitutes infringement of the exclusive rights of reproduction and distribution with respect to those passages, in violation of 17 U.S.C. §106(1) and (3), and the exclusive right to create a derivative work based on the copyrighted work in violation of 17 U.S.C. §106(2).  DMG is the beneficial owner of the rights of reproduction and distribution and the owner of the derivative work right, with respect to all those passages.

130. The University and Hop Skip Technologies are jointly and severally liable for such willful infringement.

131. The exact nature of the University's involvement in this copyright infringement is unclear at this time. To the extent that the University is not a direct infringer of DMG's copyright, it is a contributory infringer, for it has, with full knowledge of Hop Skip Technologies' direct infringement, caused, assisted, and materially contributed to that infringement, or alternatively has induced that infringement.

132. The copyright infringement described herein will cause irreparable injury to DMG not fully compensable in monetary damages unless promptly enjoined. In the absence of injunctive relief, DMG will have no adequate remedy at law. A remedy in equity is warranted considering the balance of hardships, and the public interest will be served by an injunction.

## COUNT IX

## VIOLATION OF THE COPYRIGHT MANAGEMENT INFORMATION PROVISIONS OF THE COPYRIGHT ACT

133. DMG incorporates herein by reference the allegations contained in paragraphs 1 - 132 above.

134. The DORF passages, as originally provided by DMG to UO for download, and as made available by UO to the public for nearly a decade, contained copyright notice in the name of DMG. See Exhibit FF hereto. Such copyright notice constitutes copyright management information within the meaning of 17 U.S.C. § 1202(c).

135. The Educational Use Agreement that for nearly a decade was used by UO as described earlier in this Complaint also constituted "copyright management information" with respect to DIBELS 6th within the meaning of 17 U.S.C. § 1202(c), as it included (without

limitation) the name of, and other identifying information about, the copyright owner of the work, and terms and conditions for use of the work.

136.    Defendants UO and Hop Skip Technologies have removed all the foregoing copyright management information from the DORF passages as republished in their "HiFi Reading" app.  They have done so knowing, or having reasonable grounds to know, that such removal would induce, enable, facilitate, or conceal infringement of DMG's copyright in the DORF passages.  Such conduct violates Section 1202(b) of the Copyright Act, 17 U.S.C. §1202(b).

137.    Furthermore, UO and Hop Skip Technologies have provided false copyright management information to the public in connection with the "HiFi Reading" app, consisting of (without limitation) copyright notice in the name of the University, intended to indicate to consumers that the contents of the app are copyrighted works of the University.   See, e.g., Exhibit X.  Such action was taken with the intent to induce, enable, facilitate, or conceal defendants' infringement of DMG's copyright, in violation of Section 1202(a) of the Copyright Act, 17 U.S.C. §1202(a).

138.    The violations of §1202 of the Copyright Act described herein will cause irreparable injury to DMG unless promptly enjoined.  In the absence of injunctive relief, DMG will have no adequate remedy at law.  A remedy in equity is warranted considering the balance of hardships, and the public interest in avoiding consumer confusion will be served by an injunction.

139.    The University and Hop Skip Technologies are jointly and severally liable for such violations.

ON THE BASIS OF THE FOREGOING, plaintiff DMG demands the following:

## INJUNCTIVE RELIEF

A.      The actions of UO in eradicating references to DMG's trademark rights from the UO Website and other contexts requires corrective action that goes beyond restoring the *status quo ante*.  DMG respectfully demands that an order enter enjoining defendants, during the pendency of this litigation, from continuing infringement of DMG's trademarks, and specifically but without limitation, requiring defendants and all those acting at their direction or pursuant to their control to:

(1)      Restore the former, agreed-upon Educational Use Agreements (as exemplified in Exhibits G and Q) to the download pages for DIBELS and IDEL on the UO Website at https://dibels.uoregon.edu/;

(2)      Restore the ® symbol to the DIBELS, IDEL, and DIBELS Next marks as used on the UO Website and on any DIBELS and IDEL materials downloaded from that website;

(3)      Restore the "©2002 Dynamic Measurement Group, Inc." notice on DIBELS 6th Ed. materials available for download and DMG's © notices on the IDEL materials available for download.

(4)      Add a prominent and explicit statement to the UO Website stating that DMG is the registered trademark owner of the DIBELS, IDEL and DIBELS Next marks;

(5)      Restore the former link that the UO had provided to DMG's website on the UO Website;

(6)     Take whatever technical measures are required to ensure that search results for any and all search engines will no longer identify the UO Website as the "**Official DIBELS Home Page**";

(7)     Cease all use of the phrase "University of Oregon DIBELS 6th Edition";

(8)     Cease all references to DMG-approved DIBELS Next goals as "former" goals and to UO-developed goals as "recommended" goals;

(9)     In the alternative, if the UO does not comply with the above-listed conditions, that UO be enjoined from (i) distributing the DIBELS and IDEL assessment measures in any medium and (ii) using the DIBELS, IDEL and DIBELS Next trademarks in connection with any educational materials and the UO Website.

B.      That an order enter enjoining defendants, during the pendency of this litigation, from continuing to advertise, support and distribute the "HiFi Reading" app containing the DORF passages described above.

