**Frederick A. Batson**, OSB 821887
batson@gleaveslaw.com
GLEAVES SWEARINGEN, LLP
P. O. Box 1147
Eugene, OR  97440
Phone:  (541) 686-8833
Fax:  (541) 345-2034

**William S. Strong** - Admitted *Pro Hac Vice*
wstrong@kcslegal.com
KOTIN, CRABTREE & STRONG, LLP
One Bowdoin Square
Boston, MA  02114
Phone: (617) 227-7031
Fax:  (617) 367-2988

   Counsel for Plaintiff Dynamic Measurement Group, Inc., and for Dr. Roland Good
   and Dr. Ruth Kaminski (unnamed parties)

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## EUGENE DIVISION

| | |
|---|---|
| **DYNAMIC MEASUREMENT GROUP, INC.,** an Oregon corporation,<br><br>**PLAINTIFF,**<br><br>v.<br><br>**UNIVERSITY OF OREGON,** a special governmental body as defined by ORS 174.117(1)(i); et al.<br><br>**DEFENDANTS.** | Case No.  6:14-cv-01295-TC<br><br>**MOTION AND MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AS TO COUNTERCLAIMS ONE – SIX**<br><br>**ORAL ARGUMENT REQUESTED** |

## Table of Contents

INTRODUCTORY STATEMENT ............................................................................... 4

STATEMENT OF FACTS ....................................................................................... 6

ARGUMENT ........................................................................................................ 17

I.    UO's Claims Seeking Cancellation of DMG's Federal Trademark Registrations are
      Barred by Laches ............................................................................................ 17

   A.    UO's Claim Against the Three Original DIBELS Registrations is  Too Late by at
         Least Nine Years. ...................................................................................... 17

   B.    Acquiescence and Laches Are an Available Defense to UO's Cancellation Claim... 19

   C.    UO's Behavior More than Meets the Ninth Circuit's Standards for Laches and
         Acquiescence. ........................................................................................... 21

   D.    UO's Claim Seeking Cancellation of DMG's IDEL Registration is Likewise Barred
         by Laches. ................................................................................................. 25

   E.    UO's Claims for Cancellation of the DIBELSNext and DIBELSNet Marks are Barred
         under the Morehouse Doctrine. .................................................................. 26

II.   UO'S Common Law Infringement Claims are Also Barred by Laches and
      Acquiescence. ................................................................................................. 27

III.  UO's Claim for Damages from DMG's Trademark Registrations is Time Barred. ......... 30

IV.   UO'S Copyright Claims are Barred by the Statute of Limitations. ................................. 31

CONCLUSION .................................................................................................... 35

## Cases

*Beauty Time v. VU Skin Systems, Inc.*, 118 F.3d 140, 149 (3d Cir. 1997)..................................... 31

*Bridgestone/Firestone Research v. Automobile Club*, 245 F.3d 1359, 1360-61 (Fed. Cir. 2001) 19

*Butkus v. Downtown Athletic Club of Orlando, Inc.*, 2008 U.S. Dist. LEXIS 49828 at *17-
18(C.D. Cal. 2008)..................................................................................................... 20

*Chattanoga Mfg., Inc. v. Nike, Inc.*, 301 F.3d 789, 795 (7th Cir. 2002)...................................... 24

*Conopco, Inc. v. Campbell Soup Co.*, 95 F.3d 187, 192 (2d Cir. N.Y 1996) .............................. 24

*E-Systems, Inc. v. Monitek, Inc.*, 720 F.2d 604, 607 (9th Cir. 1983)..................................... 28, 29

*Far Out Productions v. Oskar*, 247 F.3d 986, 996 (9th Cir. 2001) ............................................. 23

*Gaiman v. McFarlane*, 360 F.3d 644, 652 (7th Cir. 2004)......................................................... 34

*Gary Friedrich Enterprises, LLC v. Marvel Characters, Inc.*, 716 F.3d 302, 317 (2d Cir. 2013)34

*Grupo Gigante S.A. de C.V. v. Dallo & Co.*, 391 F.3d 1088, 1105 (9th Cir. 2004) .................... 24

*In re Beaty*, 306 F.3d 914 (9th Cir. 2002) ................................................................ 20

*Jackson v. Lynley Designs, Inc.*, 729 F. Supp. 498 (E.D. La. 1990) ........................... 30

*Jarrow Formulas v. Nutrition Now*, 304 F.3d 829, 837, 838, 840 (9th Cir 2002) ................ 21, 22

*Johannsen v. Brown*, 797 F. Supp. 835, 839-840 (D. Or. 1992) .................................. 22

*Kling v. Hallmark Cards, Inc.*, 225 F.3d 1030, 1036 (9th Cir. 2000) ........................... 26

*Kwan v. Schlein*, 634 F.3d 224, 228, 229 (2d Cir. 2011) .................................. 32, 33, 34

*Lappert's Ice Cream, Inc. v. Lappert's, Inc.*, 2007 U.S. Dist. LEXIS 58741 at *7-8 (N.D. Cal. Aug. 1, 2007) ....................................................................................................... 20

*Marshak v. Treadwell*, 240 F.3d 184, 193 n.2 and n.4 (3d Cir. 2001) ......................... 19

*Merchant v. Levy*, 92 F.3d 51, 53 (2d Cir. 1996 .................................................... 34

*Morehouse Mfg. Corp. v. J. Strickland & Co.*, 407 F.2d 881 (C.C.P.A. 1969) ............... 26, 27, 31

*Official Airline Guides v. Goss*, 6 F.3d 1385, 1395-1396 (9th Cir. 1993) ....................... 30

*O-M Bread v. United States Olympic Committee*, 65 F.3d 933, 938 (Fed. Cir. 1995) ................ 27

*Place for Vision, Inc. v. Pearle Vision Ctr., Inc.*, 218 U.S.P.Q. 1022, 1983 TTAB LEXIS 122 (TTAB 1983) ......................................................................................................... 27

*Pro-Football, Inc. v. Harjo*, 415 F.3d 44, 48 (D.C. Cir. 2005) ............................... 19, 20

*Roley v. New World Pictures*, 19 F.3d 479 (9th Cir.1994) ........................................... 32

*Santa-Rosa v. Combo Records*, 471 F.3d 224 (1st Cir. 2006) ..................................... 34

*Seller Agency Council, Inc. v. Kennedy Ctr. for Real Estate Educ., Inc.*, 621 F.3d 981, 989 (9th Cir. 2010) .......................................................................................... 21, 25

*Seven Arts Filmed Entertainment, Ltd. v. Content Media Corp. PLC*, 733 F.3d 1251, 1254, 1255 (9th Cir. 2013) ................................................................. 28, 31, 32, 33, 35

*Stone v. Williams*, 970 F.2d 1043, 1048 (2d Cir. 1992) ............................................. 34

*TBC Corp. v. Grand Prix Ltd.*, 12 U.S.P.Q.2D (BNA) 1311, 1313 (TTAB 1989) ..................... 21

*Tillamook Country Smoker v. Tillamook County Creamery Ass'n,* 311 F. Supp. 2d 1023, 1030-1031 (D. Ore. 2004), *aff'd*, 465 F.3d 1102 (9th Cir. 2006) ................................... 28, 29

*Zuill v. Shanahan*, 80 F.3d 1366, 1368, 1369, 1371 (9th Cir. 1996) ............. 25, 32, 33, 34, 35, 36

**Statutes**

15 U.S.C. §1069 ............................................................................................ 19, 20

17 U.S.C. § 507(b) ................................................................................................ 31

15 U.S.C. § 1064 (Lanham Act, § 14) ................................................................... 20, 21

15 U.S.C. § 1120 (Lanham Act) ............................................................................ 30

Lanham Act ......................................................................................................... 21

1905 Trademark Act ............................................................................................. 19

ORS 12.110(1) ....................................................................................................... 22

ORS 12.115(1) ....................................................................................................... 22

**Other Authorities**

McCarthy on Trademarks and Unfair Competition, § 20:78 (4th ed. 2014) ................. 27

**CERTIFICATE OF COMPLIANCE WITH LR 7.1**

Pursuant to LR 7.1, undersigned counsel has conferred with counsel for Defendants in a good faith effort to resolve the issues in dispute. The parties have been unable to do so.

**INTRODUCTORY STATEMENT**

DIBELS (Dynamic Indicators of Basic Early Literacy Skills) – and related products – are the nation's most extensively used tools for testing progress in literacy for students in grades K-6. Plaintiff Dynamic Measurement Group, Inc. ("DMG") has brought this action to defend its federally registered rights in the trademarks for those products – DIBELS, IDEL, and DIBELSNext – and its federally registered copyrights in some of the products themselves.

