UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON

DYNAMIC MEASUREMENT GROUP, INC.,                                    6:14-cv-1295-TC
an Oregon corporation,

                                              Plaintiff,        FINDINGS AND RECOMMENDATION

                        v.

UNIVERSITY OF OREGON, a special
governmental body as defined by ORS
174.117(1)(I); MIA TUAN, individually and
in her official capacity; EDWARD J.
KAME'ENUI, individually and in his official
capacity; FRANCIS J. FIEN IV, a/k/a Hank
Fein, individually and in his official capacity;
BRAD SHELTON, individually and in his
official capacity; and HOP SKIP
TECHNOLOGIES INC., an Oregon
corporation,

                                              Defendants.

COFFIN, Magistrate Judge:

        Plaintiff, Dynamic Measurement Group, Inc. (DMG), brings this action alleging copyright

and trademark infringement primarily against the University of Oregon. Plaintiff's founders, Dr.

Ruth Kaminski and Dr. Roland Good allege that since the early 1990s they have been engaged in

the business of researching, developing, administering, distributing, and publishing materials known

as Dynamic Indicators of Basic Early Literacy Skills (DIBELS), as well as training teachers on the use of these materials. DIBELS is designed to help teachers assess literary skills and focus remedial needs for K-6 students. Plaintiff further alleges that Kaminski and Good established DMG as a for profit company to carry on the work of developing DIBELS and training teachers in its use. DIBELS is widely used, assessing about 25 percent of U.S. students.

Plaintiff alleges that Dr. Kaminski first developed an early version of DIBELS assessment measures from 1988-92 as a doctoral candidate at the University of Oregon. After obtaining her Ph.D. in 1992, the University employed Kaminski as a part-time research associate in 92-93, and as an assistant professor in the college of education until 2003.

Dr. Kaminski's doctoral advisor was Dr. Good who worked as an assistant professor at the University of Oregon at the time. Plaintiff alleges that Good and Kaminski began to make DIBELS available to elementary schools around the country and offered fee based training. Plaintiff asserts that as early as 1994, Kaminski and Good made commercial use of the DIBELS mark.

In the Late 1990s, plaintiff alleges that Dr. Good began offering analytical support allowing schools to track individual and collective progress of their students. By 2000, plaintiff asserts, Kaminski's and Good's efforts building widespread acceptance and use of DIBELS assessments resulted in hundreds of schools adopting DIBELS as an integral part of early childhood literacy programs.

In collaboration with staff of the University's Center on Teaching and Learning, plaintiff alleges Dr. Good developed an online system allowing schools to enter their data and generate automated reports and analysis (the DIBELS Data System) housed on the University's servers in about mid 2000. Plaintiff alleges that the DIBELS data system is an ancillary service to users of DIBELS materials.

In 2001, Good and Kaminski released the 5th edition of DIBELS made available to schools upon request as part of a package price that included their teacher training services. The University's Center on Teaching and Learning posted a copy to its website for free downloads. The 5th edition bore a copyright notice and trademarks as follows: "© 2001 Good and Kaminski" and "DIBELS™." This edition contained newly created texts by independent contractors paid for by Good and Kaminski personally with copyrights for the materials (DIBELS Oral Reading Fluency (DORF)) vesting in Good and Kaminski. Also at this time, DIBELS coverage expanded from K-3 to K-6.

Also in 2001, plaintiff alleges Good and Kaminski approached the University hoping to cede rights to DIBELS (but retain developmental control with royalties reinvested in continuing development) in exchange for reimbursement for the DORF passages and dealing with a publisher for funding and distribution. Plaintiff alleges that the University instead suggested that Good and Kaminski create a private start-up to fund further development of DIBELS assessment materials and to pursue the wide distribution of DIBELS through commercial publishers. Plaintiff asserts that at no time during these discussions did anyone at the University suggest that the University of Oregon had any claim to the DIBELS mark or the DORF passages, but that the University's Office of Technology Transfer did state that it should own a copyright in some non-DORF DIBELS content because it had been funded by a grant administered by the University. However, plaintiff alleges, the University offered to assign its purported copyright to the start-up presumably for some share of the revenue.

Plaintiff alleges that the University failed to provide any follow-up paperwork and Good and Kaminski decided to develop and commercialize DIBELS independently.

In January of 2002, Good and Kaminski incorporated their start-up, plaintiff DMG. Plaintiff alleges from that point forward, it was the exclusive vehicle for development and commercialization

of DIBELS products. DMG then entered into a publishing agreement with

Sopris West Educational Services.

On February 13, 2002, DMG applied to the Patent Office to register the DIBELS mark which

issued in 2003. DMG asserts it informed the University of Oregon when it received the registration.

From then on, DMG products displayed its registered mark: DIBELS®.

DMG and Sopris marketed DIBELS 6th edition (allegedly entirely new, except for carrying

over 20 of the 24 DORF passages, with 151 new passages) with sales exceeding $1,100,000 in the

first eight months of 2003.

The University provided a link on its website to Sopris' website to enable teachers to

purchase printed copies of the DIBELS materials and below the link advertised its data system

service for DIBELS for $1 per student to analyze DIBELS scores.

DMG and its publishing partners agreed that the University should be allowed to continue

hosting free downloads but, plaintiff alleges, also agreed that DMG would maintain quality control

and the public would be on notice that the DIBELS mark and materials were proprietary to Good,

Kaminski, and DMG. Accordingly, DMG alleges it obtained acceptance from the University Of

Oregon to attach a Educational User Agreement posted to the University's download page requiring

acceptance as a condition of download. The Agreement noted that DIBELS™[1] was the proprietary

work of Good, Kaminski, and DMG and limited the use of the free download.

At this time, although Kaminski "maintained a courtesy appointment as Assistant Professor

in the College of Education," she began devoting herself full-time to DMG.

Plaintiff alleges that the University undertook an investigation in 2004 regarding ownership

---

[1]Later changed to DIBELS® after registration of the mark.

of the DIBELS copyright and registration of the mark and, in 2005, all apparently agreed that DMG was the exclusive owner with a non-exclusive license granted to the University. However, the University never signed the agreement. Nonetheless, plaintiff asserts that the University acted consistent with the "agreement" for the next seven years.

DMG asserts ownership of numerous registrations related to its DIBELS materials and that registration is now incontestible. Plaintiff further asserts registration of a Spanish language version with the mark IDEL created by Good, Kaminski, and DMG via independent contractors with the copyright vested in DMG. IDEL was also made available through the University's website in the same manner as DIBELS with paid service for data analysis beginning in 2007.

