**Frederick A. Batson**, OSB 821887
batson@gleaveslaw.com
GLEAVES SWEARINGEN LLP
P. O. Box 1147
Eugene, OR  97440
Phone:  (541) 686-8833
Fax:  (541) 345-2034

**William S. Strong -** Admitted *Pro Hac Vice*
wstrong@kcslegal.com
KOTIN, CRABTREE & STRONG, LLP
One Bowdoin Square
Boston, MA  02114
Phone: (617) 227-7031
Fax:  (617) 367-2988

Counsel for Plaintiff Dynamic Measurement Group, Inc., and for Dr. Roland Good and Dr. Ruth Kaminski (unnamed parties)

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

### EUGENE DIVISION

| | |
|---|---|
| **DYNAMIC MEASUREMENT GROUP, INC.,** an Oregon corporation,<br><br>**PLAINTIFF**,<br>v.<br><br>**UNIVERSITY OF OREGON,** a special governmental body as defined by ORS 174.117(1)(i); et al.<br><br>**DEFENDANTS.** | Case No.  6:14-cv-01295-TC<br><br>**PLAINTIFF AND COUNTER-DEFENDANTS DR. ROLAND GOOD, DR. RUTH KAMINSKI, AND DMG'S MOTIONS TO STRIKE, DISMISS AND IN THE ALTERNATIVE TO MAKE MORE DEFINITE AND CERTAIN**<br><br>**Request for Oral Argument** |

# TABLE OF CONTENTS

**Page**

INTRODUCTION .................................................................................................. 6

MOTIONS ............................................................................................................. 8

ARGUMENT ......................................................................................................... 9

I.      MOTION 1: To Strike or Dismiss the Relief Claimed in Paragraph (b) of the
        Prayer to the Extent it Asks the Court to Enjoin and Restrain Counter-Defendants
        "from continued acts of infringement of copyright."...................................... 9

II.     MOTION 2: To Strike Paragraphs (i) and (j) of the Prayer for Relief Against
        DMG for the Breach of Contract Damages or Specific Performance Because
        DMG is Not Alleged to be a Party to any Contract that Would Entitle UO to
        Such Relief............................................................................................... 9

III.    MOTION 3: To Dismiss the Breach of Contract Claims Against Drs. Good and
        Kaminski for Failure to State a Claim for Relief. ....................................... 10

        A.      None of Dr. Good's Contracts Bind Him to the OAR or IMDs During the
                Relevant Time Period of the Alleged Breaches ................................. 10

                1.      The 1988-1993 Notices of Appointment ............................... 11

                2.      The 1994 Promotion Letter.................................................. 12

                3.      The 2002 Sabbatical Leave Form ........................................ 12

                4.      The Tenure Reduction Form ................................................ 13

                5.      The Grant Abstracts ........................................................... 13

        B.      The Attached Contracts with Dr. Kaminski are from the Wrong Time
                Periods, are Unsigned or Relate to Unpaid Courtesy Appointments.............. 14

                1.      The Signed and Unsigned Notices of Appointment from 1985-
                        1988, 1992-1998 and 2000 and the Unpaid Courtesy Appointment
                        Forms ............................................................................... 14

                2.      None of Dr. Kaminski's Claimed Agreements Refer to the IMDs..... 17

                3.      The Grant of Abstracts........................................................ 19

        C.      The UO Cannot Allege Contract Claims Based on the OAR policy or the
                IMDs ............................................................................................. 20

1.      The OAR Policy...................................................................... 20

2.      The IMDs ............................................................................... 21

3.      The OAR and IMDs Are Not Sufficiently Definite on Essential
        Terms to Create an Enforceable Contract ........................................ 22

        a.      A Contract Requires Agreement on Essential Terms ............ 22

        b.      The OAR and IMDs Do Not Sufficiently Define the
                Essential Contract Terms ....................................................... 26

        c.      A More Detailed Examination of the Indefiniteness of the
                Terms ...................................................................................... 28

                (i) There are No Definite Royalty Payments .........................28

                (ii)The Property Subject to Assignment is Indefinite ............30

                (iii)There is No Allegation as to the Time for Performance ...31

        d.      UO Failed to Plead the Additional Requirement for
                Specific Performance that It Is Ready, Willing, and Able
                to Perform .............................................................................. 34

        e.      Practical Difficulties Limit the Court's Ability to Order
                Specific Performance. ............................................................ 35

IV.     MOTION 4:  To Dismiss or Strike UO's Counterclaim for Breach of Fiduciary
        Duty for Failure to State a Claim for Relief. In the Alternative, to Make UO's
        Counterclaim for breach of Fiduciary Duty More Definite and Certain. .................. 37

        A.      UO Failed to State a Claim for Breach of Fiduciary Duty ............................ 37

        B.      The Court should Decline to Hear UO's Breach of Fiduciary Duty Claim.... 38

        C.      UO's Breach-of-Fiduciary-Duty Claim should be Stated More Definitely.... 39

CONCLUSION................................................................................................. 40

CERTIFICATE OF COMPLIANCE ........................................................................ 40

# TABLE OF CASES AND AUTHORITIES

*A-C Constr., Inc. v. Bakke Corp.*, 153 Or. App. 41, 46 (1998) .........................................17

*Araujo v. GE Info. Servs*, 82 F. Supp. 2d 1161, 1168 (D. Or. Feb. 4, 2000)...............17, 18

*Bd. of Trs. of the Leland Stanford Junior Univ. v. Roche Molecular Sys.,*
    583 F.3d 832, 841 (Fed. Cir. 2009)...........................................................................24, 36

*Beaty v. Oppedyk*, 212 Or. App. 615, 622 (2007)..............................................................34

*Bennett v. Pratt,* 228 Or. 474, 477, 365 P.2d 622(1961) ..................................................22

*Booras v. Uyeda*, 295 Or. 181, 191-194 (1983)....................................................24, 34, 36

*Cimarron W. Properties v. Lincoln Loan Co.*, 123 Or. App. 614 (1993)....................35, 36

*Eberz v. Oregon Department of State Police,*
    U.S. Dist. LEXIS 3145, 2008 WL 141077 (D. Or. 2008) ..........................................38

*Effects Assocs. Inc. v. Cohen*, 908 F.2d 555, 557 (9th Cir. 1990) ......................................25

*Foraste v. Brown Univ.*, 290 F. Supp. 2d 234, 239 (D.R.I. Oct. 30, 2003) ......................30

*Gaffi v. Burns*, 278 Or. 327, 333 (1977) ............................................................................34

*Genest v. John Glenn Corp.*, 298 Or. 723, 744 (1985)......................................................25

*Gordon v. Curtis Bros. A. D. Moodie House-Moving Co.*, 119 Or. 55, 65, 248 P.
    158 (1926).....................................................................................................................23

*Helvering v.* San Joaquin Fruit, 297 U.S. 496 (1936).........................................................24

*IPVenture, Inc. v. Prostar Computer, Inc*., 503 F.3d 1324, 1327 (Fed. Cir. 2007)...........24

*Johnson v. School Dist.*, 210 Or. 585, 591, 312 P.2d 591 (1957)......................................24

*Justin Kraft & Kraft Piano Servs., LLC v. Arden*, 2008 U.S. Dist. LEXIS
    91001 (2008) .........................................................................................................8, 23

*Klimek v. Perisich,* 231 Or. 71, 78–79, 371 P.2d 956 (1962) ..........................8, 22, 23, 28

*Kretz v. Howard*, 220 Or. 73, 83, 346 P.2d 93 (1959)......................................................23

*Lakeside v. Freightliner*, 612 F. Supp. 10 (1984) .............................................................18

*Landgraver v. DeShazer*, 239 Or. 446, 448, 398 P.2d 193 (1965) ...................................23

*McDonough v. S. Or. Mining Co.*, 177 Or. 136, 156 (1945) ...........................................35

*Medford Furniture & Hardware Co. v. Hanley,* 120 Or. 229, 233,
    250 P 876 (1926)...........................................................................................................22

*Miller v. Ogden*, 134 Or. App. 589, 593-595 (1995).........................................................34

*Northrop Grumman Info. Tech., Inc. v. U.S.*, 535 F.3d 1339, 1345
    (Fed. Cir. 2008).............................................................................................................17

*Public Market Co. v. Portland*, 160 Or. 155, 167 (1938)..................................................35

*Reed v. Montgomery,* 180 Or. 196, 219–221, 175 P.2d 986 (1947) ...........................22, 23

*Sterling Savings Bank v. Chan,* U.S.Dist. LEXIS 154026 (D. Or. 2013)
    WL 5785172 .............................................................................................................8, 24

*Voin v. Szabo*, 139 Or. App. 590, 594 (1996)....................................................................35

*Western Hills, Oregon, Ltd. v. Pfau*, 265 Or. 137, 145, 508 P.2d 201 (1973)..................24

*Wittick v. Miles*, 274 Or. 1, 7 (1976)..................................................................................36

