UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON

DYNAMIC MEASUREMENT GROUP, INC., an Oregon corporation,

                    Plaintiff,

v.

UNIVERSITY OF OREGON, a special governmental body as defined by ORS 174.117(1)(I); MIA TUAN, individually and in her official capacity; EDWARD J. KAME'ENUI, individually and in his official capacity; FRANCIS J. FIEN IV, a/k/a Hank Fein, individually and in his official capacity; BRAD SHELTON, individually and in his official capacity; and HOP SKIP TECHNOLOGIES INC., an Oregon corporation,

                    Defendants.

6:14-cv-1295-TC

FINDINGS AND RECOMMENDATION

COFFIN, Magistrate Judge:

This is the second round of motions directed toward the counterclaims raised in the answer to the complaint. The background allegations are drawn primarily from the court's findings regarding the first motion.

Plaintiff, Dynamic Measurement Group, Inc. (DMG), brings this action alleging copyright

Page 1 - FINDINGS AND RECOMMENDATION

and trademark infringement primarily against the University of Oregon. Plaintiff's founders, Dr. Ruth Kaminski and Dr. Roland Good allege that since the early 1990s they have been engaged in the business of researching, developing, administering, distributing, and publishing materials known as Dynamic Indicators of Basic Early Literacy Skills (DIBELS), as well as training teachers on the use of these materials. DIBELS is designed to help teachers assess literary skills and focus remedial needs for K-6 students. Plaintiff further alleges that Kaminski and Good established DMG as a for profit company to carry on the work of developing DIBELS and training teachers in its use. DIBELS is widely used, assessing about 25 percent of U.S. students.

Plaintiff alleges that Dr. Kaminski first developed an early version of DIBELS assessment measures from 1988-92 as a doctoral candidate at the University of Oregon. After obtaining her Ph.D. in 1992, the University employed Kaminski as a part-time research associate in 92-93, and as an assistant professor in the college of education until 2003.

Dr. Kaminski's doctoral advisor was Dr. Good who worked as an assistant professor at the University of Oregon at the time. Plaintiff alleges that Good and Kaminski began to make DIBELS available to elementary schools around the country and offered fee based training. Plaintiff asserts that as early as 1994, Kaminski and Good made commercial use of the DIBELS mark.

In the late 1990s, plaintiff alleges that Dr. Good began offering analytical support allowing schools to track individual and collective progress of their students. By 2000, plaintiff asserts, Kaminski's and Good's efforts building widespread acceptance and use of DIBELS assessments resulted in hundreds of schools adopting DIBELS as an integral part of early childhood literacy programs.

In collaboration with staff of the University's Center on Teaching and Learning, plaintiff

Page 2 - FINDINGS AND RECOMMENDATION

alleges Dr. Good developed an online system allowing schools to enter their data and generate automated reports and analysis (the DIBELS Data System) housed on the University's servers in about mid 2000. Plaintiff alleges that the DIBELS data system is an ancillary service to users of DIBELS materials.

In 2001, Good and Kaminski released the 5th edition of DIBELS made available to schools upon request as part of a package price that included their teacher training services. The University's Center on Teaching and Learning posted a copy to its website for free downloads. The 5th edition bore a copyright notice and trademarks as follows: "© 2001 Good and Kaminski" and "DIBELS™." This edition contained newly created texts by independent contractors paid for by Good and Kaminski personally with copyrights for the materials (DIBELS Oral Reading Fluency (DORF)) vesting in Good and Kaminski. Also at this time, DIBELS coverage expanded from K-3 to K-6.

Also in 2001, plaintiff alleges Good and Kaminski approached the University hoping to cede rights to DIBELS (but retain developmental control with royalties reinvested in continuing development) in exchange for reimbursement for the DORF passages and dealing with a publisher for funding and distribution. Plaintiff alleges that the University instead suggested that Good and Kaminski create a private start-up to fund further development of DIBELS assessment materials and to pursue the wide distribution of DIBELS through commercial publishers. Plaintiff asserts that at no time during these discussions did anyone at the University suggest that the University of Oregon had any claim to the DIBELS mark or the DORF passages, but that the University's Office of Technology Transfer did state that it should own a copyright in some non-DORF DIBELS content because it had been funded by a grant administered by the University. However, plaintiff alleges, the University offered to assign its purported copyright to the start-up presumably for some share of

Page 3 - FINDINGS AND RECOMMENDATION

the revenue.