C.      That a permanent order enter enjoining defendants from continuing infringement of DMG's trademarks, and specifically but without limitation requiring defendants and all those acting at their direction or pursuant to their control to:

(1)     Restore the former, agreed-upon Educational Use Agreements (as exemplified in Exhibits  G and Q) to the download pages for DIBELS and IDEL on the UO Website at https://dibels.uoregon.edu/ or any other website affiliated with the UO related to DIBELS, IDEL or the DIBELS Data System (collectively, the "UO Websites");

(2)     Restore the ® symbol to the DIBELS, IDEL, and DIBELS Next marks as used on the UO Websites and on the DIBELS and IDEL materials downloaded from those websites;

(3)     Restore the "©2002 Dynamic Measurement Group, Inc." notice on DIBELS 6th Ed. materials available for download  and DMG's © notices on the IDEL materials available for download.

(4)     Add a prominent and explicit statement to the UO Websites stating that DMG is the registered trademark owner of the DIBELS, IDEL and DIBELS Next marks;

(5)     Restore the former link that the UO had provided to DMG's website on the UO Websites;

(6)     Take whatever technical measures are required to ensure that search results for any and all search engines will no longer identify the UO Websites as the "**Official** DIBELS Home Page";

(7)     On all other documents, services and media created, distributed or induced by the UO that reference the DIBELS, IDEL or DIBELS Next marks, restore the ® symbol in connection with these marks;

(8)     Cease all use of the phrase "University of Oregon DIBELS 6th Edition";

(9)     Cease all references to DMG-approved DIBELS Next goals as "former" goals and to UO-developed goals as "recommended" goals.

(10)    In the alternative, if the UO does not comply with the above-listed conditions, that UO be enjoined from (i) distributing the DIBELS and IDEL assessment measures in any medium and (ii) using the DIBELS and IDEL trademarks in connection with any educational materials and the UO Websites.

D.     That a permanent order enter (i) enjoining defendants from continuing to advertise and distribute the "HiFi Reading" app containing the DORF passages described above; (ii) requiring all copies of such app in their possession or subject to their control, and all masters from which such app can be reproduced, to be destroyed; and (iii) taking whatever technical measures are possible to disable the app for all prior purchasers.

E.     That the foregoing injunctive relief be granted not only against the University of Oregon and Hop Skip Technologies, but also against the individual named defendants, for the reason that:

- Defendant Dr. Tuan, as Interim Dean of the College of Education, has direct oversight and supervisory responsibility over the actions of the Center on Teaching and Learning, a division of the College of Education, and thus the authority to prevent continued wrongdoing;

- Dr. Kame'enui, as co-Director of the Center on Teaching and Learning, has direct oversight and supervisory responsibility over the actions of that Center, which is the locus of the infringement, and thus the authority to prevent continued wrongdoing. Indeed it is likely, and DMG expects that discovery will reveal, that Dr. Kame'enui was directly involved in the wrongful conduct described in this Complaint;

- Dr. Fien, as co-Director of the Center on Teaching and Learning, has direct oversight and supervisory responsibility over the actions of that Center, which is the locus of the infringement, and thus the authority to prevent continued wrongdoing.  Indeed it is likely, and DMG expects that

discovery will reveal, that Dr. Fien was directly involved in the wrongful

conduct described in this Complaint;

- Brad Shelton, as Interim Vice President for Research and Innovation at the
University of Oregon has oversight and supervisory responsibility over the
actions of the Center on Teaching and Learning, and thus the authority to
prevent continued wrongdoing.

## DAMAGES

F.  That defendants UO and Hop Skip Technologies be ordered jointly and severally
to pay DMG statutory damages for their infringement of DMG's copyright in the DORF
passages in their "HiFi" app, in an amount to be determined by the Court in its discretion, as
provided in Section 504(c) of the Copyright Act, 17 U.S.C. § 504(c).

G.  That defendants UO and Hop Skip Technologies be ordered jointly and severally
to pay DMG statutory damages for their wrongful removal of copyright management
information, and dissemination of false copyright management information, in their "HiFi" app
in the maximum amount permitted by law, pursuant to 17 U.S.C. §1023(c)(3).

## OTHER RELIEF

H.  That defendants UO and Hop Skip Technologies be ordered jointly and severally
to pay DMG's attorney's fees incurred in connection with their violations of Sections 106 and
1202 of the Copyright Act in connection with their "HiFi" app, as provided in Section 505 and
1203(b) of the Copyright Act, 17 U.S.C. §§505, 1203(b).

I. That Defendants file with this Court within 30 days after the entry of final judgment a written statement, under oath, setting forth in detail the manner in which they have complied with the Judgment of the Court; and

J. That the Court award such further relief as it deems just and reasonable.

Respectfully submitted,

Date: August 12, 2014        DYNAMIC MEASUREMENT GROUP, INC.

By its attorneys,

/s/ Fredrick A. Batson
Frederick A. Batson, OSB 821887
batson@gleaveslaw.com
GLEAVES SWEARINGEN LLP
P. O. Box 1147
Eugene, OR 97440
Phone: (541) 686-8833
Fax: (541) 345-203

OF COUNSEL:

William S. Strong
wstrong@kcslegal.com
KOTIN, CRABTREE & STRONG, LLP
One Bowdoin Square
Boston, MA 02114
Phone: (617) 227-7031
Fax: (617) 367-2988