As described in the Complaint, and as these motion papers will document, DMG and its commercial licensees have exercised DMG's federally registered rights nationwide, investing very substantial sums to develop and exploit these rights for more than a decade. During that time period DMG's principals, Dr. Roland Good and Dr. Ruth Kaminski, have devoted their professional lives (except, in the case of Dr. Good, for part-time work as a professor at University of Oregon) and their personal assets to the development, marketing, and distribution of DIBELS. None of this was done in secret. The University of Oregon (the "University" or "UO") was fully aware, from the beginning, of the commercial activities of DMG and its licensees. In numerous ways, through numerous channels, during the years 2001-2006 the University was put on notice of those activities, and took no steps to hinder them. Indeed, in 2005 it extensively negotiated a license from DMG for certain limited uses of the rights at issue in this case. Although for some unknown reason the University never executed that agreement, for the next 7-plus years it acted in a manner fully consistent with the terms of that agreement, even publicly acknowledging the rights of DMG and its licensees on its own website.

Now, after all those years of comity, the University suddenly asserts that it, not DMG, owns all the trademarks and copyrights that DMG has devoted the last ten-plus years to exploiting.   In an unusually vituperative set of counterclaims, it accuses DMG and its principals Drs. Good and Kaminski – long-standing members of its own faculty – of fraud, breach of fiduciary duty, theft, and so on, dating back to the last century, as if all this time it had been under some sort of evil spell instead of an active, sentient participant in the DIBELS universe.

The University's claims would have been meritless even if brought in a timely manner. But they have not been brought in a timely manner.  As these motion papers will demonstrate, two of UO's claims (Claims Four and Five, which relate to copyright) are barred by the copyright statute of limitations.  Another four (Claims One, Two, Three, and Six) are barred by acquiescence or, at the very least, laches of a particularly egregious sort.  The remainder – addressed in a separate motion filed herewith – either fail to state a claim upon which relief may be granted or are so lacking in detail that they cannot be understood.

Because this motion regarding Claims One through Six relies on facts submitted by affidavit, it is brought as a summary judgment motion under F.R.C.P. 56.  A motion for summary judgment at this early stage of proceedings may seem unusual, but so are the facts in this case. Summary judgment here is both justified and essential.  It is justified because very few questions need to be addressed, and the evidence to answer those questions is simple and beyond dispute. The two questions relevant to the statute of limitations are:

(1)    What did the University know about DMG's commercial exploitation of the DIBELS products?

(2)    When did it know it?

The other two questions relate to acquiescence and laches:

(3)     What did the University say to DMG to encourage its commercial activities?

(4)     What prejudice to DMG and its licensees has the University's delay created?

For answer to the first three questions, DMG relies entirely on documents whose existence cannot be disputed; some even come from the University's own files.   For answer to the fourth, DMG relies in part on long-established trademark doctrine, and in part on some very simple and straightforward personal and commercial information of its own and of its licensees. There are no "he said/she said" issues here.

Summary judgment is essential in this case to avoid a massive misallocation of court and private resources.  The University's counterclaims make clear that it seeks nothing less than all the business assets and livelihood of Drs. Good and Kaminski and their company DMG, and all the income they have made over the past ten years.  If the University is allowed to escape the consequences of its ten years of acquiescence in DMG's activities, and engage in the sort of trench warfare that its counterclaims portend, that very fact will work a great injustice.

## STATEMENT OF FACTS

DMG will not repeat here the narratives contained in the Declarations of Roland Good, Ruth Kaminski, George A. Logue, and Lawrence J. Berger.  The details of those narratives are extremely important, but for the Court's assistance DMG will briefly summarize here some of the key facts.

*Overview*

1.     Plaintiff and Counterclaim Defendant DMG is an Oregon for-profit corporation. It was incorporated in February of 2002 to engage in commercial development and dissemination

MOTION AND MEMORANDUM IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT AS TO
COUNTERCLAIMS ONE - SIX – Page 6

of the literacy assessment materials known as DIBELS (Dynamic Indicators of Basic Early

Literacy Skills) and to train teachers in the use of these materials.    Good Decl., ¶ 15.

2.    The owners and officers of DMG are Dr. Roland Good and Dr. Ruth Kaminski.

They have been working on the development, implementation, and dissemination of DIBELS

since the 1990s. Good Decl., ¶ 17.  When they founded DMG they assigned to it all their rights

in the DIBELS materials, including the DIBELS mark and copyrights.  Good Decl., ¶ 15.

3.    DIBELS is an assessment tool, designed to enable teachers in grades K-6 to assess

the literacy skills of their students, and thus to focus remedial help where it is needed. In

different versions it has been sold throughout the United States by plaintiff Dynamic

Measurement Group, Inc. ("DMG") and its commercial licensees for over ten years.  (Good

Decl., ¶ 60; Logue Decl., ¶ 4.)  Its companion Spanish-language product IDEL (Indicadores

Dinámicos del Éxito en la Lectura) has been sold for almost as long. (Good Decl., ¶ 60.)

DIBELS and IDEL are probably the most widely used and best known literacy assessments in

the United States for grades K-6.  Roughly 25% of all K-6 students in the United States are

assessed using DIBELS every year, and have been for the better part of a decade.  (Good Decl.,

¶ 8.)

As the following synopsis will show, the University has known of and acquiesced in

DMG's nationwide commercial distribution of DIBELS for a decade.  Yet it now seeks to reap

where it has not sown: to appropriate all the intellectual property, commercial value, and profit

that has accrued to DIBELS over those years thanks to the enormous investment of time, energy,

and money by DMG and its licensees.

***UO Acquired Full Knowledge, During the Years 2001-2005, that DMG Claimed Exclusive
Ownership of the DIBELS Copyrights and Trademark***

4.      Through extensive communications and disclosures from Dr. Good and Dr. Kaminski, and through its own investigations, UO was fully aware from the beginning that Drs. Good and Kaminski, and later their company DMG, asserted complete ownership of copyright in the product called DIBELS 6th, and of the DIBELS trademark.   These are set out in much greater detail in the Good Declaration, but the highlights are:

- Communications in May and June of 2001, between Drs. Good and Kaminski and Philip Loux of the University's Office of Technology Transfer (OTT) concerning commercialization of DIBELS.  They informed him that they had spent a significant amount of their own funds commissioning from third parties twenty-four so-called DIBELS Oral Reading Fluency (DORF) passages.  On June 8, 2001, Mr. Loux sent them an email in which he recommended that they proceed to establish a for-profit startup company.  Good Decl., ¶¶ 18-19.

  Several years later, UO's Lynette Schenkel recorded that she and Randolph Geller of UO's General Counsel Office had discussed these early contacts:

  > As Randy  and I discussed it however, ***our not following through with the Investigators***[that is, Drs. Good and Kaminski] ***in the Fall of 2001 may be considered tacit acquiescence for their moving ahead with their corporate start up apart from the UO***.

  See Exhibit 11 to the Good Declaration (Good Decl. ¶ 38) (emphasis added).

- In May of 2003, a series of emails among DMG, its commercial licensees, and two members of the UO administration, concerning the wording of an Educational Use Agreement to accompany UO's own, non-commercial distribution of DIBELS 6th, which was to occur by means of a UO website, simultaneous with the commercial exploitation of the assessment in book form and on mobile devices by DMG's licensees.  (It was DMG that insisted upon such free availability of the measures.)  Good Decl., ¶¶ 26-37.)

With no objection from the UO administrators, the final wording of the Educational Use Agreement

> ➢ acknowledged DMG's ownership of the DIBELS copyright and trademark;
>
> ➢ acknowledged that DIBELS was available commercially from  DMG's licensees, Sopris West Education Services, Inc. and Wireless Generation, Inc.; and
>
> ➢ provided a link to the website Sopris West Education Services, Inc . ("Sopris") to enable teachers to purchase DIBELS materials in print form from Sopris.

Good Decl., ¶¶ 35-37; and Exhibits 9 and 10.  This Educational Use Agreement was incorporated in the DIBELS 6th Administration and Scoring Guide, downloadable from the UO website at least as early as October, 2003. Good Decl., ¶ 35 and Exhibit 9.

- Posting by the University of this final version of the Educational Use Agreement on the UO Website, shortly thereafter, on the download page for DIBELS 6th.  This was a "click-on" agreement, so that any user would have to accept the Educational Use Agreement as a condition of the download.[1]  Good Decl., ¶ 36.

- Providing links to the Sopris and Wireless Generation websites for DIBELS users wishing to purchase print or electronic versions.  Good Decl, ¶53.