Plaintiff launched its latest literary assessment product DIBELS Next in 2011 which is presently only available from DMG and licensees/publishers SOPRIS and Wireless Generation, Inc. Plaintiff alleges that until recently, the University acknowledged that DIBELS Next was a registered trademark.

Plaintiff alleges that the University failed to properly implement support for DIBELS Next in its Data System and that it therefore undertook its own data service in 2011 which eventually became known as DIBELSNet with a registered mark. DIBELSNet supports DIBELS 6th edition and IDEL as well.

Plaintiff alleges that the University then asserted it had been using the DIBELS mark in commerce since 1980 and that it owned all DIBELS intellectual property. DMG rejected these assertions and the University then filed an application with the Patent Office on July 20, 2012, seeking to register the DIBELS mark for the goods and services allegedly covered by DMG's existing registrations. The Patent Office rejected the application.

The University sought to register the IDEL mark in June of 2013 for goods and service

essentially identical to DMG's along with a petition to cancel DMG's registration. The University's applications to register IDEL was rejected, but its petition, as of the time of the filing of the complaint was still pending.

On November 19, 2013, the University petitioned to cancel DMG's DIBELS registrations asserting DMG obtained registration by fraud. These proceedings are also still pending.

Plaintiff DMG now asserts claims for trademark violation based on the University's violation of the terms of the license DMG asserts controls by, among other things, deleting reference to DMG and the registrations on its website. Plaintiff alleges that University is attempting to mislead the public into believing that it is the owner of the mark and ultimate source of DIBELS products and to undermine DIBELSNet. Similarly, plaintiff alleges infringement of the IDEL mark and the DIBELS NEXT mark. Plaintiff also alleges state law trademark infringement claims. Plaintiff further asserts a claim for unfair competition and copyright infringement claims.

The University of Oregon and the individual University defendants have filed counterclaims against DMG, Good, and Kaminski for misappropriation of the University's federally-funded intellectual property. Indeed, the University asserts that Good admitted in Congressional testimony that he used federal research funds to create DMG. The University alleges that Good and Kaminski filed applications for trademarks DMG did not own and submitted University webpages to the Trademark Office to prove DMG's use of the marks. The University further alleges that Good and Kaminski sought copyright registrations for works DMG did not own that co-opted the authorship and support of the University and federal research grants. The University also argues that the use of its DIBELS moniker deceives parents and educators into believing that the DMG product is able to detect a significant percentage of at-risk young readers.

The University alleges that it had successfully implemented the DIBELS assessment and the

DIBELS Data System throughout the United States prior to DMG and long before DMG existed. It further asserts that it has successfully implemented the IDEL assessments at least as early as January 2008 and began using the IDEL mark in commerce as early as July 2003.

The University alleges that it expended government grants and personnel to create, develop, and implement the DIBELS assessments, the IDEL assessments, and the DIBELS Data System. It further alleges that University faculty, staff, and graduate students are credited with contributing to DIBELS 5th edition including defendants Edward Kame'enui and Francis Fein. The DIBELS 5th edition also credits several government research grants awarded to the University. The 6th edition similarly credits the University personnel and federal grants awarded to the University.

The University alleges that its regulations, policies and directives, provide that the University owns and is entitled to own all of the intellectual property developed by its employees, graduate students, and staff with University resources and/or within the scope of their employment. It further alleges that its regulations, policies and directives, as well as federal regulations provide that the work product resulting from research and grant funds awarded to the University is the property of the University. It asserts that Good and Kaminski were notified and agreed to these ownership rights and right to ownership of intellectual property developed at the University, using the University resources, and/or using research grant funds awarded to the University. The University also alleges Good and Kaminski executed agreements agreeing to assign any intellectual property using University resources to the University, but violated these regulations, policies, directives, and agreements by purporting to transfer intellectual property rights arising from University resources to DMG.

Plaintiff alleges Good worked as an Assistant Professor for the University's College of Education from June 1988 to August 1994 and then as Associate Professor continuing to the present.

With respect to this work, the University alleges Good

> executed numerous agreements as a condition of his employment whereby he agreed that the intellectual property rights arising from the research funded, developed and implemented by the University, were owned by the University. Dr. Good was one of the many University professors, graduate students, staff and others who worked on, developed and implemented the research related to DIBELS and IDEL on behalf of the University, including research funded by University grants and awards.

First Amended Answer (#40) at ¶ 42.

> The University alleges that

> Kaminski worked as a graduate student at the University, and earned her Ph.D in 1992. Dr. Good supervised her graduate work during this time. After earning her Ph.D, Dr. Kaminski has worked for the University since June 16, 1992 in various capacities including as an Assistant Professor, an Adjunct Assistant Professor and as a Courtesy Assistant Professor. Also during this time, Dr. Kaminski executed numerous agreements whereby she agreed that the intellectual property rights arising from research funded, developed and implemented by the University, were owned by the University. Moreover, Dr. Kaminski was one of the many University professors, graduate students and staff who worked on, developed and implemented University research related to DIBELS pursuant to University grants and awards.

Id. at ¶ 43.

> The University alleges Good, Kaminski and DMG engaged in fraud related to the DIBELS

registrations by among other things, submitting declarations in support with knowledge that

> (1) DMG was not the owner of the DMG DIBELS Marks; (2) DMG was not using the DIBELS mark in commerce; (3) DMG was not entitled to use the DIBELS mark in commerce; (4) the University was previously using and had the prior right to use DIBELS in commerce; and, (5) the statements in the declarations for the applications to register the DMG DIBELS Registrations were not true.

> [and]

> submitt[ing] evidence of the University's use of DIBELS to show DMG's use in commerce.

> [and]

> [Knowing] that the University owned and was using the University DIBELS Mark in commerce when Counter-Defendants filed DMG's trademark maintenance and

renewal forms for the DMG DIBELS Registrations. Counter-Defendants nevertheless executed these declarations with the knowledge and belief that the statements in the declaration were false.

E.g., Id. at ¶¶ 58, 63, 77.

The University alleges similarly that the counter-defendants engaged in fraud related to the IDEL registration.

With respect to DIBELS NEXT and DIBELSNET, the University alleges DMG hired a university employee to copy portions of the University's DIBELS Data System code as the underlying code for DIBELSNET. The research for DIBELS NEXT benchmark achievement standards was not conducted by the University and the University asserts that it is based on flawed research. The University further asserts that the product creates harm and confuses the public believing that it is based on the University's DIBELS products.