*Van Horn Construction Corp. v. Joy,* 186 Or. 473, 483 (1949) ........................................36

2 C.F.R. §200.315 ..................................................................................6, 7, 17, 18, 19, 38

17 U.S.C. § 204(a) ...................................................................................7, 16, 17, 25

28 U.S.C. § 1367(c) ............................................................................................................38

Restatement (Second) of Contracts § 33, illus. 7–8 (1981) ...............................................22

Fed. R. Civ. P. 9 .........................................................................................................6, 9, 14

Fed. R. Civ. P. 9(b) ..........................................................................................37
Fed. R. Civ. P. 12(b)(6)........................................................................................9
Fed. R. Civ. P. 12(e) ...........................................................................................9
Fed. R. Civ. P. 12(f) ............................................................................................9
IMD 4.015 ...........................................................................................................21
IMD 4.021 ...........................................................................................................21
IMD 4.022 ...........................................................................................................21
IMD 4.111 ...........................................................................................................21
IMD 6.205 .............................................................................................6, 17, 18, 21
IMD 6.210(2) ................................................................................................21, 30
IMD 6.215 .................................................................................................6, 17, 18
IMD 6.215(1) .......................................................................................................21
IMD 6.215(2) ................................................................................................21, 33
IMD 6.215(6) .......................................................................................................21
IMD 6.220 ......................................................................................................17, 18
IMD 6.225 ...........................................................................................................21
IMD 6.230 ..................................................................................6, 17, 18, 27, 33
IMD 6.230(1) .......................................................................................................21
IMD 6.230(2) .......................................................................................................25
IMD 6.235 ......................................................................................................22, 32
IMD 6.235(1), (3), (4)(b)-(c) .............................................................................29
IMD 6.235(4)(d) ...........................................................................................25, 26
IMD 6.235(4)(e) ...................................................................................................32
IMD 6.240 ......................................................................................................22, 32
IMD 6.240 (1) .......................................................................................................8
IMD 6.240(2) .......................................................................................................29
IMD 6.240(3) .......................................................................................................29
IMD 6.245(2) .......................................................................................................22
IMD 6.250 ...........................................................................................................29
IMD 6.250 (1) .......................................................................................................8
IMD 6.250(2) ..............................................................................................8, 25, 28
IMD 6.255 ......................................................................................................21, 25
OAR 580-021-0240 .............................................................................................12
OAR 580-043-0007 ......................................................................................20, 28
OAR 580-043-0011 ...................................................................6, 17, 20, 27
OAR 580-043-0011(4)(b) ...................................................................................29
OAR 580-043-016 ........................................................................................27, 32
OAR 580-043-0016(5)..........................................................................................32
OAR 580-043-0026(3)..........................................................................................32

## CERTIFICATE OF COMPLIANCE WITH LR 7.1

Pursuant to LR 7.1, undersigned counsel has conferred with counsel for UO in a good faith effort to resolve the issues in dispute.  The parties have been unable to do so.

## INTRODUCTION

By greatly expanding the volume of pages in its amended counterclaims (96) and attachments (82), the UO seeks to create the illusion that it has been more specific in its breach of contract and breach of fiduciary duty counterclaims.  Yet all it has done is throw up voluminous clouds of dust in an attempt to avoid doing what it must do to plead a legally enforceable contract or breach of fiduciary duty claim.  As the Court earlier stated, "The University should file an amended breach of contract claim identifying the precise purported terms, regulations, directives, etc. that were breached and by whom and when along with the elements of lack of breach on the part of the University and resulting damage.  Moreover, to the extent the breach allegations are supported by the allegations of fraud spread throughout the Amended Counterclaims (hereinafter "AC"), the claims must be alleged with particularity as required by Fed. R. Civ. P. 9."  F&R p. 16. UO has not done so.

For multiple independent reasons, the UO has failed to state claims for breach of contract or fiduciary duty.  The UO's contract claim turns on its core allegation that Drs. Good and Kaminski "agreed to abide by" the Oregon Administrative Rules of the State Board of Higher Education ("OARs"), including OAR 580-043-0011, various Oregon State Board of Higher Education Internal Management Directives ("IMDs"), namely IMD 6.205, 6.215 and 6.230, and 2 C.F.R. § 200.315, "when they accepted their positions at the University and pursuant to the terms and conditions of their Notices of Appointment and other agreements with the University."  AC ¶¶ 44-48, 49, 224-227.  The Notices of Appointment and other agreements are annexed to

UO's pleading as Exhibits 11-12. There are several key problems with the University's contract claim, under which it seeks both damages and specific performance.

First, UO has a timing problem. The Notices of Appointment contracts that it attaches to the amended counterclaims are short term contracts – covering either nine months or one year. For Dr. Good, the only Notices of Appointment alleged are from 1988-1993 and expired on their face no later than 1994 – long before the alleged breaches regarding DIBELS and IDEL claimed by UO. The later agreements between Dr. Good and the University do not reference the OARs or IMDs. Likewise, several of the Notices of Appointment signed by Dr. Kaminski had long expired before any of the alleged breaches occurred. Others are not signed by Dr. Kaminski, and by law an agreement to transfer a copyright must be in writing. 17 U.S.C. § 204(a).

Second, the attached Notices of Appointment with Dr. Kaminski do not mention – much less incorporate by reference – the terms of the IMDs that UO claims were breached. Nor do they mention or incorporate by reference 2 C.F.R. § 200.315 – which, in fact, was not adopted until 2013 – many years after the last of her Notices of Appointment and the alleged breaches.

Third, and critically, to the extent the employment agreements with Dr. Kaminski and Dr. Good do incorporate the OARs or are implied to include the IMDs, they leave the essential terms of any assignment up in the air and thus are too indefinite to ground a contract claim. The OARs do not specify the financial terms of any assignment or when the assignment is to occur. Instead, they require that a royalty be paid to the professor "not to exceed 50%" – while leaving the actual royalty rate to future negotiation, along with the other essential terms of such an assignment. Similarly, the IMD terms are so vague and ambiguous as to be unenforceable. They too leave the time of performance undefined and leave the essential price/royalty term up to future negotiation to be determined pursuant to the "equities of all parties" as determined by

future agreements with the author and other publishers, along with all the other essential terms of any claimed assignment obligation.  *See* IMD 6.240 (1), 6.250 (1) and (2).  The OARs and IMDs are nothing more than an unenforceable "agreement to agree."  In short, the OARs and IMDs cannot be enforced by the Court as a mutually agreed upon contract of assignment without the Court improperly engaging in writing the contract and filling in the gaps for virtually all the essential terms of such an assignment – price/royalty amount, the time for performance or assignment, and the terms of the assignment related to the rights of third parties.  That a court cannot do. The essential terms and subject matter of the agreement must be sufficiently definite to determine the nature and extent of the obligations of each party.  *Klimek v. Perisich,* 231 Or. 71, 79-80, 371 P.2d 956 (1962); s*ee also Justin Kraft & Kraft Piano Servs., LLC v. Arden*, 2008 U.S. Dist. LEXIS 91001 *23, (D. Or. 2008); *Sterling Savings Bank v. Chan*, U.S. Dist. LEXIS 154026 *13 (D. Or. 2013).

For these and additional reasons set forth herein, the University cannot state a claim for breach of contract or breach of fiduciary duty.

## MOTIONS

Plaintiff DMG and the individual Counter-Defendants now move against the amended pleading as follows:

MOTION 1:   To strike or dismiss the relief claimed in paragraph (b) of the prayer to the extent it asks the Court to enjoin and restrain Counter-Defendants "from continued acts of infringement of copyright."

MOTION 2:   To strike paragraphs (i) and (j) of the prayer for relief against DMG for the breach of contract damages or specific performance because DMG is not alleged to be a party to any contract that would entitle UO to such relief.

MOTION 3:   To dismiss or strike the breach of contract claims against Drs. Good and Kaminski for failure to state a claim for relief.

MOTION 4:    To dismiss or strike UO's counterclaim for breach of fiduciary duty for failure to state a claim for relief. In the alternative, to make UO's counterclaim for breach of fiduciary duty more definite and certain.

These motions are based upon FRCP 9, 12(b)(6), 12(e), and 12(f) and the following Argument in support.

## ARGUMENT

**I.    MOTION 1:   To strike or dismiss the relief claimed in paragraph (b) of the prayer to the extent it asks the Court to enjoin and restrain Counter-Defendants "from continued acts of infringement of copyright."**

The Court previously granted summary judgment on UO's copyright infringement claims against Counter-Defendants.  UO's attempt to revive that claim in ¶ (b) of its prayer for relief by asking the Court to enjoin and restrain Counter-Defendants "from continued acts of infringement of copyright" is a request for relief on a claim that has been dismissed from the case.  That language in the prayer should be struck or dismissed.