Plaintiff alleges that the University failed to provide any follow-up paperwork and Good and Kaminski decided to develop and commercialize DIBELS independently.

In January of 2002, Good and Kaminski incorporated their start-up, plaintiff DMG. Plaintiff alleges from that point forward, it was the exclusive vehicle for development and commercialization of DIBELS products. DMG then entered into a publishing agreement with Sopris West Educational Services.

On February 13, 2002, DMG applied to the Patent Office to register the DIBELS mark which issued in 2003. DMG asserts it informed the University of Oregon when it received the registration. From then on, DMG products displayed its registered mark: DIBELS®.

DMG and Sopris marketed DIBELS 6th edition (allegedly entirely new, except for carrying over 20 of the 24 DORF passages, with 151 new passages) with sales exceeding $1,100,000 in the first eight months of 2003.

The University provided a link on its website to Sopris' website to enable teachers to purchase printed copies of the DIBELS materials and below the link advertised its data system service for DIBELS for $1 per student to analyze DIBELS scores.

DMG and its publishing partners agreed that the University should be allowed to continue hosting free downloads but, plaintiff alleges, also agreed that DMG would maintain quality control and the public would be on notice that the DIBELS mark and materials were proprietary to Good, Kaminski, and DMG. Accordingly, DMG alleges it obtained acceptance from the University of Oregon to attach an Educational User Agreement posted to the University's download page requiring

Page 4 - FINDINGS AND RECOMMENDATION

acceptance as a condition of download. The Agreement noted that DIBELS™ [1] was the proprietary work of Good, Kaminski, and DMG and limited the use of the free download.

At this time, although Kaminski "maintained a courtesy appointment as Assistant Professor in the College of Education," she began devoting herself full-time to DMG.

Plaintiff alleges that the University undertook an investigation in 2004 regarding ownership of the DIBELS copyright and registration of the mark and, in 2005, all apparently agreed that DMG was the exclusive owner with a non-exclusive license granted to the University. However, the University never signed the agreement. Nonetheless, plaintiff asserts that the University acted consistent with the "agreement" for the next seven years.

DMG asserts ownership of numerous registrations related to its DIBELS materials and that registration is now incontestible. Plaintiff further asserts registration of a Spanish language version with the mark IDEL created by Good, Kaminski, and DMG via independent contractors with the copyright vested in DMG. IDEL was also made available through the University's website in the same manner as DIBELS with paid service for data analysis beginning in 2007.

Plaintiff launched its latest literary assessment product DIBELS Next in 2011 which is presently only available from DMG and licensees/publishers SOPRIS and Wireless Generation, Inc. Plaintiff alleges that until recently, the University acknowledged that DIBELS Next was a registered trademark.

Plaintiff alleges that the University failed to properly implement support for DIBELS Next in its Data System and, therefore, plaintiff undertook its own data service in 2011 which eventually became known as DIBELSNet with a registered mark. DIBELSNet supports DIBELS 6th edition

---

[1] Later changed to DIBELS® after registration of the mark.

Page 5 - FINDINGS AND RECOMMENDATION

and IDEL as well.

Plaintiff alleges that the University then asserted it had been using the DIBELS mark in commerce since 1980 and that it owned all DIBELS intellectual property. DMG rejected these assertions and the University then filed an application with the Patent Office on July 20, 2012, seeking to register the DIBELS mark for the goods and services allegedly covered by DMG's existing registrations. The Patent Office rejected the application.

The University sought to register the IDEL mark in June of 2013 for goods and service essentially identical to DMG's along with a petition to cancel DMG's registration. The University's applications to register IDEL was rejected, but its petition, as of the time of the filing of the complaint was still pending.

On November 19, 2013, the University petitioned to cancel DMG's DIBELS registrations asserting DMG obtained registration by fraud. These proceedings are also still pending.