- Discovery on January 9, 2004, by Brian Smith – a lawyer in the University's Office of Technology Transfer (OTT) – of a press release announcing the three-way partnership agreed to in June of 2003, among Wireless Generation, Sopris and DMG, under which

---

[1] UO now seems to allege (in ¶118 of its counterclaims) that these postings on its website were somehow due to suborned employees, ignoring the fact (evident from the face of the emails described above) that two senior UO administrators unconnected with DMG – Dr. Kame'enui and Ms. Simmons – were kept fully abreast of developments surrounding the Educational Use Agreement.

Wireless Generation would make a DIBELS version available on its mCLASS (mobile

classroom assessment) platform.  Good Decl., ¶ 39 and Exhibit 11.

- An internal investigation into DMG and its exploitation of DIBELS involving the UO

   Office for Responsible Conduct of Research and the UO General Counsel's Office, as

   reflected in an internal UO memorandum, written in January 2005 and obtained by Dr.

   Good in 2012 (the "Schenkel Memorandum," Exhibit 11 to the Good Declaration).[2].

- A search by UO of the US Patent and Trademark website, leading to the discovery of

   DMG's three federal DIBELS trademark registrations.  This investigation took place no

   later than January, 2005, when it was reported in the Schenkel Memorandum.[3]

- Submission by Drs. Good and Kaminski to the University, on July 29, 2005, of an

   "Intellectual Property Disclosure" informing the University that they had created

   DBIELS 6th "[u]sing no university resources and relying exclusively on personal time

   and investment."  Good Decl., ¶42.

*In 2005, UO Negotiated (Though it did not Sign) a Formal Agreement with DMG*
*Acknowledging DMG's Ownership of DIBELS*

   5.    According to the Schenkel Memorandum, Brian Smith of OTT had "raised the

issue of whether or not the UO should … pursue back monies owed for revenues received since

DMG's incorporation" and listed some "potential next steps," including forcing DMG to assign

the DIBELS mark and copyright to UO and pay UO a royalty.  (Schenkel Memorandum at

---

[2] The Schenkel Memorandum goes on to report that "further investigatory work was performed
immediately thereafter," though it does not describe the content or outcome of that investigation.
[3] By the date of the Schenkel Memorandum, the marks had actually been registered for more
than a year.  See the table of DMG's registrations at ¶61 of DMG's Complaint.

page 1.[4]) But it did not do so; instead, after communications with DMG's legal counsel, the University proceeded to negotiate a contract with DMG whose premises and terms were completely the opposite.

6.     This process began in April, 2005, several months after the Schenkel Memorandum. Donald Gerhart, the head of the University's Office of Technology Transfer, sent an email to Dr. Good expressing a desire to "get the ball rolling" on formalizing the University's and DMG's arrangements regarding DIBELS. Good Decl., ¶41. Notably, in that email Mr. Gerhart sought "the necessary copyright assignments, trademark assignments, [and] license agreements for DIBELS," which indicates that he was pursuing the agenda attributed to Brian Smith in the Schenkel Memorandum.

7.     On July 29, 2005, however, Drs. Good and Kaminski submitted to the University the "Intellectual Property Disclosure" noted above, whose contents directly contradicted the premises of Brian Smith's agenda.  It stated:

> Using no university resources and relying exclusively on personal time and investment, Drs. Good and Kaminski developed the DIBELS 6th Edition, which was completed in 2003.  All measures with the exception of DORF were completely redone, and all items and probes were created anew. The initial 24 DORF passages developed with the personal and private funding of Roland Good and Ruth Kaminski were incorporated in the DIBELS 6th Edition materials.  In addition, 20 additional progress monitoring passages for DORF, assessment materials for grades 4-6, and a Retell Fluency component were introduced in the 6th Edition. Some DORF passages were re-arranged from being benchmark assessments to being progress monitoring assessments.

Good Decl., ¶¶ 42-44.

8.     DMG's attorney and OTT's Brian Smith engaged in communications in the summer of 2005 leading to a "nonbinding term sheet" that Smith sent to Forsyth on September 2,

---

[4]  Note though that Ms. Schenkel observes, "these do not take into account legal issues that may be involved," perhaps referring to the concerns she and Randy Geller shared as to prior "acquiescence."

2005. This document – Exhibit 14 to the Good Declaration – is worth reading in its entirety, but the key point is that the term sheet, *prepared by an attorney working for UO*, takes a completely different position with regard to the ownership of DIBELS than had been mooted in the Schenkel Memorandum and in the Gerhart email quoted above. In short, after an extensive investigation into DIBELS at senior levels, the UO eventually took the position that DMG owned the trademark and the copyright in DIBELS 6th. The term sheet set forth the following allocation of rights:

- The DIBELS 6th assessment materials – including the DORF passages that had been included in DIBELS 5th – belonged to DMG, but UO would be granted certain limited non-exclusive rights of distribution and use, including free download distribution via the UO Website;

- The Administration and Scoring Guide for DIBELS 6th was jointly owned by UO and DMG; and

- The DIBELS trademark belonged to DMG.

**9.**     Mr. Smith of OTT then undertook to draft an agreement based on the term sheet. He sent a draft to Mr. Forsyth by email dated October 26, 2005, in which he stated that "[t]he attached Agreement has been reviewed by an attorney in the UO's General Counsel office." Good Decl., ¶46. Subsequent drafts of this agreement, including the final draft of December 7, 2005, made small adjustments but left intact the above allocation of trademark and copyright rights. Furthermore, the draft agreement formally acknowledged, and required UO to use, the Educational Use Agreement described above. (Good Decl. Exh. 16 at Section 3.3.

***For Seven Years after Negotiating the Unsigned 2005 Agreement, UO Acted in
Conformity with its Terms***

10.     For reasons that have never been explained to DMG, the University failed to sign

the negotiated Intellectual Property Agreement.  In an effort to satisfy the University's apparent

need for additional "conflict of interest" disclosures, Dr. Good provided various disclosure forms

and even showed his personal tax returns to a UO accountant.  (Among those disclosures were

two that reiterated in plain words DMG's claim to own all rights in DIBELS 6th and IDEL.)  Still

the unsigned agreement continued to languish on the desk of Randolph Geller, of UO's General

Counsel's Office.  Good Decl., ¶ 51.

11.     Despite not having signed the agreement it had negotiated, the University

continued for the next seven-plus years to act in accordance with its basic terms and tenets.  Most

critically, the University continued to post the Educational Use Agreement on the UO Website,

acknowledging DMG's ownership of DIBELS, and to condition downloads of DIBELS

assessment materials on user acceptance of the Educational Use Agreement.  Good Decl., ¶52.

12.     From 2005 to sometime in 2012 or 2013, UO provided links from its website not

only to DMG's website but also to the websites of DMG's licensees, Sopris and Wireless

Generation, for schools wishing to purchase print or wireless-enabled copies of DIBELS.  Good

Decl., ¶ 53.

***Other Evidence of UO's Knowledge of DMG's Claims and Activities***

13.     On April 20, 2007, the U.S. House of Representatives Education and Labor

Committee held a hearing on a controversy that involved DIBELS among other matters.  The

University was not only fully aware that Dr. Good would be speaking at this hearing, it even

offered to make its own outside counsel available to advise him in preparing for it.   Good Decl.,

¶ 56. At the hearing, Dr. Good was questioned extensively about the fact that federal grant

MOTION AND MEMORANDUM IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT AS TO
COUNTERCLAIMS ONE - SIX – Page 13

funding had supported research into DIBELS' general principles and that, despite such funding, DMG owned DIBELS 6th Edition and was receiving royalties from Sopris and Wireless Generation.  See pp. 71-73, 80-82, and 98-101 of the hearing transcript, Exhibit 24 to the Good Declaration.  Present throughout the hearing was Dr. Edward Kame'enui, who served as Associate Dean of the UO's Center on Teaching and Learning from September of 2007 to September of 2013.  Good Decl., ¶ 58.

14.    In 2008, Randolph Geller, by then Deputy General Counsel of UO, engaged in correspondence with Wireless Generation specifically relating to DIBELS. In that correspondence Mr. Geller expressly acknowledged (without voicing any objection) that Wireless Generation "sells services that include providing access, via a handheld device, to the DIBELS assessment tool."  Exhibit 10 to the Berger Declaration.  Mr. Geller made no demand that Wireless Generation cease and desist its DIBELS6[th] Edition sales or use of the DIBELS mark, despite his view that DIBELS was "derived from work funded by the federal government and the State of Oregon."

15.    In sum, over the last decade plus, the UO had extensive knowledge regarding DIBELS' creation, related grant funding, and DMG's exploitation of the copyright and trademark in DIBELS and decided not to bring  a claim until its very recent filings.

***The University Publicly Acknowledged DMG's Claim of Ownership to the IDEL Mark and Copyright***

16.    In addition to DIBELS, DMG and its licensees have for years sold a Spanish-language literacy assessment product known by the mark IDEL.  Good Decl., ¶¶ 59-60.