The University similarly argues that counter-defendants have unlawfully claimed copyright ownership over the University's DIBELS products which it asserts are property of the University based on the same regulations, policies, directives, and agreement noted above. Specifically, the University alleges:

The University Works underlying the DMG Copyrights were authored and are owned by the University pursuant to Oregon State regulations, University regulations, University directives, federal government research grant terms, the work for hire doctrine and/or the terms of executed contracts.

It is indisputable that, throughout their tenure at the University, Drs. Good and Kaminski knew that the University owned and was entitled to own the intellectual property arising from University resources and/or government grants pursuant to Oregon State regulations, University regulations, and University directives. In fact, Drs. Good and Kaminski executed numerous agreements whereby they agreed to comply with these Oregon State regulations, University regulations, and University directives by, among other things, agreeing to assign any intellectual property rights arising from University resources to the University as a condition of their work at the University.

Drs. Good and Kaminski did not comply with the law or their contractual obligations. Instead, Drs. Good and Kaminski unlawfully claimed ownership over the University Works. Drs. Good and Kaminski unlawfully and without authorization sold, copied, and distributed the University Works related to DIBELS and IDEL through DMG under the DMG Copyrights, as alleged in DMG's Complaint for Trademark and Copyright Infringement. Moreover, Counter-Defendants falsely stated in the copyright applications for the DMG Copyrights that DMG owned the underlying University Works in order to induce the Copyright Office to register the DMG Copyrights in DMG's name.

First Amended Answer (#40) at ¶¶ 109-111.

The University also asserts that Good and Kaminski used their positions at the University to insert and maintain the Educational Use Agreement crediting DMG with development of DIBELS in place of the University.

The University alleges claims for trademark infringement (false designation of origin), cancellation of trademark registrations, declaratory relief of prior common law trademark use, copyright infringement, declaratory relief of invalidity of DMG's copyrights or non-infringement by the University, unfair competition, conversion, breach of contract and the covenants of good faith and fair dealing, breach of fiduciary duty, unjust enrichment, and accounting. Plaintiff DMG seeks to dismiss the conversion claim, dismiss the breach of contract claim or make it more definite and certain, dismiss the breach of fiduciary duty claim or make it more definite and certain, dismiss the unjust enrichment claim, dismiss the accounting claim, and dismiss all claims against Good and Kaminski due to improper joinder. Moreover, DMG seeks summary judgment as to the remaining claims.

<u>MOTION TO DISMISS COUNTERCLAIMS 7-11</u>

A.  <u>Seventh Counterclaim - Conversion</u>

The University alleges that the counter-defendants "intentionally took possession or control

of the University's intellectual property and resources as well as the ill-gotten gains of funds belonging to the University and ... kept them for their own use, ... and/or transferred them to other persons, who were not acting in the interests of the University, for other uses."  First Amended Answer (#40) at ¶ 165.  Counter-defendants assert that this claim is preempted by copyright law and that there is no legal basis for such a claim under trademark law.  DMG also asserts that the claim is untimely.

> A plaintiff's state-law cause of action is preempted under 17 U.S.C. § 301(a) if: (1) the work involved falls within the general subject matter of the Copyright Act as specified by sections 102 and 103; and (2) the rights that the plaintiff asserts under state law are equivalent to those protected by the Act in section 106. 17 U.S.C. 301(a); Downing v. Abercrombie & Fitch, 265 F.3d 994, 1003 (9th Cir. 2001). However, where a state law claim contains an element not shared by the federal law that "changes the nature of the action so that it is qualitatively different from a copyright infringement claim" there is no preemption. Summit Machine Tool Manufacturing Corp. v. Victor CNC Systems, Inc., 7 F.3d 1434, 1439-40 (9th Cir. 1993).
>
> ...
>
> [C]onversion claims generally are preempted even though there is an additional element of intent. See Firoozye v. Earthlink Network, 153 F.Supp.2d 1115, 1130 (N.D.Cal. 2001). The extra element in a conversion claim does not necessarily change the nature of the underlying rights at issue. Id. A conversion claim arising from the unauthorized reproduction and distribution of a copyrighted work only interferes with the plaintiff's intangible property right and is equivalent to a claim for copyright infringement. Id.

Zito v. Steeplechase Films, Inc., 267 F.Supp.2d 1022, 1027 (N.D.Cal. 2003).

Counter-defendants argue that the alleged "intellectual property" converted is an intangible right and thus is equivalent to the copyright infringement claims.

The University asserts that under Oregon law, intangible property is a chattel protected under Oregon's conversion law qualitatively different from copyright law.  However, the case cited by the University, Lyden v. Nike Inc., 2013 WL 5729727 (D.Or. October 22, 2013), which allowed a

conversion claim in a patent case to survive in the face of a motion to dismiss, did not address this issue because

> Nike argues that the state law claims are preempted because all the claims are based on allegations regarding Nike's misconduct before the PTO or infringement of the '883 patent. Def.'s Mem. 6. In support of this argument, Nike provides a string cite of cases, the majority of which are from other district court jurisdictions. Id. at 6–7. Nike fails to explain how each state law claim would be preempted. Because of the lack of analysis for the preemption argument, I decline to address this argument.

Id. at *2.

Judge Hernandez did later address the issue and found the conversion claim preempted. Lyden v. Nike Inc., 2014 WL 2563401 @ *2-3 (D.Or. June 6, 2014). Judge Hernandez further affirmed such preemption after Lyden sought reconsideration. Lyden v. Nike Inc., 2014 WL 4631206 (D.Or. September 15, 2014). To the extent the University alleges a conversion claim for its purported intellectual property, such claim impermissibly seeks to redress a right protected under federal copyright law and is preempted.

Similarly there is no support for a claim of conversion of a trademark as it would seek to displace federal trademark law. See J. Thomas McCarthy, 4 McCarthy on Trademarks and Unfair Competition, § 25:9.50 (4th Ed. 2013) (allowing conversion of intangible property such as trademarks would allow conversion to largely displace IP laws defining what is infringement of copyright, trademark and patents). See also, Big Time Worldwide Concert & Sport Club at Town Center, LLC. v. Marriott Int'l, 236 F.Supp.2d 791, 806-07 (E.D. Mich. 2003) (noting no support for conversion of trademark claim).

Although the University's cite to Lyden does note some support for intangible property as a chattel protected by a conversion claim, a trademark is not even tied to tangible property such as would be the case with a copyright or patent. Rather it is a symbol of the good-will of its holder.