**II.    MOTION 2:   To strike paragraphs (i) and (j) of the prayer for relief against DMG for breach of contract damages or specific performance because DMG is not alleged to be a party to any contract that would entitle UO to such relief.**

No claim for breach of contract or breach of fiduciary duty has been pled against DMG. Nonetheless, the University requests relief against DMG for those claims.  Specifically, UO asks in its amended counterclaims "that the Court award the University specific performance by ordering DMG, Dr. Good and/or Dr. Kaminski to assign the DMG copyrights to the University." Prayer ¶ j.  UO also seeks judgment against all Counter-Defendants [including DMG] for "damages for breach of contract and breach of the duty of good faith and fair dealing, in an amount to be proved at trial."  Prayer ¶ i.  Any such claim for breach of contract relief against DMG should be struck from the pleadings or dismissed.

III.    **MOTION 3: To dismiss the breach of contract claims against Drs. Good and Kaminski for failure to state a claim for relief.**

A.    **None of Dr. Good's Contracts Bind Him to the OAR or IMDs During the Relevant Time Period of the Alleged Breaches.**

Per the Court's order, UO was required to specifically allege and attach the contracts on which it sues Dr. Good, the terms of those contracts, the specific provisions of any regulations or terms that were breached and when. In Exhibit 11, the UO attaches the "copies of Dr. Good's Notices of appointment and other agreements" that allegedly bind him to the cited OAR and IMDs that UO alleges create the contract regarding DIBELS and IDEL.[1] As an initial matter, it is striking that the University cites no contracts specifically referencing DIBELS or IDEL, given the University's extensive involvement with DIBELS and IDEL, including its operation of the DIBELS Data System over many years. AC ¶ 50. Exhibit 11 includes:

1.    Six Notices of Appointment forms Dr. Good signed for a "term of service" of "9 months" in 1988, 1989, 1990, 1991, 1992 and 1993. Those forms contain the following language relevant to the limited time those contracts were in effect:

> "The position indicated above is subject to the provisions of the Oregon Administrative Rules of the State Board of Higher Education, and to all other now existing administrative rules, regulations, and policies of the University of Oregon which are incorporated by reference herein." Exhibit 11, pgs. 1-11.

---

[1] Apart from generally alleging that all university policies are contract terms, AC ¶ 224, and attaching to its pleading 90+ pages of policy terms, UO does not specifically identify a single contract or policy term in which Good or Kaminski agreed (1) not to assign DIBELS and IDEL intellectual property to DMG, (2) not to register DIBELS and IDEL intellectual property in DMG's name, (3) not to license DIBELS intellectual property to the DMG Licensees, (4) to assist UO in patenting, licensing, and copyrighting the DIBELS intellectual property in UO's name, (5) not to use UO resources to advance other interests, or (6) not to revise the Educational Use Agreement. *See* AC ¶¶ 230-235 (alleging breach on all of the foregoing bases).

UO's counterclaim does not allege any later Notices of Appointment signed by Dr. Good.

2.  A 1994 letter approving his promotion to Associate Professor with indefinite tenure effective September 16, 1994.  No reference is made to any regulations or other policies, internal management directives, CFRs, or grant terms in the letter.

3.  An application for sabbatical leave dated February 14, 2002 in which Dr. Good informs the UO that he intends to complete DIBELS 6th and a Spanish edition.

### 1.    The 1988-1993 Notices of Appointment

None of the terms allegedly included in the 1988-1993 Notices of Appointment were in effect when DIBELS 5th or 6th were copyrighted and published.  Further, UO does not allege any DIBELS or IDEL copyrighted or copyrightable works existed prior to 2001 that could have been assigned during the term of the 1988-1993 notices.  According to the UO's allegations, DIBELS 5th was published in 2001, DIBELS 6th in 2002, and IDEL in 2003 (AC ¶ 64; Exhibit 7). To the extent UO seeks to enforce an agreement to assign copyrighted materials, it must at least allege the copyrightable educational materials that existed during 1988-1993 such that they could be assigned. UO has not done so.[2]

Notably, UO does not attach or plead there was a Notice of Appointment contract with Dr. Good for 1994-to present.  Thus, there was no such contract in 2001, 2002, or 2003 when DMG was formed, the trademarks registered in DMG's name and the conversations with Phil Loux at UO allegedly occurred.

---

[2] For the period from 1991-1993, UO's only allegations of DIBELS research on the development of a knowledge base pertain to a 1991-1993 grant that does not mention Dr. Good and did not involve research on the development of the DIBELS 5th or 6th DORF measures. AC ¶¶ 25, 33, Exhibit 4.

In short, the 1988-1993 "Notice of Appointment" of Dr. Good that expired prior to all of the relevant alleged breaches cannot and do not provide the basis for the pled breaches of contract claim.

### 2.      The 1994 Promotion Letter

The 1994 letter promoting Dr. Good does not contain terms that UO seeks to claim Dr. Good breached. It makes no reference to any obligation or agreement to assign copyrights or other intellectual property to UO. It does not refer to or incorporate any of the OARs, IMDs or the 2013 CFR that UO claims he agreed to in the contracts attached in Exhibit 11.[3]

### 3.      The 2002 Sabbatical Leave Form

The sabbatical agreement UO attaches as supposedly supporting its breach of contract claim likewise does not contain any of the policies that UO claims were breached. Nor does it reference an agreement to assign intellectual property to UO in DIBELS or IDEL. Likewise, it does not reference any IMDs or OARs relating to assigning intellectual property. It simply states that Dr. Good "agree(s) to abide by the Board of Higher Education's Administrative rules in effect as of the date of this agreement *covering such leave*." Exhibit 11, p. 12 of 14. If anything, these rules only defeat the UO's claim. These OARs provided that a professor could keep any revenue generated from his work during such a sabbatical, and contained no provisions stating that any materials written or created while on leave would become the University's property or that the professor had any obligation to assign such materials to the University. *See* former OAR 580-021-0240 (2002):

> Supplementing of Sabbatical Incomes. Staff members on sabbatical leave may supplement their sabbatical salaries to a reasonable degree, provided that such supplementation strictly

---

[3]To the extent the IMD and OARs are implied in his employment relationship, they were also inadequate to create an enforceable assignment contract for the reasons noted below.

conforms to the stated and approved purposes of the sabbatical
leave.

There is no allegation that the use of the sabbatical leave by Dr. Good to create the DORF

passages for DIBELS 6th with his own funds or to create a Spanish version of them with his own

funds were in any way contrary to his stated and approved purpose for the sabbatical leave.

Indeed, he stated in the application that he was going to complete DIBELS 6th and create a

Spanish version during his sabbatical.  *See* Exhibit 11, p. 13 of 14.  In sum, this document does

not provide any basis for UO's breach of contract claims against Dr. Good related to DIBELS or

IDEL or the formation of DMG around that time.

### 4.    The Tenure Reduction Form

The only other contract attached to the Amended Counterclaim in Exhibit 11 as

representing an agreement by Dr. Good with UO is a tenure reduction in 2006.  It contains no

language referring to any IMDs, regulations or CFRs or to an agreement to assign the DIBELS

or IDEL intellectual property to UO that would support UO's breach of contract claims against

him.

In sum, the UO has failed to adequately allege any contract that would bind Dr. Good to

the cited OAR and IMDs during the time period of the alleged breaches or otherwise make it a

breach of contract for him to take the actions set forth in ¶¶ 229-35 of the Amended

Counterclaim.  As a result, the breach of contract claims against him should be dismissed.

### 5.    The Grant Abstracts

To the extent UO's breach of contract claim is based on a supposed diversion of grant

funded resources to Dr. Good (AC ¶ 234 and ¶¶ 172-174), its pleading also remains wholly

inadequate.  No grant contracts with Dr. Good are attached.  No grant terms are set out in any

Notice of Appointment agreements attached to the Amended Counterclaims.  UO simply

attaches four exhibits of abstracts for several grants (Exhibits 3, 4, 6, and 9).  Two abstracts (Exhibits 4 and 9) do not reference Dr. Good at all, much less provide contract terms or define his roles or obligations related to those grants.  One abstract (Exhibit 6) contains an agreement but not with Dr. Good (it appears Drs. Kame'enui and Shinn signed the agreement); nor does UO allege Dr. Good signed any grant contract related to the abstracts in Exhibit 6.  Exhibit 6 mentions, Dr. Good as a key person in 2 of the 5 years but does not define obligations related to being a key person or otherwise.  Exhibit 4 refers to Dr. Good's role as a Co-Principal Investigator from 1996-2001 but no terms of the grant or grant agreements with him are attached.

These fraud-based pleadings of misuse of university resources (*i.e.*, the grant funds) in support of the UO's contract and fiduciary duty claims completely fail to meet the specificity required by Fed. R. Civ. P. 9 and the Court's earlier ruling.  The grant abstracts, only two of which even refer to Dr. Good, with no reference to any agreement entered into with him related to that grant that defines his obligations, are wholly inadequate to support such claims.

### B. The Attached Contracts with Dr. Kaminski are from the Wrong Time Periods, are Unsigned, or Relate to Unpaid Courtesy Appointments

Per the Court's order, UO was required to specifically allege and attach the contracts on which it sues Dr. Kaminski, the terms of those contracts, the specific provisions of any regulations or terms that were breached and when.