Plaintiff DMG now asserts claims for trademark violation based on the University's violation of the terms of the license DMG asserts controls by, among other things, deleting reference to DMG and the registrations on its website. Plaintiff alleges that University is attempting to mislead the public into believing that it is the owner of the mark and ultimate source of DIBELS products and to undermine DIBELSNet. Similarly, plaintiff alleges infringement of the IDEL mark and the DIBELS NEXT mark. Plaintiff also alleges state law trademark infringement claims. Plaintiff further asserts a claim for unfair competition and copyright infringement claims.

The University of Oregon and the individual University defendants filed counterclaims against DMG, Good, and Kaminski for misappropriation of the University's federally-funded intellectual property. The University further alleged that Good and Kaminski filed applications for

Page 6 - FINDINGS AND RECOMMENDATION

trademarks DMG did not own and submitted University webpages to the Trademark Office to prove DMG's use of the marks. The University also alleged that Good and Kaminski sought copyright registrations for works DMG did not own that co-opted the authorship and support of the University and federal research grants. The University also argued that the use of its DIBELS moniker deceives parents and educators into believing that the DMG product is able to detect a significant percentage of at-risk young readers.

The University alleged that its regulations, policies and directives, provide that the University owns and is entitled to own all of the intellectual property developed by its employees, graduate students, and staff with University resources and/or within the scope of their employment. It further alleged that its regulations, policies and directives, as well as federal regulations provide that the work product resulting from research and grant funds awarded to the University is the property of the University. It asserted that Good and Kaminski were notified and agreed to these ownership rights and right to ownership of intellectual property developed at the University, using the University resources, and/or using research grant funds awarded to the University. The University also alleged Good and Kaminski executed agreements agreeing to assign any intellectual property using University resources to the University, but violated these regulations, policies, directives, and agreements by purporting to transfer intellectual property rights arising from University resources to DMG.

The University also alleged Good, Kaminski and DMG engaged in fraud related to the DIBELS registrations and that the counter-defendants engaged in fraud related to the IDEL registration. The University similarly argued that counter-defendants have unlawfully claimed copyright ownership over the University's DIBELS products which it asserts are property of the

Page 7 - FINDINGS AND RECOMMENDATION

University based on regulations, policies, directives, and agreements.

Accordingly, The University alleged claims for trademark infringement (false designation of origin), cancellation of trademark registrations, declaratory relief of prior common law trademark use, copyright infringement, declaratory relief of invalidity of DMG's copyrights or non-infringement by the University, unfair competition, conversion, breach of contract and the covenants of good faith and fair dealing, breach of fiduciary duty, unjust enrichment, and accounting. After plaintiffs filed a motion to dismiss and for summary judgment against the counterclaims, the court dismissed several claims with leave to replead (or granted the motion to make more definite and certain) including the conversion claim, breach of contract claim,[2] and unjust enrichment (with leave to replead the loss of clearly identified non-intellectual property only). The court also granted summary judgment with respect to the copyright infringement claim.

The University has filed its amended answer and counterclaims and plaintiffs move to: (1) strike paragraph b of the prayer to the extent it asks the court to enjoin and restrain counter-defendants from continued acts of infringement of copyright; (2) strike paragraphs I and j of the prayer for relief against DMG for breach of contract damages or specific performance; (3) dismiss the breach of contract claims against Drs. Good and Kaminski for failure to state a claim for relief; and (4) dismiss or strike the University's counterclaim for breach of fiduciary duty for failure to state a claim or to make more definite and certain.

---

[2]The court declined to dismiss the breach of fiduciary duty claim in light of the required detail the amended breach of contract claim was required to provide.

## DISCUSSION

A.  Strike Prayer for Enjoining Continued Acts of Infringement of Copyright

The court previously granted the motion for summary judgment as to the copyright infringement claim. Accordingly, the motion to strike the prayer seeking to enjoin alleged copyright infringement should be granted.