17.    IDEL was first made available for sale to the public by DMG's licensee Wireless Generation in or around 2004, and in print by DMG's licensee Sopris in 2006. *Id.*  It was also made available for free download at the UO Website in the same manner as DIBELS 6th edition,

MOTION AND MEMORANDUM IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT AS TO
COUNTERCLAIMS ONE - SIX – Page 14

accessible only upon acceptance of a version of the Educational Use Agreement identical to the

Educational Use Agreement for DIBELS except that references to "DIBELS" were replaced with

references to "IDEL".  Good Decl., ¶ 61.

      18.     In early 2006, DMG informed UO that it was applying to register the IDEL mark.

Good Decl., ¶ 62.

      19.     In a 2007 Conflict of Interest Disclosure Form, Dr. Good explicitly informed UO

that DMG claimed copyright in the 7th edition of IDEL. Good  Decl., ¶ 64.

***During the Decade of UO's Quiet Acceptance of DMG's Commercial Publication of DIBELS,***
***DMG and its Licensees Invested Heavily in the DIBELS Brand***

      20.     DMG and its publishing licensees have invested enormous amounts of time and

millions of dollars in developing, producing, marketing, and distributing the DIBELS and IDEL

materials, including Wireless Generation's development and refinement of software to score

DIBELS assessments on a handheld device. Good Decl., ¶66; Kaminski Decl., ¶¶3 and *passim*;

Logue Declaration, ¶¶ 5-12, 17-20; Berger Decl., ¶¶ 5-23. Marketing efforts have included,

without limitation, live presentations all around the country, responses to RFPs throughout the

country, teacher training, direct mail, attendance at conferences, catalogues, brochures, videos,

and websites – all prominently featuring the DIBELS mark.  Logue Declaration, ¶¶ 5, 7-9, 12-13;

Berger Decl., ¶¶15-22; Kaminski Decl., ¶¶ 9-19.  Samples of older DIBELS materials published

by Sopris can be seen in, for example, Exhibits E-1 to E-4 of the Logue Declaration, and

Voyager Sopris Learning's most recent iterations  may be seen on its website at

http://www.iamvoyager.com/assessment/dibels-next.   Samples of Amplify/Wireless Generation

materials are attached to the Berger Declaration  and may be seen at

http://www.amplify.com/assessment/mclass-dibels-next.

21.     As a result, since 2003 DMG's publishers have distributed DIBELS throughout the United States to hundreds of schools and school systems, serving many millions of children. Good Decl., ¶ 8; Logue Decl.,¶ 19.

22.     Thanks to their efforts and DMG's, the DIBELS brand has become a very powerful brand, one that educators and administrators have come to know well and respond to. The strength and national recognition of the brand is self-reinforcing, due to the need of school officials to justify their adoption decisions based on a well-known, reputable brand.  Logue Decl., ¶¶ 16, 19; Berger Decl., ¶ 18.

23.     DMG's publishers have combined DIBELS with other educational materials, increasing the pedagogical value of both and creating what George Logue of Voyager Sopris Learning calls "Comprehensive Solution Sets."  Logue Decl., ¶¶ 13-15; Berger Decl., ¶¶ 10-11. Thus, the DIBELS brand has become emblematic of product combinations that are unique to those publishers.

24.     In the case of Voyager Sopris Learning, DIBELS materials are even embedded in intervention materials, and the brand is thus inextricably tied in with the brands of those other proprietary products.  Logue Decl., ¶ 19.  In fact, so closely associated with Voyager Sopris Learning has the DIBELS brand become that it is known to many in the education world as "the DIBELS company."  *Id.*  This severely aggravates the risk of harm to which Voyager Sopris Learning is exposed by UO's untimely claim of ownership.  Logue Decl., ¶¶ 22-23.

25.     Serious as that harm is, it pales by comparison to the risk that UO's delay has created for DMG and its principals, which can without exaggeration be called existential.  Good Decl., ¶ 66; Kaminski Decl., ¶30-31.

# ARGUMENT

## I.    UO's Claims Seeking Cancellation of DMG's Federal Trademark Registrations are Barred by Laches

### A.    UO's Claim Against the Three Original DIBELS Registrations is Too Late by at Least Nine Years.

More than eleven years ago, in mid-2003, DMG obtained federal registrations of the DIBELS mark for three different classes of goods and services.  Complaint, ¶61; Good Decl., ¶ 13.  The University was fully aware of the existence of those registrations at least as early as January of 2005, by which time it had conducted or commissioned a search of the U.S. Patent and Trademark Office, as described in the Schenkel Memorandum that is attached as Exhibit 11 to the Good Declaration.

Schenkel's memorandum also describes at some length a series of communications between the University and Drs. Good and Kaminski.   It indicates that she and certain other University administrators were concerned that Drs. Good and Kaminski and DMG were claiming and exploiting intellectual property that ought to be the University's.  She said, however:

> I am in agreement with [Office of Technology Transfer counsel] Brian Smith's assessment that UO rights have been infringed in this matter.  As Randy [Geller, UO General Counsel] and I discussed it however, our not following through with the Investigators [i.e., Drs. Good and Kaminski] in the Fall of 2001 may be considered tacit acquiescence for their moving ahead with their corporate start up apart from the UO.

Over the course of the year following that memo, the University not only did nothing about DMG's registrations, it went to considerable lengths to negotiate an agreement that explicitly confirmed DMG's ownership of the DIBELS mark and thus the validity of those registrations.  In the fall of 2005 its own counsel drafted a term sheet and the first draft of such an agreement, both containing explicit recognition of DMG's trademark rights.  As described in detail in the Good Declaration at ¶¶ 41-49, the negotiations ended in late 2005 with a final draft

that, so far as DMG could tell, had been approved and was merely awaiting certain administrative formalities in order to be signed.

The University never signed the agreement, for reasons that have never been explained, but neither did it repudiate the agreement. On the contrary, for almost eight years it acted in complete conformity with the terms of the agreement. For all that time it publicly acknowledged DMG's ownership of the DIBELS mark, on its own website. It was a full participant in the DIBELS ecosystem, providing links to DMG's publishing partners and operating the DIBELS Data System for use by school systems that had adopted DIBELS. Good Decl., ¶ 53.

Then suddenly, in April of 2012, the University through outside counsel sent DMG a demand letter claiming to have "uncovered" DMG's numerous trademark and copyright registrations, accusing it of fraud and all the other sins it now lists in its counterclaims, and demanding that DMG turn over all of its intellectual property and all profits from its intellectual property within two weeks. DMG demurred, needless to say. Good Decl., ¶ 65. Exhibit 28. Yet another year passed, and the University filed a petition to cancel DMG's registration of the IDEL mark, the least valuable of all DMG marks. Complaint, ¶77. Not until November of 2013, fully 18 months after the demand letter, did UO file a petition to cancel DMG's various DIBELS trademark registrations on the grounds of alleged fraud. Complaint, ¶ 79. Then another year passed before UO filed its other claims.

This about-face would be strange enough had it occurred back in, say, 2006, when the issue was still fresh on everyone's mind. Coming now, after such a long period of peaceful cooperation, it is incomprehensible. Whatever the explanation for it may be, the University's overt acceptance of the *status quo* over eight-plus years constitutes acquiescence or, at the very least, laches of a high order.

MOTION AND MEMORANDUM IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT AS TO
COUNTERCLAIMS ONE - SIX – Page 18

B.      Acquiescence and Laches Are an Available Defense to UO's Cancellation
        Claim.

Although the Lanham Act allows cancellation proceedings brought under 15 U.S.C.

§1064(3) – which includes those based on alleged fraud – to be brought "at any time," it also

specifically provides that the defenses of laches and acquiescence are available in all such

proceedings.  15 U.S.C. §1069.  Some cases, primarily in the Trademark Trial and Appeal Board

("TTAB"), have essentially ignored §1069 and ruled that the defenses of laches and

acquiescence are not available where a party seeks cancellation on grounds of fraud.  However,

the only federal Court of Appeals to have directly ruled on the TTAB's theory that such defenses

are not available in cancellation proceedings under §1064(3) has explicitly rejected it, and the

Ninth Circuit, while not directly ruling on the TTAB's theory, has severely criticized it.

In *Pro-Football, Inc. v. Harjo*, 415 F.3d 44, 48 (D.C. Cir. 2005), the D.C. Circuit ruled

unequivocally that the federal trademark act "does not bar the equitable defense of laches in

response to section 1064(3) cancellation petitions," and explained as follows:

> The words '[a]t any time' demonstrate only that the act imposes no statute of limitations
> for bringing petitions.  Those words have nothing to do with what equitable defenses may
> be available during cancellation proceedings . . . [Any contrary holding] would make
> section 1069, which explicitly permits consideration of laches and other equitable
> defenses, meaningless as to cancellation petitions.