Accordingly, Oregon conversion law is inapplicable.  Cf. Joe Hand Promotions, Inc. v. Jacobson, 874 F.Supp.2d 1010, 1019-21 (D.Or. 2012) (noting protection of certain intangible property tied to tangible property such as an unrecorded mortgage (security interest) which secures land, or a license or contractual right to receive an electronic signal).

To the extent the University seeks to assert a claim for conversion of grant funds and tangible University resources, the Copyright Act does not preempt such a claim because the interest at stake, the funds and other resources used to develop the intellectual property rather than the intellectual property itself, is different than what is protected by the copyright laws.  However, the proceeds, i.e., the intellectual property developed, may not be recovered through an action for conversion as that is the exclusive province of federal copyright law.

The motion to dismiss the conversion claim should be granted to the extent it seeks to assert a claim for the DIBELS intellectual property and trademarks, but denied to the extent it seeks to assert a claim for the underlying grant and other underlying tangible University resources used to develop such intellectual property.

Counter-defendants also move to make the claim for ill-gotten gains of funds more definite and certain.  The Amended Answer and Counterclaims, however, specifically identifies the grants at issue at paragraph 18, 20, 22.  The counterclaim further identifies University resources allegedly dedicated to the development of the intellectual property at paragraphs 16-17, 19, 21.  However, because the alleged conversion of these resources sound in fraud, see, e.g., paragraphs 57-88 (alleging false material misrepresentations in obtaining copyrights and trademarks by, among other things, appropriating taxpayer money and grants), more specificity regarding the underlying appropriation of resources is required under Fed. R. Civ. P. 9.  While the who, what, where and when is provided regarding the applications for copyright and trademarks, such information is

lacking with respect to the grants beyond merely listing them. It is not clear when counter-defendants misappropriated the resources and how, beyond generally developing the DIBELS product with such resources and then keeping the intellectual property. Because the conversion counterclaim needs to be amended to remove the allegations of conversion of intellectual property, the court should require more specificity with regard to the remaining portions of the claim, especially in light of the long period of time for which the counter-defendants are alleged to have engaged in such fraud to accomplish the alleged conversion. The court can then make a determination regarding whether the claim is timely if necessary.

B.      Eighth Counterclaim - Breach of Contract and Covenants of Good Faith and Fair Dealing

The University alleges that Good and Kaminski[2] breached their agreements and their implied covenants of good faith and fair dealing with the University by failing to assign their intellectual property rights related to DIBELS and IDEL to the University and by assigning their intellectual property rights to DMG. The University further alleges that Good and Kaminski breached the implied duty of good faith and fair dealing by inducing University employees, staff, and researchers to breach their employment agreements with and/or obligations to the University.

The counterclaims reference numerous agreements, regulations, directives, federal government research grant terms but fail to cite any specific agreements, regulations, directives, and other terms. In addition, other than a broad time period encompassing all of these restraints on Good and Kaminski's actions with respect to DIBELS and IDEL, no specific dates are offered as to when

---

[2]Plaintiff's breach of contract claim does not allege that DMG breached any contract or fiduciary duty owed to the University and thus the motion to dismiss the claim against DMG should be denied as moot.

they were entered into or became applicable.

To plead a breach of contract claim, the University must allege (1) the existence of a contract, (2) the relevant terms of the contract, (3) plaintiffs' full performance and lack of breach, and (4) defendant's breach resulting in damage to plaintiffs. Slover v. Or. State Bd. of Clinical Social Workers, 144 Or.App. 565, 927 P.2d 1098, 1101–02 (1996). While a motion to dismiss or a request to make more definite and certain may not be employed as a discovery device, the counterclaim here is insufficient because it only pleads the existence of terms that prohibit the actions taken by counter-defendants. The actual relevant terms are not alleged.

The University does cite a regulation that require University employees to "agree to assign rights" to "any invention or improvement to technology" and "educational and professional materials," (O.A.R. 580-043-0011(1)) and to internal management directives granting ownership of educational materials developed with University resources and the court can take judicial notice of such regulations. However, as noted, the terms of the purported contracts are not supplied in the counter-claims. Moreover, judicial notice does not take the place of pleading requirements as counter-defendants cannot guess as to which laws and regulations may apply simply because the University generally alleged violation of regulations and directive.[3]

Moreover, it is not clear if the DIBELS assessments and trademarks are educational materials or inventions within the purview of the regulations and directives cited in the response memo. In addition, the regulations require an agreement to agree and it is unclear when the University actually obtains such rights absent further allegations. Nonetheless, it appears, absent more definite and

---

[3]The University asserts the contracts were already provided to DMG in the underlying Trademark Trial Appeal Board proceedings regarding IDEL. However, just as motions attacking the pleadings are not an appropriate vehicle for discovery, discovery provided in other proceedings is not a replacement for proper pleading.

certain allegations, these are issues more appropriate to a motion for summary judgment.[4]

So while the claim is plausible, and should not be dismissed, assuming that such terms exist, the claim needs to be made more definite and certain. The University should file an amended breach of contract claim identifying the precise purported terms, regulations, directives, etc. that were breached and by whom and when along with the elements of lack of breach on the part of the University and resulting damage. Morever, to the extent the breach allegations are supported by the allegations of fraud spread throughout the counterclaims, the claims must be alleged with particularity as required by Fed. R. Civ. P. 9. <u>See</u> <u>Vess v. Ciba-Geigy Corp. USA</u>, 317 F.3d 1097, 1103 (9th Cir. 2003) (Rule 9(b) applies to state law claims in federal court and apply to averments of fraud even if fraud is not an essential element of a claim). The issue of whether the breach of contract claims are subject to the statute of limitations can be addressed once the claim is sufficiently alleged with terms and their applicable time frames.

The motion to dismiss the breach of contract claim should be denied, but the motion to make it more definite and certain should be granted.

C.      <u>Ninth Counterclaim - Breach of Fiduciary Duty</u>

The University does not allege a breach of fiduciary duty claim against DMG and its motion to dismiss the claim against it should be denied as moot. The University does allege that

Dr. Good and Dr. Kaminski were under certain fiduciary duties to the University, including, without limitation, duties of loyalty, trust, honesty, and disclosure, which,

---

[4]The same is true as to whether requirements of grant funding provide a bases for breach given that the specific terms are not alleged. Thus, the court cannot determine if grant terms vest intellectual property rights in the University or the professors who develop the property even if appropriate in determining on a motion to dismiss rather than a motion for summary judgment.

among other things, required them not to misappropriate the University's resources for their own benefit, make full disclosure to the University of all material facts, and to otherwise act in the utmost good faith and honesty toward the University in all matters connected with Dr. Good and Dr. Kaminski's work with the University.