### 1. The Signed and Unsigned Notices of Appointment from 1985-1988, 1992-1998, and 2000 and the Unpaid Courtesy Appointment Forms

UO alleges its contracts with Dr. Kaminski that bind her to the cited University policies are contained in "A copy of Dr. Kaminski's Notices of Appointment … attached hereto as Exhibit 12", which contains the following:

1. Signed notices of appointment each containing a "twelve-month"  "term of

    service" for a paid position in 1985, 1986 and 1987 while Dr. Kaminski was a

student at UO.  These contracts do not support the UO's claim for breach because they all predate and expired long prior to the pled existence of any DIBELS copyrightable works – sometimes by almost 10 years.  *See* AC ¶¶ 21 and 29 (alleging research on the development of DIBELS 5th and 6th in 1996-2001); AC ¶¶ 18 (alleging first publication of DIBELS 5th in 2001); Exhibit 5; Exhibit 2 (alleging first publication of DIBELS 6th grades 1-3 in 2003)  and grades 1-3 for DIBELS 6th in 2003); AC ¶¶ 230-235.

2.  Four signed Notices of Appointment each containing a "9-month"  "term of service" for a paid position in 1992, 1993, 1994, 1995.  Again, these contracts expired long before UO alleges the DIBELS 5th and 6th materials were first published in 2001 and 2003, and predate the date IDEL was first published in 2003.  They also predate the grant that UO alleges she was a co-principal investigator on in 1996-2001 and were long before any obligation to assign that not-yet-existing intellectual property to UO could have arisen.  *See* AC ¶¶ 21 and 29 (alleging research on the "development" of DIBELS 5th and 6th measures in 1996-2001).

3.  Signed Notices of Appointment from 1996-1998 and 2000.  On their face, these Notices of Appointment are limited duration contracts for nine month terms each.  Thus, they do not apply to activities Dr. Kaminski engaged in during the other three months of each year.  These Notices of Appointment arguably apply to <u>some</u> points in time where UO claims <u>some</u> parts of DIBELS were being researched (1996-2001).  But for the reasons noted in Section III(c) below, the claims related

to these Notices of Appointment are not sufficient to support any of the breaches of contract claimed against Dr. Kaminski.

4.      *Unsigned* Notices of Appointment in 1999, and 2001-2002.  Because these Notices of Appointment were unsigned, the UO has not alleged a valid signed written agreement to transfer copyrights to UO as is required by statute for a valid copyright transfer to exist.  *See* 17 U.S.C. § 204(a) (requiring for valid transfer of copyright an "instrument of conveyance, or a note or memorandum of the transfer" that is signed by the author).  Even if these forms were signed, for the reasons noted below in Section III(c), they are not sufficient to support a breach of contract claim against Dr. Kaminski.  Finally, it is highly significant that the 2001 Notice of Appointment is unsigned and that there is no Notice of Appointment for Dr. Kaminski for 2003, because those are the critical years in which UO alleges DIBELS 5th and 6th and IDEL were published (AC ¶ 64), the trademarks were registered (AC ¶¶ 74 and 75), DMG was formed (AC¶ 7), and the assignments by Dr. Kaminski to DMG of the trademark and copyright rights occurred (AC ¶¶ 7, 136, 167, 230).

5.      Cover letters to Dr. Kaminski with "*Unpaid* Appointment Form[s]" signed by UO department personnel, but not by Dr. Kaminski, noting Dr. Kaminski would be an unpaid professor with a courtesy appointment.  These date from 2004, 2005 (to "be an occasional guest lecturer in SPSY academic classes"), 2006 (to "be an occasional guest lecturer in SPSY academic classes"), 2008 (to "be an occasional guest lecturer in SPSY academic classes"), and 2009.  Not only are these agreements not signed, none of these forms make Dr. Kaminski an employee of

UO.  Nor do they mention application of University rules other than the OARs and limited sections of the Faculty Handbook that relate to Courtesy appointments, a part of the handbook UO fails to mention or attach to its pleading. (Exhibit 12, pp. 20-31; Exhibit 14, pp 1-16).  Nor do the forms refer to any obligation to assign intellectual property or to any specific engagement to create DIBELS or IDEL while being an occasional unpaid guest lecturer at UO.  As a result, UO has failed to plead a contract with Dr. Kaminski that would support any of the claimed breaches alleged against her for 2004-2009 related to assignments of the DIBELS and IDEL copyrights or a valid signed copyright assignment as required by 17 U.S.C. § 204(a).

### 2.    None of Dr. Kaminski's Claimed Agreements Refer to the IMDs

None of Dr. Kaminski's Notices of Appointments expressly reference or incorporate into her contracts with UO the IMDs or CFRs that are the basis of virtually all UO's breach allegations in ¶¶ 226-235 against Dr. Kaminski.  Specifically, UO alleges that Dr. Kaminski agreed to assign DIBELS and IDEL intellectual property rights to UO under OAR 580-043-0011, IMD 6.205, IMD 6.215, IMD 6.230, IMD 6.220 and 2 C.R.F. § 200.315.  Only the OARs are mentioned in her Notices of Appointment.

Language in an employment contract incorporating extrinsic material must "explicitly, or at least precisely, identify the written material being incorporated and must clearly communicate that the purpose of the reference is to incorporate the referenced material into the contract." *Northrop Grumman Info. Tech., Inc. v. U.S.*, 535 F.3d 1339, 1345 (Fed. Cir. 2008).  Consistent with that requirement, Oregon courts have declined to acknowledge a broader incorporation by reference than is apparent on the face of the document.  *A-C Constr. v. Bakke Corp.*, 153 Or. App. 41, 46 (1998) (citing cases); *Araujo v. GE Info. Servs*, 82 F. Supp. 2d 1161, 1168 (D. Or.

Feb. 4, 2000); *Lakeside v. Freightliner*, 612 F. Supp. 10 at 13 ("The fact that general policies for managers are written into a manual does not create an offer to employees that is the foundation for a contractual relationship. Nor is the fact that the manual was accessible to employees at a manager's work area sufficient to infer that a contractual relationship existed.").  Also, where a manual expressly states that its terms do not create a contract, its provisions cannot be used in support of a breach-of-contract claim – which is the case with the Faculty Handbook. *Araujo*, 82 F. Supp. 2d at 1169.  As provided on the front page of the handbook webpage, "The Faculty Handbook does not, itself, constitute university policy, and its contents are not grievable." https://academicaffairs.uoregon.edu/content/faculty-handbook. Here, absent an apparent and specific reference on the face of the Notices of Appointment to the IMDs, faculty handbook[4] and CFRs, they are not part of the contract and cannot be the basis for a breach of contract claim against Dr. Kaminski.[5]

As a result, UO's breach of contract claim based on the allegation that Dr. Kaminski "agreed to assign DIBELS and IDEL intellectual property rights" to the University pursuant to "IMD 6.205, IMD 6.215, IMD 6.230, IMD 6.220 and 2 C.F.R 200.315" AC ¶ 227 finds no support in the alleged and pled terms of the Notice of Appointment contracts (signed and unsigned) from 1992, 1993, 1994, 1995, 1996, 1997, 1998, 1999, 2000, 2001 (unsigned) and 2002 (unsigned).  UO's claim that Dr. Kaminski breached any of the notice of appointment contracts (signed or unsigned) from these years by not complying with IMDs and CFRs that are not even mentioned or incorporated into any of the notices of appointment should be dismissed.

---

[4] Further, none of the Faculty Handbooks attached to the AC are for the time period Dr. Kaminski signed Notices of Appointment.  *See* Exhibit 14 (containing select pages from 2001-2008 and nothing from 1985-2001).

[5] Similarly, the IMDs – Internal Management Directives by the very name given to them appear to be directives for management purposes and not contractual in nature.

### 3. The Grant of Abstracts

UO also alleges diversion of UO resources in the form of grants (¶ 234 and ¶¶ 172-174). Yet no grant contracts are attached and no grant terms appear in any agreements attached to the Amended Counterclaims. UO attaches four exhibits of abstracts for several grants (Exhibits 3, 4, 6 and 9). Exhibits 4, 6, and 9 do not mention Dr. Kaminski or contain any relevant contract terms that could apply to Dr. Kaminski. While Exhibit 3 contains one reference to Dr. Kaminski's role as a co-principal investigator from 1996-2001, no grant terms are attached. *See* Exhibit 3. Critically, no grant terms in any of the abstracts attached to the Amended Counterclaim state that Dr. Kaminski was required to transfer all intellectual property to UO. The abstracts are completely silent in that regard.

Likewise, 2 C.F.R. § 200.315 cannot be the basis of UO's breach of contract claim. That regulation was not adopted until 2013 – years after any of the grants described in the abstracts or the alleged breaches. AC ¶ 48.