B.  Strike the Breach of Contract Damages or Specific Performance Prayer against DMG

There are no claims for breach of contract made against DMG as it was not a party to any contract with the University. Nonetheless, the University asserts that DMG is an alter ego of Good and Kaminski and that Good and Kaminski's assignment of the disputed intellectual property is void. However, the remedy, even if such theories had been properly pleaded, could not compel specific performance of a contract by DMG. The University cites several cases in support of its reverse veil-piercing theory, but those cases generally deal with fraudulent conveyance claims. See Towers v. Titus, 5 B.R. 786, 795 (N.D.Cal. 1979) (applying reverse alter ego doctrine to equitable recovery of monies which have been wrongfully withheld by fraudulent grantees, not legal damages); In re National Audit Defense Network, 367 B.R. 207 (D.Nev. 2007) (trustee sought to reverse pierce corporate veil to make individual defendants liable for fraudulent transfers to corporations); Cure v. Fullman, 2000 WL 3551694 (Or. Cir. Multnomah County Sept. 7, 2000) (using doctrine to protect rights of shareholders and concluding the corporate entity and the principals are one and the same). It is illogical to force a corporate entity to engage in specific performance of a contract entered into by its shareholders (pre-incorporation) via the veil piercing theory. While the theory may be appropriate to disgorge the corporate entity of property fraudulently conveyed it by those

Page 9 - FINDINGS AND RECOMMENDATION

shareholders, using it to assert a breach of contract is not. Here, the harm to the University is through the alleged breach of contract in that Good and Kaminski failed to assign the copyright to it and not the later incorporation of DMG and subsequent assignment of that intellectual property.[3] Logically, the University would prevail on its claim for breach and, absent an appropriate legal remedy of damages, would then seek to pierce the corporate veil to have the court ignore the corporate entity and disgorge DMG of the copyrights so that Good and Kaminski could then be required to specifically perform assignment of the intellectual property to the University. Piercing the corporate veil cannot be used to force the corporate entity to perform under a contract it is not a party to and that predates its existence. To the extent the University seeks to have the court award damages specifically for breach of contract or require specific performance of a contract against DMG, the motion to strike such prayer should be granted.

## C. Breach of Contract and Breach of the Implied Covenant of Good Faith and Fair Dealing Against Good and Kaminski

The University alleges that Drs. Good and Kaminski, in agreeing to work at the University and in accepting their University positions, were contractually bound to abide by the University rules, regulations and policies and that they were notified of such rules regulations and policies.

---

[3]To hold a corporation liable as an alter ego, a party must prove: (1) another entity actually controlled (or was under common control with) the corporation; (2) the other entity used its control over the corporation to engage in improper conduct; and (3) as a result of the improper conduct, the party was harmed. State ex rel. Neidig v. Superior Nat'l Ins. Co., 343 Or. 434, 173 P.3d 123, 136 (Or. 2007). Here the alleged improper conduct is the assignment of the copyrighted works to DMG, but the alleged breach of contract harm stems from the failure to assign the copyright to the University in the first place. Thus, a fraudulent conveyance theory is the proper vehicle against DMG, not breach of contract. See, e.g., O.R.S. § 95.260 (use of judgment to levy execution on the asset transferred or avoidance of the transfer).

Page 10 - FINDINGS AND RECOMMENDATION

Specifically, the University alleges that as a condition of working at the University and in accepting federal research grants awarded to the University, Drs. Good and Kaminski agreed that the University owns and is entitled to own all of the intellectual property developed with University resources, federal research grants and/or within the scope of their employment under OAR 580-043-0011, IMD 6.205, IMD 6.215, IMD 6.230, IMD 6.220 and 2 C.F.R. § 200.315. Accordingly, the University alleges that Good and Kaminski agreed to assign DIBELS and IDEL intellectual property rights to it and breached that agreement. The University alleges further breaches of contract and the implied covenant of good faith and fair dealing via: Good and Kaminski's use of University employees and resources to advance their own interests, DMG's interests and the DMG Licensees' interests; failure to assist the University in patenting, licensing and copyrighting the DIBELS intellectual property in the University's name; and revision of the Education Use Agreement in the DIBELS 5th Edition and DIBELS 6th Edition to remove references to the University's ownership of DIBELS intellectual property and directing a University employee to post the revised version on the University website without the University's consent. The University seeks specific performance of assignment of the DIBELS and IDEL intellectual property rights to the University as well as damages.

To plead a breach of contract claim, the University must allege (1) the existence of a contract, (2) the relevant terms of the contract, (3) plaintiffs' full performance and lack of breach, and (4) defendant's breach resulting in damage to plaintiffs. Slover v. Or. State Bd. of Clinical Social Workers, 144 Or.App. 565, 927 P.2d 1098, 1101–02 (1996). The court previously required the University to replead the breach claims identifying the precise purported terms, regulations, directives, etc. that were breached and by whom and when along with the elements of lack of breach

Page 11 - FINDINGS AND RECOMMENDATION

on the part of the University and resulting damage. The court further required that to the extent the breach allegations are supported by the allegations of fraud spread throughout the counterclaims, the claims must be alleged with particularity.