*See also Bridgestone/Firestone Research v. Automobile Club*, 245 F.3d 1359, 1360-61 (Fed. Cir.

2001).[5]

---

[5]  In *Marshak v. Treadwell*, 240 F.3d 184, 193 n.2 and n.4 (3d Cir. 2001), the Third Circuit
discussed the TTAB case law referred to above, in the context of deciding whether a state statute
of limitations could apply to a cancellation proceeding for alleged fraud.  (The Court held that
"at any time" means there is no statute of limitations for such proceedings.)  In fn. 4 of its
opinion, the Third Circuit noted that the laches defense had not been available in cancellation
proceedings under the 1905 Trademark Act, but that the statute had been changed to make
express provision for the laches defense.  To the extent the Third Circuit's discussion of the

The Ninth Circuit, even before the D.C. Circuit's opinion in *Harjo*, sharply criticized the above-referenced TTAB cases in a separate context. In *In re Beaty*, 306 F.3d 914 (9th Cir. 2002), the Ninth Circuit considered whether similar "at any time" language in a Bankruptcy Court Rule foreclosed laches as a defense and decided it did not. The Ninth Circuit noted that "the Patent and Trademark Office has consistently held that Section 14 of the Lanham Act, which provides that a cancellation action premised on genericism, abandonment or fraudulent procurement may be brought 'at any time,' precludes a laches defense to such actions," *id.* at 922, but criticized such cases as containing "virtually no analysis as to why such language would eliminate the application of the equitable doctrine, instead simply assuming that the absence of a time limitation also results in the absence of a laches limitation." *Id.* at 923. The Ninth Circuit concluded that "there is nothing inherently contradictory about saying that an action that may be brought 'at any time' is nonetheless subject to an equitable limitation based on prejudicial delay." *Id.* at 924.

Two subsequent California district court cases, *Lappert's Ice Cream, Inc. v. Lappert's, Inc.*, 2007 U.S. Dist. LEXIS 58741 at *7-8 (N.D. Cal. Aug. 1, 2007) and *Butkus v. Downtown Athletic Club of Orlando, Inc.*, 2008 U.S. Dist. LEXIS 49828 at *17-18(C.D. Cal. 2008), have held that laches may be raised as a defense in a cancellation proceeding based on alleged fraud. Both cited *In re Beaty; Lappert's* explicitly followed the ruling in *Harjo*; and *Butkus*, while not citing *Harjo*, pointed to Section 1069 as the basis for its ruling.[6] Not a single court in this Circuit

---

TTAB cases might be read as suggesting that the TTAB's anti-laches theory remained a correct view of the law, the Third Circuit in *Harjo* expressly rejected it. 415 F.3d at 48.

[6] In both *Lappert's* and *Butkus*, the court was not able to grant summary judgment on laches because it was unclear when the party to be charged with laches had become aware of the allegedly fraudulent registrations. No such uncertainty exists here.

has found otherwise, and it is impossible to imagine a basis on which one could. Thus, DMG's

defenses of acquiescence and laches are cognizable by this Court.[7]

> C.    UO's Behavior More than Meets the Ninth Circuit's Standards for Laches and
> Acquiescence.

As the Ninth Circuit has repeatedly held, the test for laches is two-fold: "first, was the

plaintiff's delay in bringing suit unreasonable? Second, was the defendant prejudiced by the

delay?" *Jarrow Formulas, Inc. v. Nutrition Now, Inc.*, 304 F.3d 829, 838 (9th Cir. 2002).

Acquiescence differs from laches only in requiring "some form of active consent," some conduct

by which the plaintiff "actively represented that it would not assert a right or a claim." *Seller

Agency Council, Inc. v. Kennedy Ctr. for Real Estate Educ., Inc.*, 621 F.3d 981, 989 (9th Cir.

2010). Such affirmative act need not be an express promise but rather can be an implied

assurance that the plaintiff will not assert its trademark rights against the defendant. *Id.* at 988-

989. The facts here meet all three tests.

In measuring the reasonableness of a plaintiff's delay, the courts look to the analogous

state statute of limitations as a touchstone. *Id.* If a Lanham Act claim is brought outside the

period of the analogous statute of limitations, it is presumptively unreasonable. *Jarrow*

---

[7] The TTAB's discredited theory violates not only the principles of statutory construction but
also the public policy rules of the Ninth Circuit. The TTAB argues against allowing a laches
defense in cancellation proceedings based on fraud, acquiescence, and the like because it is in the
public interest to "preclude registration of merely descriptive designations or registration
procured by fraud." *TBC Corp. v. Grand Prix Ltd.*, 12 U.S.P.Q.2D (BNA) 1311, 1313 (TTAB
1989). That is precisely the kind of public policy claim that the Ninth Circuit rejected in *Jarrow
Formulas v. Nutrition Now*, 304 F.3d 829, 840 (9th Cir 2002), because it denies the defense in
every case, indiscriminately and across the board. As the Ninth Circuit said in *Jarrow Formulas*,
"we must be careful not to define the public's interest in such a manner as to effectively swallow
the rule of laches and render it a spineless defense." In that case, based on alleged false
advertising, the Ninth Circuit held that "in order to ensure that laches remains a viable defense
to Lanham Act claims, the public's interest will trump laches only when the suit concerns
allegations that the product is harmful or otherwise a threat to public safety and well-being." 304
F.3d at 841.

*Formulas, Inc.*, 304 F.3d at 837. And of course, the more a plaintiff's delay exceeds the analogous limitations period, the stronger the presumption becomes.

The analogous statute here is Oregon's two-year statute of limitations for actions sounding in fraud. ORS 12.110(1); *Johannsen v. Brown*, 797 F. Supp. 835, 839-840 (D. Or. 1992). In *Jarrow Formulas,* the plaintiff delayed for seven years, where the analogous state statute was a three-year statute, and the court had no difficulty finding laches; UO's delay has been four times as long relative to the Oregon limitations period. In fact, UO's delay in seeking cancellation of DMG's 2003 DIBELS registrations has exceeded even the ten-year Oregon statute of ultimate repose (ORS 12.115(1)).

Several unusual factors aggravate the unreasonableness of UO's delay in making its claim. First, in contrast to many cases, which involve strangers or parties with little contact, here there was a close relationship between the UO and the parties it now seeks to sue. DMG's principals, Drs. Good and Kaminski, were members of its own faculty. It engaged in extensive discussions and negotiations with them over the very issues it now dresses up as counterclaims. Second, the fact that UO on several occasions over the years from 2001 to 2005 turned its attention to investigating DMG's intellectual property rights in DIBELS and at those times chose not to assert a trademark claim, makes the delay more unreasonable. In short, this is not a case in which the delay in filing trademark and related claims was caused by ignorance of its potential claims, or even excusable failure to investigate; rather, the UO took purposeful actions and should be bound by the consequences of those actions.

Not only is UO's delay extraordinarily long, it has created the risk of extreme prejudice to DMG, its licensees, and its owners Drs. Good and Kaminski. To be sure, cancellation by itself would not inflict a mortal blow; DMG would still have its common law rights in the DIBELS

mark. *Far Out Productions v. Oskar*, 247 F.3d 986, 996 (9th Cir. 2001). But UO's cancellation claim cannot be read in isolation; it is part of a larger campaign by UO to set itself up as the owner of the DIBELS mark, as is evident from its First, Third, and Sixth Claims for Relief. As a package, these claims could disable or destroy DMG's business and seriously impact the business of its publishers.

As summarized in the Statement of Facts above, at ¶¶ 20-24, during the long period of UO's public acquiescence DMG and its publishing partners have invested millions of dollars in development, production, marketing, and distribution of DIBELS products and in promoting the DIBELS brand. DMG's principals, Drs. Good and Kaminski, have poured their personal assets into growing the business. In 2003, Dr. Kaminski personally gave up her job at UO and all of its salary and began working full time at DMG to develop DIBELS, and has devoted the last ten years of her life to promoting and developing the materials and their good name. Kaminski Decl., ¶ 29. Following the negotiation of the 2005 agreement, Dr. Good reduced his work at UO to half-time, giving up a portion of his salary, and has devoted the balance of his time to the development, distribution, and marketing of DIBELS. Good Decl., ¶67. These investments have been made in reliance on DMG's federally registered rights. UO knew of these commercial efforts from the beginning and took no action to prevent them.