The University relied upon Dr. Good and Dr. Kaminski to manage the University resources, University research, University training and University employees related to DIBELS and IDEL, and Dr. Good and Dr. Kaminski were bound to act in good faith and with due regard to the interests of the University.

By their actions or omissions, Dr. Good and Dr. Kaminski acted in disregard of their fiduciary duty owed to the University by committing the foregoing unlawful and/or fraudulent actions, by breaching their agreements and the terms of their employment with the University, by placing their own interests above those of the University in their position as professors at the University and by misleading the University through the above-referenced acts and/or omissions.

First Amended Answer (#40) at ¶¶ 175-177.

To recover for breach of fiduciary duty, the University must plead the existence of a fiduciary relationship. Evergreen West Bus. Ctr., LLC v. Emmert, 254 Or.App. 361, 367 (2012). Good and Kaminski argue that the University has failed to adequately allege any fiduciary relationship beyond the mere fact that they were, at various times, attending graduate school at or employed by the University.

A fiduciary duty exists under Oregon law only where the parties are in a "special relationship" in which one party is obliged to pursue the other party's best interests. Conway v. Pacific University, 324 Or. 231, 237 (1996). In determining whether such a relationship exists:

The focus [of the inquiry] is not on the subject matter of the relationship, such as one party's financial future; nor is it on whether one party, in fact, relinquished control to the other. The focus instead is on whether the nature of the parties' relationship itself allowed one party to exercise control in the first party's best interests. In other words, the law does not imply a tort duty simply because one party to a business relationship begins to dominate and to control the other party's financial future. Rather, the law implies a tort duty only when that relationship is of the type that, by its nature, allows one party to exercise judgment on the other party's behalf.

Bennett v. Farmers Ins. Co., 332 Or. 138 (2001).

Such relationships include certain professional relationships in which one party has a professional obligation to protect the interests of the other party, or contractual relationships of a kind that give rise to a status upon which the general law predicates a duty independent of the terms of the contract. <u>Conway</u> 324 Or. at 239.

In <u>Fenn v Yale University</u>, 283 F.Supp.2d 615, 624 (D.Conn. 2003), the court determined Yale had a policy that "all inventions ... shall be reported promptly in writing to the provost through the director of the Office of Cooperative Research" and that "[i]f the University decides that it does not wish and has no legal obligation to participate in the patenting or licensing of an invention, the University may release to the inventor the University's interest in the invention, and the inventor shall then be free to dispose of the invention as he or she wishes." The policy had royalty sharing provisions with the majority of the share going to Yale. The court determined that plaintiff was bound by the policy. <u>Id.</u> at 629. The court also determined that Yale and Fenn had a special relationship of trust and confidence that was different from the usual employer-employee relationship. Yale supported Dr. Fenn's research in the form of facilities, funding, and staff and entrusted Dr. Fenn with the proper management of its NIH grants in the reasonable expectation that Dr. Fenn would use his superior knowledge, skill and expertise to act in good faith and with complete candor and undivided loyalty in connection with the University's research funds and intellectual property. The court noted that Dr. Fenn knew more about the value and patentability of inventions he developed than anyone else, and Yale necessarily sought out and reasonably relied on his expertise in evaluating such inventions. Similarly, Yale was entirely dependent on Dr. Fenn, the inventor, to provide truthful and forthright information regarding the progress and outcome of his federally funded research so that Yale could fulfill its reporting obligations to the NIH pursuant to the Bayh–Dole Act. <u>Id.</u> at 632. Thus, when Fenn failed to promptly disclose his invention and

actively discouraged Yale from preparing and filing a patent application by the deadline while preparing and filing his own patent at the same time and then licensing it to a third party, Fenn breached his fiduciary duty. Id.

Here, the University alleges it provided Good and Kaminski with facilities, funding, and staff and entrusted them with grant money. In addition, the University alleges that the agreements, directives, etc. establish that the intellectual property developed with such resources belong to the University. Counter-defendants assert there is no such reservation of property and at best there is only an agreement to assign at some future date. Again, these are issues that appear beyond the scope of a motion to dismiss given the lack of specificity regarding the agreements, etc. Because the University should amend its breach of contract claim to provide greater detail, the motion to dismiss the breach of fiduciary duty claim should be denied for now. Even then, it appears that whether a fiduciary duty exists will be a fact specific inquiry that probably should be addressed in a motion for summary judgment or at trial.

D.      Tenth Counterclaim - Unjust Enrichment

The University alleges that counter-defendants obtained funds, access to funds, and/or ill-gotten gains of funds, including intellectual property belonging to the University. The university seeks a return of the "ill-gotten gains that rightfully belong to" it via imposition of a constructive trust. To the extent this claim seeks the intellectual property itself, the claim is preempted by the Copyright Act for the reasons stated above. To the extent the claim seek royalties that flow from those copyrights, it is also preempted. See Zito, 267 F.Supp.2d at 1027 (While a claim for unjust enrichment may require proof that a benefit was conferred on the defendant, where the unjust enrichment arises from defendants' unauthorized use of a copyrighted work, such an extra element

does not qualitatively change the rights at issue, the rights the plaintiff holds in the copyrighted work, and does not avoid preemption.).

To the extent the claim seeks a return of specific grant money, the claim fails to clearly identify the money. See Tupper v. Roan, 349 Or. 211, 222 (2010) (a constructive trust can attach only to items and money that the evidence clearly identifies as rightfully belonging to the plaintiff, or to the identifiable products of, or substitutes for, those items and money). The counterclaim fails to clearly identify the grant money or its substitute. The motion to dismiss the unjust enrichment claim should be granted with leave to replead the loss of clearly identified non-intellectual property.

E.      Eleventh Counterclaim - Accounting

The University alleges that counter-defendants have failed to account for the use and location of University funds and or ill-gotten gains. This claim depends on the existence of a fiduciary relationship. Assuming that an amended complaint will provide a sufficient basis for plausible breach of fiduciary duty claim, then the need to prove an element, breach of a special relationship, changes the nature of the action so that it is qualitatively different from a copyright infringement claim and allows the claim to survive. The statute of limitations issue is premature at this time due to the lack of specificity in the complaint.