The continuing lack of any allegations of a particular contract term or grant term that would support fraud-type breach of contract claims for diversion of grant funds as University resources is contrary to Fed. R. Civ. P. 9 and the Court's earlier findings. Attaching pre-2013 grant abstracts, only one of which even refers to Dr. Kaminski, and none of which make any reference whatsoever to any agreement related to intellectual property or Dr. Kaminski's grant-related obligations, is wholly inadequate to allege a breach of contract claim.

C.     **The UO Cannot Allege Contract Claims Based on the OAR Policy or the IMDs**

1.     **The OAR Policy**

The heart of the UO's contract claim is that Drs. Good and Kaminski's contracts incorporate the OARs. UO cites to only one OAR as the basis for its contract claim, namely OAR 580-043-0011. AC ¶ 226.

Notably, OAR 580-043-0011 reflects a policy to encourage publication *and* to share royalties with employees. It states:

> "580-043-0007 Objectives of Policies. It is Board intent to:
>
> (1) Provide systematic means of bringing inventions, technological improvements and educational and professional materials into the public domain.
>
> (2) *Encourage the development* of new knowledge while *protecting traditional academic freedom of employees in the publication of materials*, development of inventions and discovery of technological improvements.
>
> (3) *Establish principles and procedures for equitably sharing net royalty income with employees*, and with sponsoring agencies when required by an agreement."

In an effort to achieve these goals, Notices of Appointment were supposed to include a condition related to those aims. OAR 580-043-0011 states:

> "(1) As a condition of employment, all Board and institution employees shall agree to assign to the Board rights to: ….
> (b) Educational and professional materials, whether or not registered for copyright, that result from the instructional, research or public service activities of the institutions.
>
> ******
>
> (4) Employees shall be eligible to share in net royalty income from each invention or separate improvement thereof, an amount not to exceed…. (b) 50 percent of net royalty income from educational and professional materials."

### 2.   The IMDs

The IMDs expressly permit faculty to engage in activities UO alleges as contract breaches. See IMDs 4.111 and 4.015 (employees may engage in outside activities including consulting and for which they may receive remuneration in certain circumstances); IMD 4.021 (permitting use of telephones for personal calls when efficient); IMD 4.022 (permitting personal use of University computing facilities, internet connections, and e-mail).

The IMDs include policies on "Licensing, Patent, Educational and Professional Material, Development and Copyright Policies and Procedures."  *See* IMD 6.205 through IMD 6.255. Under those rules, the University reserves a right to certain "educational and professional materials" that are developed with institutional resources, and states that employees "agree to assign" such materials to the UO.  IMD 6.215(1), IMD 6.230(1). Educational and professional materials are defined as materials "used or distributed primarily for the formal or informal instruction or education of professional students." IMD 6.210(2). Materials are considered "developed in the course of employment" only where the University employed the employee "for the specific purpose of preparing or producing the material" or "specifically directed" the employee to develop the material.  IMD 6.215(2).  Except as otherwise provided in limited enumerated circumstances, ownership rights to materials "shall accrue to the author. IMD 6.215(6).

Where a University employee creates materials that may potentially be subject to assignment, the IMDs provide a process for determining whether and to what extent the materials should be assigned to the University, if at all. The process begins when an employee discloses the material on official written form. IMD 6.225. Designated institutional officials are then to counsel with the inventor regarding the equities of the parties and commercialization of the materials, reach a final agreement on revenue sharing and other terms, and send it along for

approval by other higher-up University officials all within 60 days of the initial disclosure. IMD 6.235; IMD 6.240; IMD 6.245(2). Importantly, UO has not alleged that Drs. Good or Kaminski ever failed to disclose educational or professional materials to the University. Nor has UO alleged any facts suggesting it followed the policy procedure or reached a final agreement on revenue sharing or other terms of any assignment contract it alleges was breached.

### 3.   The OAR and IMDs Are Not Sufficiently Definite on Essential Terms to Create an Enforceable Contract

#### a.   A Contract Requires Agreement on Essential Terms

The OAR and IMDs do not sufficiently define the essential terms of an agreement to assign the DIBELS and IDEL copyrights and trademarks and thus do not create an enforceable contract.  Accordingly, the UO's contract claim should be dismissed for failure to state a claim.

A contract is formed by an offer and acceptance of the essential terms such that they may be determined with reasonable certainty. An offer must be certain so that upon an unqualified acceptance the nature and extent of the obligations of each party are fixed and may be determined with reasonable certainty.  *Klimek v. Perisich,* 231 Or. 71, 78–79, 371 P.2d 956 (1962); *see Medford Furniture & Hardware Co. v. Hanley,* 120 Or. 229, 233, 250 P. 876 (1926). When the offer leaves an essential term for future agreement by the parties, acceptance of the offer cannot result in a contract. *Reed v. Montgomery,* 180 Or. 196, 219–221, 175 P.2d 986 (1947). Essential terms will vary, depending on the type of contract and other specific facts involved. *See, e.g., Bennett v. Pratt,* 228 Or. 474, 477, 365 P.2d 622 (1961) (lease requires at least three essential terms: description of property being leased, duration of lease, and rental amount).  Price is normally an essential term in a contract of sale. *See* Restatement (Second) of Contracts § 33, illus. 7–8 (1981).

As the court summarized in *Justin Kraft & Kraft Piano Servs., LLC*, 2008 U.S. Dist.

LEXIS 91001 at p. 22-23:

> "A meeting of the minds upon each and all essential elements is indispensable to the creation of a contractual relationship." *Kretz v. Howard, 220 Or. 73, 83, 346 P.2d 93 (1959)*. The subject matter of the agreement must be sufficiently definite to determine the nature and extent of the obligations of each party. *Klimek v. Perisich, 231 Or. 71, 79-80, 371 P.2d 956 (1962)*. This principle applies to the obligation of both the plaintiff and the defendant because if the plaintiff's obligation is too indefinite, there is no mutuality. *Landgraver v. DeShazer*, 239 Or. 446, 448, 398 P.2d 193 (1965). Parties, however, may create a contract with incomplete terms if they stipulate to a formula to determine the content or value of those terms. *See Reed*, 180 Or. at 221.

As the court continued:

> In *Klimek*, for example, the court upheld the trial court's decision to set aside a jury verdict for the plaintiff, where the plaintiff's evidence could not establish that the parties agreed to sufficiently definite terms. 231 Or. at 83. The purported contract for remodeling did not specify the extent the building should be remodeled beyond the fact that it should be partitioned into a certain number of rooms. It did not, for example, specify whether remodeling required replacement of the wiring, floors and stairways. *Id.* at 81-82. Although the plaintiff asserted the minimal requirements of the city building code provided a substitute for contract terms, she presented no evidence that the parties agreed that compliance with the code would constitute satisfactory performance. *Id.; see also Landgraver*, 239 Or. at 448-49 (upholding trial court's grant of demurrer where contract provision required a party to build a pool but stated nothing about the size, shape, kind or cost of the pool); *Kretz*, 220 Or. at 82-83 (upholding trial court's refusal to grant specific performance of a land sales contract where uncertainty remained regarding amount of land and personal property included in the sale and whether the seller reserved an easement).

> Here, even assuming that the parties agreed that the price list, sales history and inventory list would become part of their agreement, the purported contract still lacks sufficient detail. Kraft could not identify what deadline the parties set for Kraft Piano to be ready to take on New Octave customers or for Arden to refer those customers. Although the court may infer the parties intended a reasonable time for performance, *see Gordon v. Curtis Bros. A. D.*

*Moodie House-Moving Co.*, 119 Or. 55, 65, 248 P. 158 (1926), other missing terms remain. Kraft, for example, could not identify what, specifically, the parties agreed to regarding the requirement that he "ramp up" Kraft Piano. Rather, Kraft testified that Arden would decide whether Kraft Piano had made sufficient efforts. Plaintiffs, however, rely on case law that implies a duty of good faith and thus demands that a party exercise its discretion in an objectively reasonable manner. *See, e.g., Western Hills, Oregon, Ltd. v. Pfau*, 265 Or. 137, 145, 508 P.2d 201 (1973); *Johnson v. School Dist.*, 210 Or. 585, 591, 312 P.2d 591 (1957).

Even if I were to imply all the terms as plaintiffs suggest, their contract claim fails because they have not presented objective evidence of mutual assent to an exclusive distributorship."

Id. at *23-25.