The University has now provided the rules, regulations, and policies and attached them to the complaint. The University relies on a hodgepodge of Notice of Appointments (NOA) (some unsigned) and internal management directives (IMD) to cobble together an alleged contract to assign the copyrights and trademarks to the University.

The University attaches six NOAs for nine month terms in the years 1988-1993 applicable to Dr. Good. The NOAs contain the statement that the position is "subject to the provisions of the Oregon Administrative Rules [OAR] of the State Board of Higher Education, and to all other now existing administrative rules, regulations, and policies of the University of Oregon which are incorporated by reference herein." E.g., Ex. 11 at p. 1 to Amended Answer (#86-5). Dr. Good also signed a sabbatical leave form in 2002 in which Good agreed to abide by administrative rules covering such leave.

The University supplies NOAs for Dr. Kaminski covering 1985-88, 1992-98, as well as a 2000 unpaid courtesy appointment form. The NOAs noticed the OARs, but do not reference the IMDs.

OAR 580-043-0011 provided that as a condition of employment the employee shall agree to assign to the board rights to "[e]ducational and professional materials, whether or not registered for a copyright, that result from the instructional research, research, or public service activities of the institutions." The regulation further provided that employees shall be eligible to share in net royalty income from each invention in an amount not to exceed 50 percent of net royalty profits. Under

Page 12 - FINDINGS AND RECOMMENDATION

IMD 6.215(1):

> The Board reserves the ownership rights to all institutional work-related inventions, and to educational and professional materials developed with institutional resources, including the right to a free and irrevocable license for usage, and if desired, the licensing for use by others. The foregoing does not preclude an institution employee from granting copyright privileges to the publisher of a scholarly or professional journal when no compensation or royalty is involved.

IMD 6.230(1) provides:

> As part of the acceptance of the Notice of Appointment, each academic employee is obligated to comply with conditions of employment including agreement to assign rights to inventions conceived and materials developed while employed by the institution.

Educational and professional materials are defined as:

> Educational and professional materials to which these policies and procedures apply are those used or distributed primarily for the formal or informal instruction or education of professional or general students. Such materials may result from the instructional, research, or public service activities of employees.

IMD 6.210(2).

Because the NOAs are either unsigned, from an a inapplicable time period, and/or did not explicitly note the University policy, the University essentially asserts that Good and Kaminski were on notice of the requirement to assign intellectual property (regardless of any separate agreement regarding royalties) to it during their entire tenure with the University and that an explicit signed agreement to that effect is not necessary. See Response (#100) at pp. 12 (no writing requirement for employment contract); 13 (no signature requirement); 14-16 (university intellectual property policies enforceable without written contract or express notice of the policy). The intellectual property at issue with respect to the breach of contract claims is the DIBELS and IDEL copyrights. The

Page 13 - FINDINGS AND RECOMMENDATION

University relies on case law with respect to patents.[4] However, 17 U.S.C. § 204(a) provides:

> A transfer of copyright ownership, other than by operation of law, is not valid unless an instrument of conveyance, or a note or memorandum of the transfer, is in writing and signed by the owner of the rights conveyed or such owner's duly authorized agent.

This writing requirement

> is more stringent than traditional statutes of frauds. Unlike the latter, whose sole purpose is to "effectuate the parties' intent," the writing requirement aims "principally to protect authors from those claiming, contrary to the author's view of the facts, that he or she transferred rights in the work."[footnote omitted] In fact, Section 204's protection of authors extends even to "protecting authors [ ] from themselves if need be." [footnote omitted] It imposes a rigid default in favor of letting creators retain their interests in copyrighted work.

Tjeknavorian v. Mardirossian, 56 F.Supp.3d 561, 565 (S.D.N.Y. 2014).