Had DMG and its publishers, Sopris West Educational Services (now Voyager Sopris Learning) and Wireless Generation (now Amplify), known in 2004, when they were first bringing DIBELS to market on a commercial scale, that UO considered DMG's registrations to be fraudulent, they would have pushed to resolve the matter. And if it could not be resolved in DMG's favor, they would have rebranded the product and focused their energies and money on developing goodwill for a different product name. Good Decl., ¶ 67; Logue Decl., ¶ 21; Berger

Decl., ¶4.  No rational business will invest money in developing a brand that has such a cloud hanging over it.

On facts less egregious than the facts here, the Ninth Circuit found laches due to plaintiff's four-year delay in *Grupo Gigante S.A. de C.V. v. Dallo & Co.*, 391 F.3d 1088, 1105 (9th Cir. 2004), observing: "[A] defendant can make the required showing of prejudice by proving that it has continued to build a valuable business around its trademark during the time that the plaintiff delayed the exercise of its legal rights."  In that case, had defendants been put on timely notice of plaintiff's claim they could have changed the name of their existing store; instead, due to plaintiff's failure to object, they opened a second store under the same name; this was sufficient prejudice to support a finding of laches.  *See also, e.g., Conopco, Inc. v. Campbell Soup Co.*, 95 F.3d 187, 192 (2d Cir. N.Y 1996) ("By waiting over five years to assert its present claim, Conopco precluded the possibility that Campbell could effectively adopt an alternative marketing position.  Thus, the district court properly found that Campbell had been prejudiced by the delay.");[8] *Chattanoga Mfg., Inc. v. Nike, Inc.*, 301 F.3d 789, 795 (7th Cir. 2002) ("Had [plaintiff] challenged Nike's use of the term Jordan in a timely manner and prevailed, Nike could have promoted its products in a number of different ways.").

In essence, the University has waited years while DIBELS has been built into a powerful nationwide educational brand, generating millions of dollars each year in sales, and now seeks to reap where it has not sown.  As the Ninth Circuit observed in the context of a copyright dispute, "It is inequitable to allow the [plaintiff] to lie in the weeds for years … while large amounts of money are spent developing a market for the copyrighted material, and then pounce on the prize

---

[8] In *Conopco* the court found laches even though plaintiff's delay was *less than* the analogous state statute of limitations.  Here UO's delay is far longer than the applicable state statute.

after it has been brought in by another's effort." *Zuill v. Shanahan*, 80 F.3d 1366, 1371 (9th Cir. 1996).

UO's counterclaims should be barred not only by laches; acquiescence is an independent ground for dismissal.  The University has gone beyond mere passive failure to act; its conduct in the critical years when DIBELS was getting off the ground – especially its conduct in 2005 – encouraged DMG and its principals, Drs. Good and Kaminski, to believe that the University accepted and even supported what DMG was doing.  How else can one fairly interpret the University's overt acceptance – first in the term sheet drafted by an attorney in its Office of Technology Transfer and (so it told Dr. Good) approved by its General Counsel office, then in the formal contract also drafted by the OTT attorney – of DMG's ownership of the DIBELS mark?  How else can one fairly interpret its continued posting (as per the agreed but never-signed 2005 agreement) of the Educational Use Agreement that explicitly recognized DMG's trademark rights, and the provision on the UO Website of links to DMG's licensees, Sopris and Wireless Generation?  Such conduct goes beyond "actively represent[ing] that it would not assert a right or a claim" (*Seller Agency Council*, 621 F. 3d at 989); it amounts to actively agreeing with and acting on DMG's fundamental legal position.  Then in 2007, when Congress put DMG's private ownership of DIBELS (among other Reading First concerns) under a very public microscope, the University did not seize an opportunity to turn on DMG, but even offered Dr. Good the benefit of its own counsel's advice.  If all this is not acquiescence, it is hard to imagine what would be.

> D.    UO's Claim Seeking Cancellation of DMG's IDEL Registration is Likewise Barred by Laches.

In addition to the DIBELS mark, UO is attempting to claim DMG's IDEL mark and, as part of that campaign, to cancel DMG's registration of that mark.

The laches period here is shorter than that for DIBELS, but it is still well in excess of the Oregon two-year statute of limitations.  UO was put on notice of DMG's intention to register the IDEL mark in January of 2006, and posted IDEL materials and an IDEL Educational Use Agreement bearing the ® symbol shortly after DMG's registration of IDEL issued in 2008. Good Decl., ¶ 61.  Even if UO now tries to claim that the UO employees concerned had no authority with respect to these actions, that does not excuse its delay.  For UO was under a duty of inquiry with respect to DMG's trademark registrations generally, given its previous awareness of – and, in the case of Lynette Schenkel at least, unhappiness with – DMG's DIBELS registrations.  It therefore "knew or should have known" of the IDEL registration when it issued in 2008, *Kling v. Hallmark Cards, Inc.*, 225 F.3d 1030, 1036 (9th Cir. 2000), and its delay in seeking to cancel the registration was presumptively unreasonable.

As for prejudice, while the IDEL brand and product are less valuable than DIBELS, they have still been the object of significant investment by DMG and its publishers.  Logue Decl. ¶¶ 8-12; Berger Decl., passim.  Thus, laches bars UO's claim for cancellation of the IDEL registration.

### E. UO's Claims for Cancellation of the DIBELSNext and DIBELSNet Marks are Barred under the Morehouse Doctrine.

Although UO seeks cancellation of DMG's registrations of the DIBELSNext and DIBELSNet marks, it has alleged no claim to own the words "Next" and "Net."   Its objections to DIBELSNext and DIBELSNet are purely derivative of its objection to DIBELS, and must meet the same fate.

This is the so-called *Morehouse* rule, named for the holding in *Morehouse Mfg. Corp. v. J. Strickland & Co.*, 407 F.2d 881 (C.C.P.A. 1969).  The Federal Circuit has summarized the rule in the following words:

MOTION AND MEMORANDUM IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT AS TO
COUNTERCLAIMS ONE - SIX – Page 26

[I]f the opposer cannot be further injured because there already exists an injurious registration, the opposer cannot object to an additional registration that does not add to the injury.

*O-M Bread v. United States Olympic Committee*, 65 F.3d 933, 938 (Fed. Cir. 1995).[9]  Thus, in

*Place for Vision, Inc. v. Pearle Vision Ctr., Inc.*, 218 U.S.P.Q. 1022, 1983 TTAB LEXIS 122

(TTAB 1983), a party who had failed to oppose two prior registrations for VISION CENTER

was denied the right to oppose registration of PEARLE VISION CENTER, where its claim of

damage related solely to the words VISION CENTER and not to the newly added name

PEARLE.

Just so, here, UO's claim of injury relates solely to the reuse of DIBELS in the marks

DIBELSNext and DIBELSNet, and because its cancellation claim against DIBELS must be

denied on the grounds of laches and acquiescence, so must its cancellation claim against these

two derivative marks.

## II.     UO'S Common Law Infringement Claims are Also Barred by Laches and Acquiescence.

UO's First, Third, and Sixth Claims for Relief all allege, in one way or another, that UO

has superior rights to DMG in the DIBELS and IDEL marks and that DMG is infringing on those

alleged rights.   These are merely the obverse of UO's cancellation claims.  And for all the

reasons already stated above regarding UO's cancellation claims, these infringement claims are

barred by laches and acquiescence.

Only one question remains, and that is whether to apply, and if so how to apply, the

analysis that courts in the Ninth Circuit typically apply to laches defenses in trademark

---

[9] Although the *Morehouse* doctrine evolved in the context of opposition proceedings in the Trademark Trial and Appeal Board, the same principal applies in cancellation proceedings. *See* J. Thomas McCarthy, 4 *McCarthy on Trademarks and Unfair Competition*, § 20:78 (4th ed. 2014).

infringement cases.   Where a plaintiff's claim concerns infringement, the Court must consider at

least the following six factors: "(1) strength and value of the trademark rights asserted; (2)

plaintiff's diligence in enforcing mark; (3) harm to senior user if relief is denied; (4) good faith

ignorance by junior user; (5) competition between senior and junior users; and (6) extent of harm

suffered by the junior user because of senior user's delay." *E-Systems, Inc. v. Monitek, Inc.*, 720

F.2d 604, 607 (9th Cir. 1983).   However, as the Court noted in *Tillamook Country Smoker v.*

*Tillamook County Creamery Ass'n,* 311 F. Supp. 2d 1023, 1030-1031 (D. Ore. 2004), *aff'd*, 465

F.3d 1102 (9th Cir. 2006):

> While a court is guided by various factors, ultimately, the doctrine of laches requires "'a
> consideration of the circumstances of each particular case and a balancing of the interests
> and equities of the parties.'" [citations omitted]

But this is not a typical infringement case.  In the typical case there are two entities with

no relationship to each other, with their separate histories of usage, one (the "senior user")

having a longer history than the other (the "junior user").   Although the University asserts in its

pleadings that its use predates DMG's, and claims infringement, that is not the gravamen of the

dispute here.  The fundamental issue here is who owns the mark that for ten-plus years DMG has

openly and unambiguously exploited as its own property with the full knowledge of the

University. In short, this is really the trademark equivalent of the dispute in *Seven Arts Filmed*

*Entertainment, Ltd. v. Content Media Corp. PLC*, 733 F.3d 1251 (9th Cir. 2013), which is more

fully discussed in Section IV below.