F.      Improper Joinder

Counter-defendants argue that Good and Kaminski are not parties to this action and that the counterclaims improperly join them because the University did not file a third-party complaint and did not file a motion to join. However, although motions are often filed, Fed. R. Civ. P 13(h) does

not require a motion to name a nonparty as a defendant to a counterclaim. Wright, Miller and Kane, Federal Practice and Procedure, § 1434. Additionally, joinder is appropriate under Fed. R. Civ. P. 20(a)(2) because Good and Kaminski are alleged to be jointly and severally liable and there are common questions of law and fact. The motion to dismiss for improper joinder should be denied.

MOTION FOR SUMMARY JUDGMENT

At its heart, this action appears to be more about money rather than the integrity and ownership of DIBELS products. It appears that the University of Oregon enjoyed a long and lucrative relationship with DMG through the operation of its Data System to analyze DIBELS assessments and DMG profited from selling the DIBELS products developed, at least in part, with University resources. In 2011, when DMG launched DIBELS NEXT, whether because of an intent to take all of the profits (including payments for analyses through DIBELSNet) or through faulty integration of DIBELS NEXT with the University's Data System, the relationship apparently was no longer mutually beneficial. Accordingly, the battle over the ownership of DIBELS intellectual property heated up with fights at the Trademark Trial and Appeals Board and now in court. Accordingly, DIBELS moves for summary judgment as to the University's trademark counterclaims and the copyright counterclaims, based on the statute of limitations and acquiescence/laches. It is not clear at this early stage of the proceedings if equity bars any claims, but summary judgment is appropriate as to the copyright claims based on the statute of limitations.

A.      Laches and Acquiescence

The University alleges trademark infringement and false designation of Origin under the Lanham Act with respect to the DIBELS and IDEL marks. The University also alleges that the

DMG trademark registrations should be canceled and seeks damages under the Lanham Act. The University similarly alleges common law claims for declaratory relief that its use of the marks are senior to DMG's use and unfair competition by DMG's trading on the University's goodwill associated with the DIBELS marks and IDEL marks.

Counter-defendants assert that the University's claims are too late. The Lanham Act permits a person to petition to cancel a trademark registration at any time if its registration was obtained fraudulently. 15 U.S.C. § 1064(3). Nonetheless, "equitable principles of laches, estoppel, and acquiescence, where applicable may be considered and applied." 15 U.S.C. § 1069.

The Trademark Trial and Appeal Board (TTAB) has determined that laches and acquiescence are not available where cancellation is based on fraud. See Marshak v. Treadwell, 240 F.3d 184, 193, n. 2. The Circuit Court for the D.C. Circuit, however, disagrees:

> The words "[a]t any time" demonstrate only that the act imposes no statute of limitations for bringing petitions. Those words have nothing to do with what equitable defenses may be available during cancellation proceedings.

Pro-Football, Inc. v. Harjo, 415 F.3d 44, 48 (D.C.Cir. 2005). However, the equitable defense may not be available in cases of continuing and inevitable likelihood of confusion where the registrant engages in fraud and deceit. See Bridgestone/Firestone Research, Inc. v. Automobile Club De L'Quest De La France, 245 F.3d 1359, 1363 (Fed. Cir. 2001) (Although there are cases where a continuing and inevitable likelihood of confusion led the court to permit tardy challenge to a registered mark, the equitable defenses of laches and estoppel are not barred in false suggestion cases, absent misrepresentation or deceit). The Ninth Circuit has not specifically addressed the issue, but in In Re Beatty, 306 F.3d 914, 922-26, (9th Cir. 2002) it found that laches may be available to a non-dischargeability claim under the section 523(a)(3)(B) of the bankruptcy code where Bankruptcy Rule 4007(b) provides that such complaint by unscheduled creditors may be filed

"at any time."  But the court also noted that the provisions also direct bankruptcy courts

> to be especially solicitous to § 523(a)(3)(B) claimants when laches is invoked, and to refuse to bar an action without a particularized showing of demonstrable prejudicial delay. Just as there is a strong presumption that a delay is reasonable for purposes of laches when a specified statutory limitations period has not yet lapsed, there should be a similar presumption in § 523(a)(3)(B) cases. A party asserting laches as a defense to a complaint filed under § 523(a)(3)(B) must make a heightened showing of extraordinary circumstances and set forth a compelling reason why the action should be barred. See Jarrow Formulas, 304 F.3d at 835 ("If the plaintiff filed suit within the analogous limitations period, the strong presumption is that laches is inapplicable."); Shouse v. Pierce County, 559 F.2d 1142, 1147 (9th Cir.1977) ("It is extremely rare for laches to be effectively invoked when a plaintiff has filed his action before limitations in an analogous action at law has run.").

Id. at 926.[5]

Because of the unique treatment of governmental entities under Oregon law for purposes of the state statute of limitations, which are applicable for the reasons stated infra, the presumption of unreasonableness does not come into play in this case.  Accordingly, the court should decline to make such a factual determination as to unreasonableness and fraudulent conduct at this very early stage of the proceedings.

Laches is an equitable time limitation on a party's right to bring suit.  Boone v. Mech. Specialties Co., 609 F.2d 956, 958 (9th Cir. 1979).  Laches is a valid defense to Lanham Act claims, including those for false advertising. E.g., Hot Wax, Inc. v. Turtle Wax, Inc., 191 F.3d 813, 820–21 (7th Cir. 1999); GoTo.com, Inc. v. Walt Disney Co., 202 F.3d 1199, 1209 (9th Cir. 2000) (considering laches defense to a trademark infringement suit under § 43(a)).  A party asserting

---

[5]The University asserts that the Ninth Circuit favorably cited the Marshak case. However, the In re Beatty court actually stated that the cases reaching the conclusion that the "at any time" language in statutes negates a laches defense do "so with virtually no analysis as to why such language would eliminate the application of the equitable doctrine, instead simply assuming that the absence of a time limitation also results in the absence of a laches limitation." In Re Beatty, 306 F.3d at p. 922-23.

laches must show that it suffered prejudice as a result of the plaintiff's unreasonable delay in filing suit. <u>Couveau v. Am. Airlines, Inc.</u>, 218 F.3d 1078, 1083 (9th Cir. 2000).

The equitable defense of acquiescence similarly requires unreasonable delay with the addition of an active rather than passive consent to the alleged violation. <u>Seller Agency Council, Inc. v. Kennedy Center for Real Estate Educ.</u>, 621 F.3d 981, 989 (9th Cir. 2010).