In a related vein, it is established law that a mere "agreement to agree" does not create an enforceable contract where it leaves material terms open for future negotiation. *Booras v. Uyeda*, 295 Or 181, 191 (1983); *Sterling Savings Bank v. Chan*, 2013 U.S. Dist. LEXIS 154026, *25, 2013 WL 5785172 (D. Or.) (settlement that left tax and collateral issues up to future negotiation was not specifically enforceable). As a matter of contract law, use of the terms "agree to assign" and "agreement to assign" contemplates that the parties will enter into a future agreement before the actual assignment of property will occur. *Bd. of Trs. of the Leland Stanford Junior Univ. v. Roche Molecular Sys.*, 583 F.3d 832, 841 (Fed. Cir. 2009) (the language "agree to assign" reflects a mere promise to assign rights in the future, and not an immediate transfer of expectant rights). Such an "agreement to agree" to assign does not create a specifically enforceable contract because it is, by its nature, subject to future negotiations over the terms and scope of the assignment.[6]

---

[6]Regardless of whether the alleged contract is better classified as an option or a mere agreement to assign, in either case future conveyance is required to ground a contract claim. *See IPVenture, Inc. v. Prostar Computer, Inc.*, 503 F.3d 1324, 1327 (Fed. Cir. 2007) (interpreting the statement "agree to assign" as requiring a subsequent written instrument) (citing *Helvering v. San Joaquin Fruit & Investment Co.*, 297 U.S. 496, 499 (1936) (an option in a property right may be an

It is particularly important in the context of this case that the alleged contract be clear and definite in its essential terms.  Assignment contracts are required to be in writing by both UO policies and as a matter of federal copyright law, out of a public policy concern that the parties adequately describe their respective rights at the time the property is being transferred. 17 U.S.C. § 204(a) (requiring for valid transfer of copyright an" instrument of conveyance, or a note or memorandum of the transfer" that is signed by the author); IMD 6.250(2) (requiring agreements involving royalties to be "initiated in writing"); IMD 6.230(2) (referring to execution of an assignment agreement), IMD 6.235(4)(d) (referring to executing an assignment agreement "initiated at the institution"); *Effects Assocs. Inc. v. Cohen*, 908 F.2d 555, 557 (9th Cir. 1990) (describing purposes of writing requirement for copyright transfers).

From the Court's perspective this is also very practical issue – it is being asked to sign and enforce an order requiring specific performance of an agreement that has intentionally left terms open for future negotiations and that cannot be defined in the order without writing those missing terms into the parties' contract.  *See Genest v. John Glenn Corp.*, 298 Or. 723, 744 (1985) (re-affirming that "[a] court of equity cannot, under the guise of 'filling gaps' make the contract which it thinks the parties would have agreed to.  The court can only enforce an existing agreement which is so definite in its terms that the court can frame a decree to compel performance.").

---

equitable interest in the property but "it would not follow that . . . [the optionee] acquires property at the date of the option rather than at the date of the conveyance"); IMD 6.255 (providing that materials shall be registered for copyright "at the ***option*** of the institution and Board")(emphasis added).

b.     **The OAR and IMDs Do Not Sufficiently Define the Essential Contract Terms**

The OAR and IMDs do not sufficiently define the essential terms of the contract alleged. As an initial matter, neither the written agreements between the University and Drs. Good and Kaminski nor the University policies set forth in the OAR and IMDs reference trademarks at all. There are no specific prohibitions forbidding Drs. Good and Kaminski from assigning trademarks in materials they wrote or funded, nor prohibiting the registration of trademarks in DMG's name. *See* Exhibits 10 and 14. Further, even assuming *arguendo* that DIBELS and IDEL qualify as "educational and professional materials," the OAR do not prohibit Drs. Good and Kaminski from registering the copyright in materials they authored – even if UO might later want them to assign the copyright at some unspecified date. To the contrary, the OAR expressly contemplates that the copyright might already be registered. For these reasons alone, the applicability of the OAR and IMDs are insufficiently clear and definite to sustain the contract claim pled.

Second, as further detailed below, many of the key terms of the alleged contract are indefinite. The OAR does not define the price to be paid for the assignment or Drs. Good and Kaminski's share in the royalty other than by a "not to exceed amount" and by a policy that says it is to "[e]*stablish principles and procedures for equitably sharing net royalty income with employees."* Nor do the IMDs. Further, the OARs do not state when assignment is to occur. The IMDs provide only that UO officials are to make recommendations about assignment contract terms within 60 days after material is disclosed. However, the UO has not alleged failure to disclose by Drs. Good or Kaminski or that it went through that process and reached agreement on the terms of an assignment contract. IMD 6.235(4)(d). Such a policy provision is not sufficiently definite to create an enforceable contract to assign any DIBELS or IDEL

intellectual property as the Court would be forced to fill in gaps and write those essential terms on which the parties did not reach agreement.  For instance, if the Court here is to impose a specific performance remedy on the "agreement to assign" DIBELS and IDEL, what term does it impose for the required revenue sharing – 50%, 25%, 7% or some other amount to which the parties never mutually agreed?  No terms are alleged that provide an objective formula for determining how to do so – although the OAR and IMDs clearly contemplate that the UO will pay something.  Similarly, no provisions are contained in the OAR or IMDs that specify the condition of title in an assignment – *i.e.*, what happens if other people have contributed to that work who are not employed by UO or if the rights have been assigned to third parties?  Likewise, the OAR and IMD's do not say when the assignment is to occur.  Is it when the writing begins, when it is published, or when UO requests an assignment?

Here, absent mutual assent to what the actual revenue share will be under OAR 580-043-0016, the time for assignment, or any of the other essential terms of any resulting assignment, the incorporation of OAR 580-043-0011 into the Notices of Appointment that UO has attached to its Amended Counterclaim is insufficient to establish mutual agreement to the essential terms of an assignment.  Likewise, to the extent the IMDs apply, they do not define the essential elements of a contract claim.

At best, the OARs and IMDs contain mere agreements to agree at some later unspecified date on unspecified terms.  This is clearly reflected in their wording.  OAR 580-043-0011 states that employees "shall agree to assign" IP rights to the Universities as a condition of employment.  IMD 6.230 states employees shall comply with conditions of employment "including agreement to assign intellectual property."   These mere agreements to agree to an assignment are insufficient to state a contract claim.

### c.    A More Detailed Examination of the Indefiniteness of the Terms

Below is a more detailed review of why the following material terms of the alleged assignment contract are too indefinite to ground a contract claim:  (i) the terms regarding royalty payments, (ii) the subject property, and (iii) the dates when performance was required and the obligation was breached.

### (i)    There are No Definite Royalty Payments

UO's failure to allege a royalty term is a key basis on which its contract claim should be dismissed.  Price is a material term to any contract providing for payment.  *Klimek v. Perisich*, 231 Or. 71, 79 (Or 1962).  For example, in *Klimek*, the defendant agreed to remodel the plaintiff's property in exchange for payment. *Id.* at 73-75. The parties did not agree to a specific amount of payment; rather, they discussed that the services would amount to around "eight, nine, ten thousand dollars." *Id.* The court noted that, because the agreement was one for the payment of money, the price must be reasonably certain in the terms of the contract. *Id.* at 79. The court held that the only reasonable conclusion about the parties' discussions relating to price was that the amounts discussed were only estimates.  Because the parties had not agreed to any fixed amount on price, the court held there was no enforceable contract. *Id.* at 83.

Under the University policies, the amount of the royalty payment to Good and Kaminski was a material term of any assignment contract, including because the alleged contract provides for royalty payments. Under the heading "Patents, Copyrights and Licenses," the 2001 Faculty Handbook plainly states: "faculty members as individuals share in the benefits that come from creative work." AC, Exhibit 14, p. 2. One of the stated objectives of the OARs UO alleges as contract terms is to "[e]stablish principles and procedures for equitably sharing net royalty income with employees." OAR 580-043-0007.  *See also* IMD 6.250(2) ("In determining

disposition of income [for royalty purposes], due consideration shall be given to the equity of all parties in the light of all circumstances surrounding the development of the invention or material.")**.** Sharing income from materials developed by faculty and assigned to UO was thus a fundamental purpose upon which UO's intellectual property policy was based.

The regulations that form the backbone of UO's contract claim expressly reserve the issue of royalty payments for future negotiation and determination.  Specifically, UO employees assigning rights may share in up to a 50% of royalty income produced from educational and professional materials. OAR 580-043-0011(4)(b) ("Employees shall be eligible to share in net royalty income . . . , an amount not to exceed: . . . 50 percent of net royalty income from educational and professional materials"). The policies do not set the amount between 0-50% for the parties; rather, that figure is to be determined through consultation between the individual authors and certain specific University officials. The policies task the UO president with counselling the individual authors "concerning Board policies and procedures applicable to the invention or material," including "copyright policies and procedures," "apprais[ing] the equities of all concerned parties," and working with the OUS Vice Chancellor to obtain and execute agreements for assignment and distribution of royalties. IMD 6.235(1), (3), (4)(b)-(c). Before recommending terms to the Vice Chancellor, the UO president must "take affirmative steps to assure thorough consideration of the equities of all parties" in regard to the ownership rights in the invention or material. IMD 6.240(3).  If developed with joint efforts, "an agreement shall be reached among the inventors or authors, institution, and Board for distribution of any royalties." IMD 6.240(2).  The final step requires the president to recommend a written agreement to the OUS Vice Chancellor, who then "conclude[s]" the agreement.  IMD 6.250.

Agreement as to royalty payments was thus both a condition precedent and a material term to UO's alleged assignment contract. Yet UO has not alleged any agreement to a royalty term.  It has not even alleged that it negotiated with Drs. Good or Kaminski or that it evaluated the equities of the parties in contemplation of an assignment contract.