Accordingly, the breach of contract and breach of the implied covenant and good faith and

---

[4] Patents may be assigned orally or by implication. See Dalzell v. Dueber Watch Case Mfg, 149 U.S. 315, 320 (1893) (oral agreement for assignment of the right to obtain patent may be enforced upon sufficient proof). The University, at oral argument, cited Enreach Technology, Inc. v. Embedded Internet Solutions, Inc., 403 F.Supp.2d 968 (N.D.Cal. 2005) for the proposition that a breach of contract action may be brought by an employer based on an agreement to assign a copyright. However, in that case the signed contract explicitly provided that the employee agrees to "assign to the Company all my right, title, and interest in and to any and all inventions, discoveries, developments, improvements, technology, trade secrets, computer programs, know-how, designs, formulas, original works of authorship, or any other confidential materials, data, information or instructions, technical or otherwise and whether or not patentable or copyrightable and whether or not reduced to practice relating to the Company's business (collectively referred to as 'Inventions') which I may solely or jointly conceive or develop or reduce to practice, or cause to be conceived or reduced to practice, during the period of time I am in the employ of the Company." Id. at 971. At best, the University in this case points to a notice, separate from any signed agreement, that Good and Kaminski will agree to assign educational and professional materials. This is insufficient to assign a copyright even if the court were to read the OAR as an agreement to assign rather than an agreement to agree (should the University proffer) to assign.

Page 14 - FINDINGS AND RECOMMENDATION

fair dealing[5] must fail for lack of a sufficient signed writing memorializing the agreement to assign the copyrights.[6] To the extent the University asserts a breach of related to trademarks, neither the NOAs or policies and regulations refer to trademarks. The IMDs and OARS only reference "copyrights," "professional and educational materials," technological improvements," and "inventions." The motion to dismiss the breach of contract claim should be granted and the entire Fifth Claim for Relief should be dismissed.[7]

### D. Breach of Fiduciary Duty Against Good and Kaminski

The University alleges that

> Pursuant to their work at the University, the University supported Drs. Good and Kaminski in the form of facilities, research funding and staff, and entrusted Drs. Good and Kaminski with the proper management of its federal research grants in the reasonable expectation that Drs. Good and Kaminski would use their superior knowledge, skill and expertise to act in good faith and with complete candor and undivided loyalty in connection with the University's research funds, the University's employees, the University's resources and the DIBELS and IDEL intellectual property.
> The University and Drs. Good and Kaminski had a special relationship of trust and confidence. Pursuant to this relationship, Drs. Good and Kaminski were under certain fiduciary duties to the University, including, without limitation, duties

---

[5] In the absence of an enforceable contract to assign the copyrights, a claim for breach of the covenant of good faith and fair dealing cannot be asserted. See Davis v Pacific Saw and Knife Co., 2008 WL 4319981 (D.Or. September 16, 2008) at *2 (In the absence of a contract between the parties one cannot assert a claim for breach of the covenant of good faith and fair dealing).

[6] In addition, the alleged agreement to assign copyrights applies to "educational and professional materials" which are those used or distributed primarily for the formal or informal instruction or education of professional or general students. This appears to apply to university students not the elementary students who benefit from DIBELS and IDEL.

[7] The motion to dismiss should also be granted for the additional reasons stated in plaintiffs' reply at pp. 14-24.

Page 15 - FINDINGS AND RECOMMENDATION

> of loyalty, trust, honesty and disclosure, which, among other things, required them not to misappropriate the University's resources for their own benefit, make full disclosure to the University of all material facts and to otherwise act in the utmost good faith and honesty toward the University in all matters connected with their work with the University.
> 
> The University relied upon Dr. Good and Dr. Kaminski to manage the University resources, University research, University training and University employees related to DIBELS and IDEL, and Dr. Good and Dr. Kaminski were bound to act in good faith and with due regard to the interests of the University.
> 
> Drs. Good and Kaminski acted in disregard of their fiduciary duty owed to the University by using government grants awarded to the University for their own benefit and for the benefit of DMG and the DMG Licensees.
> 
> Drs. Good and Kaminski acted in disregard of their fiduciary duty owed to the University by submitting false applications to register the DIBELS and IDEL intellectual property to the USPTO and the Copyright Office in DMG's name.
> 
> Drs. Good and Kaminski acted in disregard of their fiduciary duty owed to the University by revising the Education Use Agreement in the DIBELS 5th Edition and DIBELS 6th Edition to remove references to the University's ownership of the DIBELS intellectual property, by replacing these references in the Education Use Agreement with language reflecting DMG's ownership of the DIBELS intellectual property and by directing a University employee to post the revised Education Use Agreement on the University website, without the University's knowledge or consent.
> 
> Drs. Good and Kaminski acted in disregard of their fiduciary duty owed to the University by failing to notify the University of the Texas Litigation.
> 
> As a direct and proximate result of the actions taken by Dr. Good and Dr. Kaminski in breach of their fiduciary duty, the University has been damaged, and continues to be damaged in an amount to be determined at trial. Dr. Good and Dr. Kaminski's ongoing breach also is inflicting irreparable harm on the University.