If, however, the *E-Systems* factors are germane here, they do not help the University.

The second and sixth *E-Systems* factors are essentially different wordings for the reasonableness

of the plaintiff's delay and the prejudice to defendant; those factors (as already shown) strongly

favor DMG.  The fourth factor – good faith ignorance on the part of defendant – also strongly

MOTION AND MEMORANDUM IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT AS TO
COUNTERCLAIMS ONE - SIX – Page 28

favors DMG. The actions taken by UO at a critical juncture in 2005 – including especially the term sheet its own counsel drafted and the agreement it negotiated, never signed, but never repudiated – make it impossible for UO now to claim that DMG was acting in bad faith as it moved forward with its commercial publishing plans for DIBELS.

The first factor might at first blush seem to be plaintiff-oriented, but in fact it is not. In the *E-Systems* case itself the Ninth Circuit focused on the value and strength of the *defendant's* mark, which it found to be valuable and strong, placing this factor on defendant's side of the scale. So too, here, the DIBELS mark is a strong and valuable mark due to the huge investment of DMG and its publishing licensees.

The fifth factor – competition between the parties – has unusual ramifications in this case. The fact is that until very recently the parties were not competitors but collaborators. DMG sold DIBELS commercially; UO allowed free downloads and ran the DIBELS Data System for analyzing DIBELS test results. Good Decl., ¶ 11. It is only in the very recent past that UO without warning began to act in a manner hostile to DMG and inconsistent with eight years of prior practice. Given that, and given the admonition in *Tillamook* that it is the circumstances of the particular case that count, this factor too must weigh in DMG's favor.

As for the third factor – harm to the plaintiff – any harm suffered here by UO consists entirely of being denied the fruits of DMG's labors, which after a decade or more of silence it has sought to grab for itself.

For all these reasons, UO's First, Third and Sixth Claims for Relief must be denied on the grounds of laches.

### III.    UO's Claim for Damages from DMG's Trademark Registrations is Time Barred.

Nowhere in the factual allegations of its counterclaims does the University ever suggest how it has suffered any damage from DMG's trademark registrations.   Nevertheless, in Paragraph 141 of its Second Claim for Relief, UO asserts that DMG is liable for such damages.[10]

The Lanham Act, at 15 U.S.C. §1120, allows a private party to sue for damages arising from another party's registration of a trademark.   The Ninth Circuit has ruled that claims under §1120 are subject to the Oregon two-year statute of limitations.   *Official Airline Guides v. Goss*, 6 F.3d 1385, 1395-1396 (9th Cir. 1993).   Furthermore, the Ninth Circuit has made clear that the limitations period is triggered by the registration itself, not by the date on which damage was allegedly suffered as a result of the registration.   *Id.* [11]

DMG's registrations of the DIBELS mark were applied for in February, 2002, and granted by the U.S. Patent and Trademark Office on various dates between June and October, 2003.   Complaint, ¶ 61.   The University was aware of these registrations no later than January 2005, at which time the Schenkel Memorandum stated:

> A search at the US Patent and Trademark Office reveals that on February 13, 2002, three separate Trademarks were filed with the US PTO by Dynamic Measurement Group, Inc.

Good Decl., ¶ 39.   Since UO's awareness of DMG's DIBELS registrations predates its counterclaims by more than nine years, the statute of limitations bars its Second Claim for Relief, insofar as that Second Claim seeks damages from the DIBELS registrations.

---

[10]   In this respect, DMG's Second Claim for Relief also fails to meet its pleading requirements. *See Jackson v. Lynley Designs, Inc.*, 729 F. Supp. 498 (E.D. La. 1990).   However, for the sake of simplicity, DMG focusses here on the statute of limitations bar.
[11]   *Official Airlines Guide* does not discuss the application of any discovery rule, perhaps because only a few weeks separated the registration at issue in that case from the date on which the party claiming damages became aware of the registration.   But even if a discovery rule applies here, discovery occurred no later than January, 2005 – see discussion immediately below.

As for the registration of IDEL, that registration was obtained in 2008 (Complaint, ¶ 61) and, for the reasons discussed above, the University knew or should have known of the existence of that registration at or near the time it issued. Moreover, in April of 2012 the University caused its counsel to send a demand letter to DMG, complaining of the existence of "numerous" trademark registrations taken out by DMG. Good Decl., ¶ 65. Although that letter does not specifically mention IDEL, the University must be charged with knowledge of the existence of the IDEL registration at that time. A mere search of the PTO database for all registrations by DMG would have turned up its registration of IDEL at that time. See *Beauty Time v. VU Skin Systems, Inc.*, 118 F.3d 140, 149 (3d Cir. 1997). The two-year statute of limitations regarding IDEL has thus also passed.

Finally, UO alleges damages from DMG's federal registrations of two subsidiary DIBELS marks, DIBELSNEXT and DIBELSNET. (DMG obtained those registrations during the period May 2011 to June, 2012.) Again, it is clear from the letter sent by its outside counsel in April of 2012, more than two years before the filing of its counterclaims, that UO was on notice of DMG's trademark registrations and applications. Indeed, under the *Morehouse* doctrine any claim for damages based on these registrations would have been barred many years ago, because the registrations are essentially of DIBELS with "Next" and "Net" attached to them, and the University's counterclaims allege no rights in either "Next" or "Net."

Therefore, all claims for damages under §1120 must be dismissed.

**IV.  UO'S Copyright Claims are Barred by the Statute of Limitations.**

Claims arising under the Copyright Act are subject to a three-year statute of limitations. 17 U.S.C. § 507(b); *Seven Arts Filmed Entertainment, Ltd. v. Content Media Corp. PLC*, 733 F.3d 1251, 1254 (9th Cir. 2013) (hereinafter "*Seven Arts*"). The University's Fourth and Fifth

Claims for Relief both run afoul of this limitation, because DMG and its licensees have been openly exercising copyright rights in the DIBELS 6th and IDEL materials for a far longer period of time.[12] Indeed, the University has known that DMG claimed copyright in DIBELS for over ten years.

It has long been the rule in the Ninth Circuit that claims contesting ownership of copyright accrue only once, namely when the other party "expressly repudiates" the claimant's entitlement to copyright. *Id.* at 1254; *Zuill v. Shanahan*, 80 F.3d 1366, 1369 (9th Cir. 1996). Thus in *Zuill*, for example, the plaintiff sought a declaration that it was the joint owner of a copyright, although the defendant had on several occasions, beginning five years before the commencement of litigation, put the plaintiff on notice that he claimed exclusive ownership of the copyright. The Ninth Circuit upheld the District Court's finding that the copyright three-year statute of limitations barred the claim.

In *Seven Arts*, the Ninth Circuit joined the Second and Sixth Circuits in holding that "where the gravamen of a copyright infringement suit is ownership, and a freestanding ownership claim would be time-barred, any infringement claims are also barred." 733 F.3d at 1255, citing *Kwan v. Schlein*, 634 F.3d 224 (2d Cir. 2011). In run-of-the-mill copyright infringement cases, where the plaintiff's complaint focuses on the "nature, extent or scope of copying" by a third party (*Kwan*, 634 F.3d at 229), there is a "rolling" statute of limitations, permitting the plaintiff to sue on infringements occurring within the prior three year period, even if the initial infringement commenced earlier. *See, e.g., Roley v. New World Pictures*, 19 F.3d 479 (9th Cir.1994). However, when ownership "forms the backbone of the 'infringement' claim at issue" (*Kwan*, 634 F.3d at 229), "allowing infringement claims to establish ownership where a

---

[12] The Fourth Claim for Relief is limited to the various editions of DIBELS (but not IDEL). Although it is unclear, the Fifth Claim for Relief seems to encompass both DIBELS and IDEL.

freestanding ownership claim would be time-barred would permit plaintiffs to skirt the statute of limitations for ownership claims and lead to results that are potentially bizarre." *Seven Arts*, 733 F.3d at 1255.[13]

UO's counterclaims present a situation legally identical to that in *Seven Arts*. Its Fourth Claim alleges infringement of copyright, and its Fifth Claim challenges the validity of DMG's copyright registrations. Both claims rest entirely on UO's assertion that it, not DMG, owns copyright in the DIBELS 6th, DIBELS NEXT, and/or IDEL materials. See, e.g., Amended Answer ¶147 ("The University Works are comprised of original material owned by UO..." and ¶158 ("The University desires a judicial determination that . . . DMG does not own and never owned these underlying copyrights. . . ").