While laches and the statute of limitations are distinct defenses, a laches determination is made with reference to the limitations period for the analogous action at law. If the plaintiff filed suit within the analogous limitations period, the strong presumption is that laches is inapplicable. <u>E.g.</u>, <u>Shouse v. Pierce County</u>, 559 F.2d 1142, 1147 (9th Cir. 1977). However, if the claim is filed after the analogous limitations period has expired, the presumption is that laches is a bar to suit. <u>Jarrow Forumulas</u>, 304 F.3d at 837. Since the Lanham Act does not provide its own limitations period, the applicable state statute of limitation applies. Although the counter-defendants assert that only the limitation period itself is applicable, given the equitable nature of the defense, the court should also borrow any other statute applicable to determining when an action is timely commenced including the statute's exemption of certain parties from the limitation. Accordingly, while the applicable limitations period is found at O.R.S. 12.110(1) for actions sounding in fraud, which is two years, the Oregon legislature has determined that such limit shall not apply to actions brought in the name of the state or other public corporation therein or for the state's benefit. O.R.S. § 12.250. This is not just a gap filling provision because the issue for the court is to determine what amount of delay is reasonable, not merely the applicable limitations period. This is especially true where the federal courts are in disagreement as to the applicability of laches at all to cancellation claims under the Lanham Act. Accordingly, merely because the general statute of limitation for actions sounding in fraud has run, the court should decline to presume that laches bars the claims. The University of

Oregon is now a university with its own governing board, but a university with a governing board is a governmental entity performing governmental functions and exercising governmental powers. O.R.S. § 352.033. So even though the University "is not considered a unit of local or municipal government or a state agency, board, commission or institution for purposes of state statutes or constitutional provision," id., it may still be an instrumentality of the state and thus any action it brings is for the benefit of the state. Cf. Clarke v. Oregon Health Sciences University, 343 Or. 581, 600 (finding OHSU an instrumentality of the state even though state statute stated that it shall not be considered a unit of local or municipal government or a state agency for purposes of state statutes or constitutional provisions). However, the Clark case noted that OHSU was specifically designated as a public corporation which is a provision lacking in the University of Oregon's case. Nonetheless, Prior to July 1, 2014, the University was part of the Oregon University System and expressly an instrumentality of the State. See O.R.S. § 351.011. Accordingly, during the applicable time period for determining the reasonableness of the University seeking to assert its claims for cancellation, the University was clearly within the provisions of O.R.S. § 12.250 because it instituted the TTAB proceedings prior to July 1, 2014. Accordingly, the applicable statute of limitation does not establish a presumption of laches because during the time period at issue, the University of Oregon was exempted from such limitation.[6]

---

[6]This is not to say that the University may forever sit on its hands while its alleged trademark rights are violated. Laches still applies, just without the presumption that the running of the limitations period precludes asserting those rights. At this stage of the proceedings, the court cannot determine whether the University is estopped from asserting it has a valid trademark or that DMG has an invalid trademark in the DIBELS products. By the same token, the University cannot claim that because it is exempt from the limitations period, there is a presumption that laches is inapplicable. The court should only find that the exemption for state entities eliminates the presumptions associated with the running of the generally applicable limitations period.

A determination of whether a party exercised unreasonable delay in filing suit consists of two steps. First, the court assesses the length of delay, which is measured from the time the University knew or should have known about its potential cause of action. See Portland Audubon Soc'y v. Lujan, 884 F.2d 1233, 1241 (9th Cir. 1989). Second, the court decides whether the University's delay was reasonable. See Danjaq v. Sony Corp., 263 F.3d 942, 954–55 (9th Cir. 2001). As noted, the reasonableness of the University's delay is considered in light of the time allotted by the analogous limitations period, but resort to Oregon's limitations period provides no presumption either way. The court also considers whether the University has proffered a legitimate excuse for its delay. See Danjaq, 263 F.3d at 954–55 (outlining several legitimate excuses for delay in filing suit). Importantly, the Danjaq court noted that delay is reasonable when its purpose is to determine whether the scope of proposed infringement will justify the cost of litigation. Id. at 954. But the delay is not permissible when its purpose is to capitalize on the value of the alleged infringer's labor, by determining whether the infringing conduct will be profitable. Id.

Here, as noted, the complicated relationship between DMG, Good and Kaminski on the one hand throughout the years, especially when both Good and Kaminski worked at the University, and the University on the other hand was mutually beneficial until about 2011. The University states that to the extent it was aware of infringement prior to 2011, it felt that harm was too small to justify the costs of litigation. While, there is some evidence to show that the goodwill of the University was being exploited at least in certain advertising by DMG, the record is not clear at this stage as to whether the University or DMG actually sought to capitalize on the alleged infringing conduct until the product was profitable--it was profitable for both up until 2011.

While there is significant evidence of the University's awareness of the allegedly infringing conduct, see, e.g., Declaration of Roland Good (#52) at Ex. 11 (Schenkel memo dated January 31,

2005 asserting University's rights have been infringed and failure to follow through on 2001 investigation may amount to acquiescence ); Ex. 16 (drafted but unexecuted intellectual property agreement with DMG in December of 2005).[7]  Because there are issues of fact as to the reasonableness of the delay, the court need not reach the issue of prejudice.  Accordingly, the court should deny summary judgment as to the cancellation claims based on laches or acquiescence.[8]  Similarly, to the extent laches and acquiescence apply to the common law trademark claims, the issue is not ripe for summary judgment.[9]

In addition, counter-defendants' assertion that the University's request for damages pursuant to its cancellation claim is time-barred is not ripe for summary judgment because, as note above, the applicable statute of limitations during the time period at issue did not apply to the University. Contrary to counter-defendants' argument, the court should borrow all applicable provisions from

---

[7]DMG also asserts that the University acted as if DMG had valid trademarks and copyrights by inserting the User Agreement on the downloads page of its website, but the record is not amenable to a finding as a matter of law  at this stage as to whether this was an act attributable to the University or attributable to DMG improperly engaging a University employee to breach his agreement with the University to place the notice.

[8]The court also need not reach the issue of the applicability of the Morehouse Doctrine to the DIBELS Next registration and DIBELSNet registration.

[9]For purposes of trademark infringement courts generally consider the following factors as to whether laches will bar relief:  1. strength and value of trademark rights asserted; 2. plaintiff's diligence in enforcing the mark; 3. harm to the senior user if is relief denied; 4. good faith ignorance by the junior user; 5. competition between the senior and junior users; and 6. extent of harm suffered by the junior user because of the senior user's delay.  E-Systems, Inc. v. Monitek, Inc., 720 F.2d 604, 607 (9th Cir. 1983).  At this stage of the proceedings, the court simply cannot determine as a matter of law the consumer's identification of the marks with either party, or the reasonable diligence in enforcing the mark given how both parties benefitted from the way the products were presented in the market as perhaps being developed by both parties and offered by both.  Thus, the court cannot determine the harm to the senior user, the good faith by the junior user, the competition between the two and the extent of harm absent further development of the record.