**(ii)        The Property Subject to Assignment is Indefinite**

The property subject to assignment is also too indefinite to ground a contract claim. The subject property of the transfer is a material term to any agreement to assign property. *See Foraste v. Brown Univ.*, 290 F. Supp. 2d 234, 239 (D.R.I. Oct. 30, 2003).

UO alleges the OAR and IMDs require the assignment of "educational and professional materials," but their contract claim is focused on an assignment of "the DMG Copyrights" and "DIBELS and IDEL intellectual property rights."  Neither the "DMG Copyrights" nor "DIBELS and IDEL intellectual property rights" are defined terms in UO's pleading.  Further, the pleading does not allege that these property rights constitute "educational or professional materials" within the meaning of the OARs or IMDs.  The definitions in the IMDs strongly suggest that they do not.  In the IMDs, "educational and professional materials" are defined as materials "used" or distributed for the instruction or education of "professional or general students" – presumably students at the Oregon state universities.  IMD 6.210(2). UO has not alleged that the DMG Copyrights or the DIBELS and IDEL intellectual property it seeks assignment of are educational and professional materials or that they were prepared for such students. To the contrary, the pleadings admit that the materials are used for the education of <u>grade school students</u> (who do not attend the UO).  Because UO has failed to plead facts connecting the property it seeks to the assignment term in the alleged contract, UO has not alleged contractual entitlement to the property and its contract claim should be dismissed.

Additionally, as stated above, the OAR and IMDs that form the backbone of UO contract claims do not even mention trademarks and should not be construed as sufficiently definite to apply to them.[7]  Further, by seeking assignment of "the DMG Copyrights," it is unclear which copyrights Good and Kaminski allegedly agreed to assign. UO apparently alleges that Good and Kaminski were under agreements to assign during their entire time at the University, yet the IMDs and regulations that it attaches as the terms of those obligations are all dated after 2001 while the Notices of Appointment for Dr. Good are only from 1988-1993 and for Dr. Kaminski are only from 1985-1987 and 1992-2002.  Exhibit 10, p. 1 (noting revision dates as late as 2010 for the IMDs); Exhibit 14, pp. 1-16 (select Faculty Handbook portions dating back to 2001); pp. 17-21, 24 (miscellaneous webpages of policies dated from 2009-2015), pp. 22-23 (OARs from 2012).

### (iii)    There is No Allegation as to the Time for Performance

UO also does not allege *when* Good or Kaminski were required to assign property to UO. Allegations as to time are material when testing the sufficiency of a pleading. Time allegations are particularly important here, where UO bases its claims on a longstanding relationship with Drs. Good and Kaminski and seeks assignment of property that evolved over time.

The regulations attached to UO's Amended Counterclaims are inadequate to state a term for time of performance. First, these policies do not contain definite terms about when an employee is to actually assign rights.  Instead, the policies direct University officials to evaluate the equities surrounding employee inventions or materials, draft an assignment agreement, and then recommend the agreement to the Vice Chancellor for Finance and Administration (the "Vice Chancellor") of the Oregon University System ("OUS") for final review and approval.

---

[7]Accordingly, at minimum, UO's breach-of-contract and specific performance claims should be dismissed to the extent they seek entitlement to or damages for trademarks.

IMD 6.235; IMD 6.240; OAR 580-043-0016(5); OAR 580-043-0026(3).  UO has not alleged that an evaluation was undertaken or that a recommendation was made to the appropriate individuals.

Indeed, if anything, the IMDs suggest that the deadline has long since passed for University to make such an evaluation.  IMD 6.235(4)(e) provides that, "The duties of the president . . . shall be: . . . [t]o recommend to the president appropriate action pertaining to the invention or material *within 60 days after its disclosure*" (emphasis added).  Without any allegations that UO took such steps within the 60 days required by the IMD, UO has not alleged a sufficient basis for a contract claim.

Second, UO does not allege which contract terms from the policies were in effect at what time throughout the parties' long relationship or what property right existed at that time. Rather than quoting the applicable terms of the contracts in the body of its pleading, UO pled the contract by referencing policies and then attaching the policies. That is directly contrary to what the Court required – said in reference to UO's original counterclaims: "[O]ther than a broad time period encompassing all of these restraints on Good and Kaminski's actions with respect to DIBELS and IDEL, *no specific dates* are offered as to when they were entered into or became applicable." F&R 14-15.

In its pleading, UO claims that the knowledge base for DIBELS 6th was developed from 1991-2007. (AC ¶¶ 29, 33-34). Yet, the pertinent policies attached to UO's pleading are from 2010 or later.  Further, UO pled that Good and Kaminski had notice of those policies via a University webpage (AC ¶ 51), which did not even exist for much of the '80s and '90s and the earliest screenshots attached by UO are from 2001. AC, Exhibit 14. Under these circumstances, it is not clear whether UO alleges any violation of policies prior to 2010, and if they do, what

policies and terms were in effect at the time the breach was alleged to occur.  Moreover, it is

entirely unclear what terms allegedly governed Good and Kaminski's work at UO from the late

1980s until 2001.

From what UO has alleged, Drs. Good and Kaminski (and the Court) are simply unable

to determine when Drs. Kaminski and Good were required to execute assignment agreements

under the alleged University contracts.  They are also left unable to determine when they

allegedly breached that obligation since it relates to alleged contracts that for the most part had

expired by the time that, according to UO's version of events, work on DIBELS 5th and 6th took

place.  Due to UO's failure to allege a time of performance or date of breach that is tied to the

specific contract on which it is suing, UO's claim is too indefinite to be specifically enforced.

Finally, because UO fails to allege when any assignment was required, UO's breach

allegations fail to tie the alleged contract terms in the OAR and IMDs to Good or Kaminski's

specific UO roles and contracts at the time.  In previously ordering that UO's allegations be

made more definite, the Court noted that the existence of UO policies was insufficient to allege

the "actual relevant terms" of the contract.  F&R 15.  Good and Kaminski worked at UO on and

off for decades and throughout this time they acted in various different roles with differing time

commitments, compensation (if any), and duties, including a sabbatical.  Under UO policies, the

particular role and duties of UO personnel inform how the policies apply to that position. For

example, different procedures apply to the assignment of copyright for non-employees than for

employees. IMD 6.230. Additionally, materials are considered to be developed "in the course of

employment" at the UO only when the individual was employed for the specific purpose of or

was otherwise specifically directed to create the material. IMD 6.215(2). Without information

sufficient to tie Good and Kaminski's role at UO to the obligation in the policies that was

allegedly breached at that time, it is impossible to determine what Drs. Good and Kaminski's obligations actually were under the alleged policies.

> **d.**    **UO Failed to Plead the Additional Requirement for Specific Performance that It Is Ready, Willing, and Able to Perform**

UO's contract claim includes a demand for specific performance of the purported agreement by Drs. Good and Kaminski to assign the DIBELS and IDEL intellectual property to UO. AC ¶ 231. To state a claim for specific performance under Oregon law, a plaintiff must allege both a valid, enforceable contract and that the plaintiff is ready, willing, and able to perform its obligations under the contract. *Beaty v. Oppedyk,* 212 Or. App. 615, 622 (2007). A court will not grant specific performance unless the contract, as alleged, is definite in all material aspects, leaving nothing open to future negotiation except details of performance that are subordinate to the material terms. *Booras v. Uyeda*, 295 Or. 181, 191-194 (1983) (declining to specifically enforce a contract that expressly referred to the preparation of additional documents and lacked evidence of agreement by one of the parties); *Miller v. Ogden*, 134 Or. App. 589, 593-595 (1995) (declining to specifically enforce a contract that contemplated subsequent agreements and did not address other terms the parties had contemplated or disagreed on). As noted above, there is not a valid, enforceable contract definite in all material respects that the court can enforce. Virtually all of the material elements of an assignment are left to future negotiations.

Furthermore, because UO failed to allege a royalty term, UO has not pled readiness to perform its contractual obligations. To obtain specific performance, the party requesting it must plead and prove that it was and is ready, willing, and able to perform its own obligations under the contract. *Gaffi v. Burns*, 278 Or. 327, 333 (1977). "To establish that a party is ready, willing and able to perform, more is required than speculation that, but for [the other party]'s

repudiation, a contract *might have been* performed." *Voin v. Szabo*, 139 Or. App. 590, 594 (1996).

UO does not allege it ever tendered the price of the assignment. Nor does it allege it is ready, willing and able to pay it now. It simply wants the property for free without paying the price, which is insufficient.

Furthermore, while the alleged contract called for negotiations, consultations, and evaluation of equities to determine royalties, UO's allegations do not say that any of these conditions actually occurred. UO is not entitled to claim specific performance of a contract if UO did not endeavor to perform the contract at the relevant time. By failing to allege it has tried to or is willing to comply with the provisions relating to the royalty terms of any assignment, UO has failed to state a claim upon which specific performance can be granted.