Amended Answer at ¶¶ 238-247.

To recover for breach of fiduciary duty, the University must plead the existence of a fiduciary relationship. Evergreen West Bus. Ctr., LLC v. Emmert, 254 Or.App. 361, 367 (2012). A fiduciary duty exists under Oregon law only where the parties are in a "special relationship" in which one party is obliged to pursue the other party's best interests. Conway v. Pacific University, 324 Or. 231, 237 (1996). In determining whether such a relationship exists:

> The focus [of the inquiry] is not on the subject matter of the relationship, such as one party's financial future; nor is it on whether one party, in fact, relinquished control to

Page 16 - FINDINGS AND RECOMMENDATION

the other. The focus instead is on whether the nature of the parties' relationship itself allowed one party to exercise control in the first party's best interests. In other words, the law does not imply a tort duty simply because one party to a business relationship begins to dominate and to control the other party's financial future. Rather, the law implies a tort duty only when that relationship is of the type that, by its nature, allows one party to exercise judgment on the other party's behalf.

Bennett v. Farmers Ins. Co., 332 Or. 138 (2001).

Such relationships include certain professional relationships in which one party has a professional obligation to protect the interests of the other party, or contractual relationships of a kind that give rise to a status upon which the general law predicates a duty independent of the terms of the contract. Conway 324 Or. at 239.

As the court noted previously, whether a fiduciary duty exists will be a fact specific inquiry that probably should be addressed in a motion for summary judgment or at trial and not a motion to dismiss. Although there is no enforceable agreement requiring the assignment of the copyrights at issue, the court cannot determine at this stage whether a special relationship existed requiring Good and Kaminski to exercise the University's best interest with respect to the development, marketing, licensing, etc., of the materials developed, at least in part, with University resources or whether the University had other mechanisms in place to protect its interests vis-a-vis the development of such materials.[8] Accordingly, the motion to dismiss this claim should be denied.[9]

---

[8] Although the allegations of fraud with respect to misappropriation of grant funds could be clearer, the University does point to Dr. Good's own testimony that he used federal funds to create DMG, notes that Good also blurred funding for the DIBELS measures starting in 2006, and references specific webpages and email strings. The University also identifies the specific grants directed to DIBELS. The claim should not be dismissed at this stage for failure to comply with Rule 9.

[9] The court should also refuse plaintiffs' invitation to decline to hear the breach of fiduciary claim as a novel issue of Oregon law. The court can adequately determine whether the policies and regulations within the context of the employment relationship at issue give rise to a

Page 17 - FINDINGS AND RECOMMENDATION

## CONCLUSION

For the reasons stated above, counter-defendants' motion to dismiss, strike, or make more definite and certain (#93) should be granted in part and denied in part as noted above.

This recommendation is not an order that is immediately appealable to the Ninth Circuit Court of appeals. Any notice of appeal pursuant to Rule 4(a)(1), Federal Rules of Appellate Procedure, should not be filed until entry of the district court's judgment or appealable order. The parties shall have fourteen (14) days from the date of service of a copy of this recommendation within which to file specific written objections with the court. Thereafter, the parties shall have fourteen (14) days within which to file a response to the objections. Failure to timely file objections to any factual determination of the Magistrate Judge will be considered as a waiver of a party's right to de novo consideration of the factual issues and will constitute a waiver of a party's right to appellate review of the findings of fact in an order or judgment entered pursuant to this recommendation.

DATED this 29 day of February 2016.

THOMAS M. COFFIN
United States Magistrate Judge

---

fiduciary duty.

Page 18 - FINDINGS AND RECOMMENDATION