The only question, therefore, is whether DMG asserted ownership of the rights UO now claims to own, in such a manner as to put UO clearly on notice of DMG's assertion of ownership, more than three years before UO's present counterclaims. See *Kwan*, 634 F.3d at 228 (an ownership claim accrues "only once, when a reasonably diligent plaintiff would have been put on inquiry as to the existence of a right. [Citation omitted.] Under this rubric, any number of events can trigger the accrual of an ownership claim, including an express assertion of sole authorship or ownership."). And here too the record is clear.

---

[13] Although in *Zuill* the Ninth Circuit had limited its rule to cases where the parties had a "close relationship," in *Seven Arts* the Court indicated that that might no longer be a requirement. *See* 733 F.3d at 1255-1256. If such a requirement still applies, it is certainly met here. In *Seven Arts* the parties were arm's length licensor and licensee. Here, the relationship between UO and DMG has been far closer. Dating back to the late 1990s, DMG's principals, Drs. Good and Kaminski, have served as UO faculty in one capacity or another. During the early years of that time period they worked on DIBELS with the full knowledge and encouragement of UO – and according to UO, with the collaboration of other UO researchers. During the years 2002-2006, Drs. Good and Kaminski engaged in extensive communications with numerous UO administrative staff regarding the ownership and exploitation of DIBELS – including the negotiation of the never-executed 2005 license agreement. In short, a very "close relationship" existed between them and the University.

MOTION AND MEMORANDUM IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT AS TO
COUNTERCLAIMS ONE - SIX – Page 33

DMG's clearest act of repudiating any copyright interest by UO in DIBELS occurred during the last half of 2005 when Drs. Good and Kaminski filed an Intellectual Property Disclosure specifically claiming that DIBELS 6th was created completely outside the University, and then agreed to a term sheet and draft agreement with the UO reciting that DMG owned the copyright in DIBELS 6th Edition.[14] That draft agreement included a requirement that the University continue to use the Educational Use Agreement that expressly attributed copyright to DMG, and the University did in fact continue to use that Educational Use Agreement for some eight years. All this was more than repudiation by DMG, it was repudiation by the University of its own claims to copyright. Then in January of 2006, Dr. Good submitted a Conflict of Interest Disclosure Statement in which he specifically stated that DMG owned copyright in DIBELS 6th and IDEL. Good Decl., ¶51. This is as express a repudiation as any statement in any Ninth Circuit case.

Many other kinds of conduct can also count as repudiation, triggering the running of the statute of limitations. As the Second Circuit observed in *Gary Friedrich Enterprises, LLC v. Marvel Characters, Inc.*, 716 F.3d 302, 317 (2d Cir. 2013):

> For example, a claim can accrue: when a book is published without the alleged co-author's name on it [citing *Kwan v. Schlein*, 634 F.3d 224, 229 (2d Cir. 2011); when alleged co-authors are presented with a contract identifying the defendant as the "sole owner and copyright holder," [citing *Zuill v. Shanahan*, 80 F.3d at 1368 and *Gaiman v. McFarlane*, 360 F.3d 644, 652 (7th Cir. 2004)]; or when alleged co-owners learn they are entitled to royalties that they are not receiving [citing *Merchant v. Levy*, 92 F.3d 51, 53 (2d Cir. 1996) and *Stone v. Williams*, 970 F.2d 1043, 1048 (2d Cir. 1992)].

The First Circuit's decision in *Santa-Rosa v. Combo Records*, 471 F.3d 224 (1st Cir. 2006), is particularly apt and instructive here. The First Circuit stated that a claim for declaratory

---

[14] Good Decl., ¶¶ 42, 45-49. The parties agreed that they would jointly own the copyright in the Administration and Scoring Guide, which is a separate work from the DIBELS product itself. Good Decl., ¶¶ 45.

judgment of ownership accrued when the defendant record label failed to pay royalties to the

plaintiff, the purported copyright owner. *Id.* at 227-28. The court held that because the defendant

was openly selling the plaintiff's work and not paying him royalties, the defendant had

repudiated the plaintiff's claim to own the copyright at issue. The court explained:

> [W]e cannot think of a more plain and express repudiation of co-ownership than the fact
> that Combo openly, and quite notoriously, sold Santa Rosa's records without providing
> payment to him: according to documents provided by Santa Rosa, at least 1,140 of the
> recordings in dispute were sold during the six month period between January and June of
> 2000, almost four years before Santa Rosa filed suit in May 2004.[15]

DMG has taken all of the actions described in these cases and more. With the full

knowledge of UO, DMG's licensees Voyager Sopris and Amplify have been openly selling

DIBELS and IDEL products to school districts with sole attribution to DMG and none to the

University for approximately a decade. Further, DMG and its licensees have not paid annual

royalties to the University on DIBELS and IDEL sales.

Under the rule of *Seven Arts*, therefore, the three-year statute of limitations bars UO's

claim to own the DIBELS copyrights, and UO cannot separately sue for alleged infringement

occurring within the three years prior to the filing of its counterclaims. UO's Fourth and Fifth

Claims for Relief must therefore be dismissed.

---

[15]  The First Circuit's use of the words "openly" and "notoriously" – terms commonly used in
adverse possession proceedings – was not accidental. In *Zuill* the Ninth Circuit observed that
"there is some similarity between co-ownership of a copyright, and tenancy in common in real
property. ... An express or implicit ouster of a cotenant by an unequivocal act of ownership starts
the adverse possession statute of limitations running. ... We see nothing wrong with this
resemblance. Copyright, like real estate, lasts a long time, so stability of title has great economic
importance." 80 F.3d at 1370 (internal citations omitted).

MOTION AND MEMORANDUM IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT AS TO
COUNTERCLAIMS ONE - SIX – Page 35

## CONCLUSION

DMG and its principals, Drs. Good and Kaminski, have from at least as early as 2001 made it very clear to the University that they believed themselves to be the owners of the DIBELS and IDEL trademarks and copyrights. They have done so in meetings, in disclosure forms, through emails, and through their counsel in the course of negotiation of the agreement that was put in final form (though never signed) in 2005. The University has acquiesced to their position on these issues, in emails such as that sent by Philip Loux to Drs. Good and Kaminski in 2001, in the email exchanges leading to the 2003 Educational Use Agreement, in the negotiation of the 2005 agreement, and in an entire course of conduct that lasted from 2003 until 2012, during which period it openly acknowledged the rights of DMG on its website through the Educational Use Agreement and through links to DMG's publishers, Sopris and Wireless Generation.

This conduct triggers the statute of limitations on UO's copyright claims, and on its claim to be damaged by DMG's trademark registrations. But the significance of UO's conduct over the years from 2001 to 2012 goes beyond that. A party that behaves as UO has for such a long period of time must accept the consequences of its behavior. DMG is confident that it would win on the issues if this case had to go forward, but it should not be obliged to go through that ordeal. It and its commercial licensees have invested years of effort and millions of dollars in reliance on the University's apparent acceptance of their legal claims of ownership. The University cannot now, having "lain in the weeds" for years (to borrow the image invoked by the Ninth Circuit in *Zuill*) rise up and try to seize the fruits of the labor of DMG and its publishers.

Counterclaims One through Six should be summarily dismissed.

MOTION AND MEMORANDUM IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT AS TO
COUNTERCLAIMS ONE - SIX – Page 36

## CERTIFICATE OF COMPLIANCE

This brief complies with the applicable word-count limitation under LR 7-2(b), 26-3(b),

54-1(c), or 54-3(e) because it contains 10,621 words, including headings, footnotes, and

quotations, but excluding the caption, table of contents, table of cases and authorities, signature

block, exhibits, and any certificates of counsel.

Respectfully submitted,

Date: December 23, 2014                    DYNAMIC MEASUREMENT GROUP, INC., and
                                           DR. ROLAND GOOD and DR. RUTH KAMINSKI

                                           By their attorneys,

                                           /s/ Frederick A. Batson
                                           Frederick A. Batson, OSB 821887
                                           batson@gleaveslaw.com
                                           GLEAVES SWEARINGEN LLP
                                           P. O. Box 1147
                                           Eugene, OR  97440
                                           Phone:  (541) 686-8833
                                           Fax:  (541) 345-203

                                           OF COUNSEL:

                                           William S. Strong
                                           wstrong@kcslegal.com
                                           KOTIN, CRABTREE & STRONG, LLP
                                           One Bowdoin Square
                                           Boston, MA  02114
                                           Phone: (617) 227-7031
                                           Fax:  (617) 367-2988