Oregon's limitations statute including the exemption of a state entity to the limitation period for fraud type actions.

B.     Statute of Limitations and the Copyright Claims

The University alleges two copyright claims: (1) infringement related to the DIBELS, DIBELS 6th Edition, DIBELS Next, and DIBELSNET copyrights, and (2) declaratory relief of non-infringement of DMG's alleged copyrights. A copyright action must be commenced within three years from the date the claim accrued.  17 U.S.C. § 507(b).  The counter-defendants assert it has been openly exercising ownership of the disputed materials for a far longer period and that the claims are therefore time-barred.

Copyright claims accrue, with respect to claims of infringement centered on ownership rather than copying, when plain and express repudiation is communicated to the claimant.  Seven Arts Filmed Entertainment Ltd. v. Content Media Corp. PLC, 733 F.3d 1251, 1254 (9th Cir. 2013).  The counter-defendants assert several acts of repudiation via communication to the University's Office of Technology and Transfer (dated 2001)(ECF #s 62-2 and 62-3), open nationwide sales of DIBELS products without payment of royalties to the University, an intellectual property disclosure dated July 29, 2005 (ECF #52-13 at p. 1), a term sheet drafted by University counsel in 2005 (ECF #52-14) draft intellectual property agreement created by the Office of Technology and Transfer in 2005 (ECF #52-15), another draft intellectual property agreement from 2005 (ECF #52-16), a conflicts of interest disclosure dated January 13, 2006 (ECF #52-18), a conflict of interest disclosure dated September 19, 2007 (ECF# 52-19), and the educational use agreement posted with the download of the DIBELS product on the University's website for about eight years. (ECF #52-20).  While there is an issue of fact regarding imputing knowledge of the user agreement to the University, there is

no dispute of the University's knowledge of the remaining items. Moreover, the University participated in a hearing before Congress in 2007 in which Good discussed ownership of DIBELS 6th edition.

The counter-defendants assert sole ownership of the disputed works. The repudiations in the documents go beyond mere blanket statements of ownership to outright hostility to the University's claimed ownership of the DIBELS products. DMG expressly notes primary DIBELS 5th edition ownership and ownership of prior editions including TORF passages and DORF passages, ownership of DIBELS 6th edition and DORF passages (specifically noting solo development by DMG). Indeed, in conflict disclosures, Good expressly claimed DMG ownership of the copyright to DIBELS 6th, IDEL 7th and for training and consultation materials, DIBELS 2008 edition, DIBELS DEEP, and DIBELS Survey. These statements to the University along with the open selling of the product without paying royalties establish that no finder of fact could not conclude that DMG plainly and expressly repudiated University ownership and communicated such to the University. Indeed, the Schenkel memo establishes that the University was aware in 2005 of alleged copyright infringement and discussed whether to seek royalty sharing, register the copyright in the name of the State of Oregon, or negotiate a license agreement with DMG for use of DIBELS. Although there is an issue of fact as to whether the University received some attribution for its work on the DIBELS products in advertising, there is no dispute that DMG did not pay royalties.[10] The motion for summary judgment should be granted as to the copyright infringement claim. With respect to the claim for a declaration of non-infringement, to the extent it is based on the University's own assertion of ownership of the intellectual property, the motion should be granted and otherwise

---

[10]The fact that DMG did not register its copyrights until 2009 does not negate a finding that it repudiated the University's claim to own the products prior to that time.

denied.

## CONCLUSION

For the reasons stated above, counter-defendants' motion to dismiss (#47) should be granted in part and denied in part as follows:

(1)     The motion to dismiss the conversion claim should be granted to the extent it seeks to assert a claim for the DIBELS intellectual property and trademarks, but denied to the extent it seeks to assert a claim for the underlying grants and other tangible University resources used to develop such intellectual property.  The court should require more specificity with regard to the remaining portions of the claim, especially in light of the long period of time for which the counter-defendants are alleged to have engaged in such fraud to accomplish the alleged conversion.

(2)     The motion to dismiss the breach of contract and covenants of good faith and fair dealing claim should be denied, but the motion to make it more definite and certain should be granted.  The University should file an amended breach of contract claim identifying the precise purported terms, regulations, directives, etc. that were breached and by whom and when along with the elements of lack of breach on the part of the University and resulting damage. Morever, to the extent the breach allegations are supported by the allegations of fraud spread throughout the counterclaims, the claims must be alleged with particularity.

(3)     Because the University should amend its breach of contract claim to provide greater detail, the motion to dismiss the breach of fiduciary duty claim should be denied for now but with greater specificity provided in accordance with the amended breach of contract claim.

(4)     The motion to dismiss the unjust enrichment claim should be granted with leave to replead the loss of clearly identified non-intellectual property.

(5)     Assuming that an amended complaint will provide a sufficient basis for plausible

breach of fiduciary duty claim, the motion to dismiss the accounting claim should be denied for now.

(6)     The motion to dismiss for improper joinder should be denied.

In addition, counter-defendants' motion for partial summary judgment (#48) should be granted in part and denied in part as follows:

(1)     The motion for summary judgment as to the trademark claims based on laches, acquiescence, or the statute of limitations should be denied.

(2)     The motion for summary judgment should be granted as to the copyright infringement claim. With respect to the claim for a declaration of non-infringement, to the extent it is based on the University's assertion of ownership of the intellectual property, the motion should be granted and otherwise denied.

This recommendation is not an order that is immediately appealable to the Ninth Circuit Court of appeals. Any notice of appeal pursuant to Rule 4(a)(1), Federal Rules of Appellate Procedure, should not be filed until entry of the district court's judgment or appealable order.  The parties shall have fourteen (14) days from the date of service of a copy of this recommendation within which to file specific written objections with the court. Thereafter, the parties shall have fourteen (14) days within which to file a response to the objections. Failure to timely file objections to any factual determination of the Magistrate Judge will be considered as a waiver of a party's right to de novo consideration of the factual issues and will constitute a waiver of a party's right to appellate review of the findings of fact in an order or judgment entered pursuant to this recommendation.

DATED this 27th day of April 2015.

s/Thomas M. Coffin
THOMAS M. COFFIN
United States Magistrate Judge