### e.    Practical Difficulties Limit the Court's Ability to Order Specific Performance.

In deciding whether specific performance is available, courts consider whether it would be difficult to oversee specific performance of the agreement. *See McDonough v. S. Or. Mining Co.*, 177 Or. 136, 156 (1945); *Public Market Co. v. Portland*, 160 Or. 155, 167 (1938). Here, court enforcement of specific performance would be difficult or impossible given the indefiniteness of the essential terms, and the involvement of third-party rights in the materials.

In *Cimarron W. Properties v. Lincoln Loan Co.*, 123 Or. App. 614 (1993), the parties had a contract for the purchase of real property that authorized payments in regular monthly installments, but there was no clause expressly allowing prepayment. When the plaintiff tried to pre-pay the full purchase price, the defendant would not accept it, and the plaintiff sued for specific performance. Because the written terms of the contract did not authorize prepayment,

the court dismissed the specific performance claim, declining to "rewrite the contract to reflect what plaintiff now wishes it had agreed to." *Id.* at 617-618.

As in *Cimarron W. Properties*, ordering specific performance here would require inserting one or more material terms that were omitted from the contract pled. To craft a decree for specific performance, the Court would need to insert more specific terms for the parties than originally agreed to, governing the scope of the property to be assigned, the time for performance and of breach, and the royalty payments to be paid to Good and Kaminski.

Rights of third parties in the DIBELS and IDEL materials present further barriers to the Court's ability to decree specific performance, namely DMG's licensees. Courts will not enforce specific performance where to do so would interfere with the rights of third parties. *See Booras*, 295 Or. at 193-94 (declining to grant specific performance where there had been changes in ownership and equity interests of the subject property since the agreement); *Wittick v. Miles,* 274 Or. 1, 7 (1976) (holding that specific performance could not be granted because it would adversely affect rights of third party not before court); *Van Horn Construction Corp. v. Joy,* 186 Or. 473, 483 (1949) (quoting 49 Am. Jur, Specific Performance, § 106).

Here, specific enforcement would be difficult or impossible to oversee without interfering with superior rights of third parties. For example, in *Stanford v. Roche,* a professor contractually agreed to assign property to the University, but assigned it to another company before the University elected to take title. 583 F.3d 832, 842. The court held the assignee company's rights were superior such that the University could not sue the company for the property. *Id.* As the UO concedes, other independent companies, namely Cambium and Amplify, have been assigned rights in the DIBELS property by Good, Kaminski, and DMG. AC ¶¶ 180-181, 232. Thus,

ordering Good and Kaminski to specifically perform assignment of DIBELS would not be possible without interfering with third parties' rights.

IV.    **MOTION 4:  To dismiss or strike UO's counterclaim for breach of fiduciary duty for failure to state a claim for relief. In the alternative, to make UO's counterclaim for breach of fiduciary duty more definite and certain.**

A.    **UO Failed to State a Claim for Breach of Fiduciary Duty**

UO alleges that Good and Kaminski breached their fiduciary duties to UO in the following regards: "by engaging in fraudulent activities, by breaching their agreements and the terms of their employment with the University," "by misleading the University," "by using government grants awarded to the University for their own benefit," "by using University employees and resources," "by failing to notify the University of the Texas Litigation." AC ¶¶ 241-246. None of these allegations state a claim for breach of fiduciary duty upon which relief may be granted.

Even assuming that Good and Kaminski owed a fiduciary duty to UO, UO has failed to sufficiently allege breach. First, UO's claim that they breached a duty "by engaging in fraudulent activities" falls short of pleading requirements because UO does not identify these "fraudulent activities."  For this claim, UO must "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). Second, there is no claim for breach based on violation of UO contracts because, as explained above, UO has not sufficiently pled the contract terms.

Third, the allegations of breach of fiduciary duties based on misleading UO, using government grants, and using UO employees and resources are too indefinite to state a claim for relief. UO does not specify how Good or Kaminski allegedly misled UO. UO does not specify which government grants and UO resources Good or Kaminski "used," or how such grants or resources were used. Previously, the Court noted that "the who, what, where and when . . . is lacking with respect to the grants beyond merely listing them. It is not clear when counter-

defendants misappropriated the resources and how, beyond generally developing the DIBELS product with such resources and then keeping the intellectual property." F&R 13-14. The same holds true for UO's amended allegations. While UO alleged ownership of intellectual property created with grants pursuant to 2 C.F.R. § 200.315, AC ¶ 48, that allegation should be ignored because 2 C.F.R. § 200.315 did not even exist until 2013 and thus it could not have governed any of the conduct UO alleges was wrongful in this case. For the same reason, that regulation could not as a matter of law have applied to "the above-referenced University grant awards" UO refers to in its pleading. Accordingly, these aspects of UO's claim for breach of fiduciary duty should be dismissed because the UO has not adequately alleged breach.

Finally, UO alleges breach by a failure to notify it of "the Texas Litigation." AC ¶ 246. Curiously, while this breach is alleged against both Good and Kaminski, the pleading does not allege that either Good or Kaminski knew of the litigation.  It does not allege what interest, if any, it had in the Texas Litigation, how the Texas Litigation could have affected its rights, or how any such interest or rights could have been protected had it known of the litigation. It does not identify any fiduciary duty that would require faculty to notify UO about litigation that does not involve them and that they do not know exists. Accordingly, UO's claim for breach of fiduciary duty based on failure to notify it of the Texas litigation fails to state a claim for relief.

### B.    The Court Should Decline to Hear UO's Breach of Fiduciary Duty Claim

The Court also should decline to hear UO's breach of fiduciary duty claims because the question of Good or Kaminski's fiduciary duty to UO presents a novel issue of Oregon law.  If a counterclaim raises a complex or novel issue of State law, federal district courts may decline to exercise supplemental jurisdiction over the claim. 28 U.S.C. § 1367(c). For example, in *Eberz v. Oregon Department of State Police*, a policeman brought a claim against his employer, the Oregon State Police, for retaliation and wrongful termination. 2008 U.S. Dist. LEXIS 3145, **1-

2, 2008 WL 141077 (D. Or. 2008).  In response, the Oregon State Police brought state law counterclaims against the plaintiff, including claims for fraudulent misrepresentation and breach of fiduciary duty. *Id.* at **2-3.  The counterclaims were based on the plaintiff's alleged breaches of employer personnel policies in addition to other statutes and conduct codes that applied outside of the employment relationship.  *Id.* at *4.  Noting that "Oregon law has not addressed the question of an officer's fiduciary duty to his public employer," the court held that "application of these tort theories within the context of an employee-employer relationship would be novel and, given the current state of the law in Oregon, unusual."  *Id.* at *5. Accordingly, the court declined to exercise supplemental jurisdiction over the state law counterclaims.  *Id.* at *6.

This case presents a situation identical to that in *Eberz*.  As in that case, the UO alleges that Good and Kaminski have breached fiduciary duties to UO that stem from alleged violations of UO personnel policies (e.g., the IMDs), state regulations (the OARs), and conduct codes that applied outside the employment relationship (e.g., federal grant regulations). Whether these sources give rise to a fiduciary relationship within the context of an employer-employee relationship presents a novel issue of Oregon law. This Court has declined to exercise supplemental jurisdiction to decide a similar issue before, and it should do so again now.

### C.     UO's Breach-of-Fiduciary-Duty Claim Should be Stated More Definitely

In the alternative, UO should be required to plead its breach of fiduciary claims more definitely. The claim should specify the particular circumstances constituting the alleged fraud. Further, the claim should explain how UO was allegedly misled, what UO resources were misused or misappropriated and how, and what property was misused for which grants and how.

## CONCLUSION

For the foregoing reasons, the Court should grant Drs. Good and Kaminski's motions to dismiss, or in the alternative, to make more definite.

## CERTIFICATE OF COMPLIANCE

This brief complies with the applicable word-count limitation under LR 7-2(b), 26-3(b), 54-1(c), or 54-3(e) because it contains 11,000 words, including headings, footnotes, and quotations, but excluding the caption, table of contents, table of cases and authorities, signature block, exhibits and any certificates of counsel.

Respectfully submitted,

Date: December 4, 2015                    DYNAMIC MEASUREMENT GROUP, INC., and
                                          DR. ROLAND GOOD and DR. RUTH KAMINSKI

                                          By their attorneys,


                                          */s/ Frederick A. Batson*
                                          Frederick A. Batson, OSB 821887
                                          batson@gleaveslaw.com
                                          GLEAVES SWEARINGEN LLP
                                          P. O. Box 1147
                                          Eugene, OR  97440
                                          Phone:  (541) 686-8833
                                          Fax:  (541) 345-203


                                          OF COUNSEL:

                                          William S. Strong
                                          wstrong@kcslegal.com
                                          KOTIN, CRABTREE & STRONG, LLP
                                          One Bowdoin Square
                                          Boston, MA  02114
                                          Phone: (617) 227-7031
                                          Fax:  (617) 367-2988